UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHICAGO VENTURE PARTNERS, L.P. an Illinois Limited Partnership, <br><br> Plaintiff, <br> v. <br><br> BRILLIANT TECHNOLOGIES CORPORATION, a Delaware Corporation, <br><br> Defendant. | **ECF CASE** <br><br> 07 Civ. 6571 (SAS) |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S APPLICATION FOR INJUNCTIVE RELIEF

DOAR RIECK KALEY & MACK
217 Broadway, Suite 707
New York, New York 10007
Tel: (212) 619-3730
Fax: (212) 962-5037
Attorneys for Plaintiff

By:   EDWARD SCARVALONE (ES-4880)
       JOHN F. KALEY (JK-3598)

## TABLE OF CONTENTS

Preliminary Statement ................................................................. 1

Facts .................................................................................. 1

ARGUMENT ............................................................................ 5

    THIS COURT SHOULD ENTER THE TEMPORARY RESTRAINING
    ORDER AND PRELIMINARY INJUNCTION PREVENTING THE
    TRANSFER OF SUBSTANTIALLY ALL OF BTC'S ASSETS
    WITHOUT PRIOR SHAREHOLDER APPROVAL ............................ 5

    A.    CVP is Likely to Succeed on the Merits ................................ 6

    B.    CVP and the other Shareholders of BTC Will Be Irreparably
        Harmed By the Proposed Transfer of the Qtrax Technology to
        Flooring Zone .................................................... 11

CONCLUSION ........................................................................ 13

# TABLE OF AUTHORITIES

**Cases:**

*B.S.F. Company v. Philadelphia Nat'l Bank*, 204 A.2d 746
  (Del. 1964) .................................................. 9

*Concerned Residents of Talyor-Wythe v. New York City Housing Authority*,
  96 Civ. 2349, 1996 WL 452432 (S.D.N.Y. 1996) ................ 12

*Consol. Gold Fields, PLC v. Minorco, S.A.*, 871 F.2d 252
  (2d Cir. 1989) .............................................. 12

*Gimbel v. Signal Cos.*, 316 A.2d 599 (Del. Ch. 1974) .......... 6,7,10,11,12

*Heubelin, Inc. v. FTC*, 539 F. Supp. 123 (D. Conn. 1982) ...... 12

*Hollinger Inc., v. Hollinger Int'l, Inc.*, 858 A.2d 342 (Del. Ch. 2004) ... 6,7,8,9

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70
  (2d Cir. 1979) .............................................. 5,11

*Katz v. Bregman*, 431 A.2d 1274 (Del. Ch. 1981) ............... 9

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.* 454 F.3d 108
  (2d Cir. 2000) .............................................. 5,11

*Metro Goldwyn-Mayer, Inc. v. Transamerica Corp.*, 303 F.Supp. 1344
  (S.D.N.Y. 1698) ............................................. 11,12

*Oberly v. Kirby*, 592 A.2d 445 (Del. 1991) .................... 6

*Studebaker Corp. v. Gittlin*, 360 F.2d 692 (2d Cir. 1966) ..... 12

*Thorpe v. CERBCO, Inc.*, 676 A.2d 436 (Del. Super Ct. 1996) ... 9

**Statutes:**

8 Del. Code Ann tit. 8, §271 .................................. 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHICAGO VENTURE PARTNERS, L.P., )
an Illinois Limited Partnership, )
 )
         Plaintiff, ) **ECF CASE**
         v. )
 ) 07 Civ. 6571 (SAS)
BRILLIANT TECHNOLOGIES CORPORATION, )
a Delaware corporation, )
 )
         Defendant. )

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S APPLICATION FOR INJUNCTIVE RELIEF

Plaintiff, CHICAGO VENTURE PARTNERS, L.P. ("CVP"), by and through its attorneys, Doar Rieck Kaley & Mack, respectfully submits this memorandum of law in support of its application for a temporary restraining order and preliminary injunction.

**Preliminary Statement**

CVP, a shareholder of defendant Brilliant Technologies Corporation ("BTC"), seeks emergency relief from this Court to prevent BTC, a Delaware corporation, from proceeding with its announced plans to transfer the Qtrax technology described below -- which constitutes substantially all of BTC's assets -- to another company without shareholder approval, in direct contravention of Delaware General Corporation Law § 271.

**Facts**

CVP is a shareholder of BTC and has been a substantial shareholder of BTC, having held and sold over 2.5 million shares in 2007. BTC, formerly known as

Advanced Technology Industries, Inc. ("ATI"), is a Delaware corporation with its principal place of business in New York, New York.

As described in the Form 10-QSB filed by BTC with the Securities and Exchange Commission ("SEC") on March 31, 2007, BTC's "principal business activity consists of the development of . . . Qtrax. Qtrax is a music file sharing technology-based internet service, which when available will provide consumers the ability at no charge to download music files." (Declaration of Edward Scarvalone, dated July 27, 2007 ("Scarvalone Dec."), Exhibit D thereto at F-8). In addition, as described in the Form 10-KSB for the year ended December 31, 2006, "[t]he Company's [BTC's] principal business activity consists of the development of a technology referred to as Qtrax." (Scarvalone Dec. Exhibit E at F-16). After years of development, Qtrax is now ready for market and is scheduled to be launched sometime in the third quarter of 2007. (*Id.* at 4).

Besides being BTC's principal business activity, Qtrax is also the Company's only significant revenue-generating asset. This fact is established by the Company's own SEC filings. Thus, in the Company's 10-KSB for the year ended December 31, 2006, the Consolidated Balance Sheet has a line item under Assets for Deferred Licenses and Other Fees totaling $1,326,500 (*id.* at F-2); a footnote to the Consolidated Financial Statements reflects that all or substantially all of these Deferred License Fees emanate from the Qtrax technology. (*Id.* at F-26 & F-27, Note 3).[1] The other assets on the Balance Sheet are non-revenue producing assets, such as property and equipment ($59,420) and sunk costs, such as capitalized software ($851,728); and a cash balance of only $86,927. (*Id.* at F-2).

---

[1] The Deferred License Fees are license fees that have been prepaid by BTC to the record companies from whom Qtrax's consumers will download music files. (*See id.* at F-26 & F-27). For accounting purposes, these prepaid license fees are treated as an asset of the Company. (*See id.* at F-26).

2

In short, the Balance Sheet reveals that the Qtrax technology is the only economically viable, productive, and revenue-generating asset of BTC.

BTC's most recently filed financial statements further supports this conclusion. In the Company's Form 10-QSB for the period ending March 31, 2007, the Balance Sheet lists total assets of $2,612,958 (Exhibit D at F-1); of this number, $339,947 is cash, and the only other productive assets to generate revenue are the Deferred License Fees emanating from the Qtrax technology ($1,068,470). (*Id.* at F-18 & F-19). Note 3 to the Consolidated Financial Statements makes clear that the revenues from the Deferred License Fees are the result of agreements entered into with such music industry giants as EMI Music Publishing ("EMI"), Sony/ATV Music, TVT Music Inc., Warner Music Inc. ("Warner"), and Universal Music Publishing Group ("Universal") with respect to the Qtrax technology. (*Id.* at F-18 & F-19); see also *supra* at 2.

Significantly, this Form 10-QSB reveals while BTC currently has negligible revenue ($9,862, *see id.* at F-2; *see also id.* at F-8 ("no significant revenue to date")), BTC expects that "substantially all" of its revenues going forward will derive from the Qtrax business (*id.* at F-10). BTC explained its economic forecast entirely in terms of its expectations for the Qtrax business:

> The Company expects that it will derive substantially all of its revenues for the sale of advertising on its Qtrax product. The Company anticipates to have four major advertising revenues streams: Click Ad [] revenues will be recognized when an ad that is placed in Qtrax is successfully 'Clicked' and linked to another website or area; Video revenues will be recognized when ads are played within the Qtrax product; Banner revenues will be recognized when an ad is displayed on the Qtrax site; and Imprint revenues will be recognized [once] the established number of time[s] an ad is to be shown is shown. Any prepaid advertising payments received will be treated as deferred revenues. (*Id.*).

The revenue from the Qtrax technology is expected to be considerable. According to a

June 25, 2007 news article, BTC projects Qtrax initial revenue to range from a low of $20,000,000 to a high of $175,000,000. (Scarvalone Dec. Exhibit G). Moreover, the article indicates that Qtrax's "size and service could not only be considered a legitimate threat to Apple's iTunes . . . but also a better economic proposition as well. . . ." (*Id.*). The article further notes that Qtrax has the support of all four major record labels – EMI, Sony/BMG, Warner, and Universal. (*Id.*).

Notwithstanding these favorable economic forecasts for the Qtrax business, and the fact that Qtrax is BTC's only viable, revenue-producing asset, BTC recently announced its intention to transfer Qtrax to a floor-covering company known as The Flooring Zone, Inc. ("Flooring Zone").[2] According to a Form 8-K recently filed by BTC, the Company entered into a non-binding letter of intent with Flooring Zone to "transfer *all* of the outstanding shares of [BTC's] wholly owned subsidiary, LTDnetwork, Inc. ("LTD"), which owns and operates the Qtrax technology and business, [to Flooring Zone] in exchange for newly issued Flooring Zone common stock, representing 80% of the then outstanding common stock of Flooring Zone." (*See* Scarvalone Dec. Exhibit F, dated June 22, 2007)) (emphasis added). BTC and FZI agreed to "use their reasonable best efforts to execute a definitive agreement within 45 days of the non-binding letter of intent" (*id.*) – *i.e.*, by August 3, 2007.

---

[2] According to its SEC filing for calendar year 2006, Flooring Zone was incorporated on May 5, 2003 and is in the retail floor-covering business. (Scarvalone Dec. Exhibit H, at 3). Shortly thereafter, on May 13, 2003, it acquired The Flooring Zone of Georgia, Inc., which was founded in 2000, and had been operating in the retail floor-covering industry since its inception. (*Id.*). As of the SEC filing, Flooring Zone operated one retail flooring store in southern Georgia and its executive offices are located in Brunswick, Georgia. (*Id.*).

4

BTC's transfer of LTD shares would constitute a transfer of substantially all of BTC's assets, which, under Delaware corporate law, requires shareholder approval. *See infra* at 6. CVP has made written demand that BTC obtain shareholder approval of the contemplated transfer, but BTC has ignored that demand. (Scarvalone Dec. ¶ 10). BTC has not sought, and apparently does not intend to seek, shareholder approval of this transfer of substantially all of its assets.

Accordingly, emergency relief is needed to prevent BTC from transferring substantially all of its assets to another company without shareholder approval in direct contravention of Delaware corporate law.

## ARGUMENT

### THIS COURT SHOULD ENTER THE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PREVENTING THE TRANSFER OF SUBSTANTIALLY ALL OF BTC'S ASSETS WITHOUT PRIOR SHAREHOLDER APPROVAL

A preliminary injunction should be granted when the plaintiff establishes (1) irreparable harm will result should the injunction not be granted, and (2) either a likelihood of success on the merits, or a sufficiently serious question going to the merits to make them a fair ground for trial with a balance of hardships tipping in plaintiff's favor. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 113-14 (2d Cir. 2006); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (*per curiam*).

As is set forth below, CVP establishes both elements. CVP should therefore be granted a temporary restraining order and preliminary injunction restraining and enjoining BTC from transferring the Qtrax technology without first obtaining shareholder approval at a properly called shareholder's meeting.

5

A.     **CVP is Likely to Succeed on the Merits.**

CVP is likely to succeed on the merits of that claim because, under Delaware corporate law, BTC is under an express duty to obtain shareholder approval before transferring substantially all of its assets. Specifically, Section 271 of Title 8 of Delaware's General Corporation Law provides that:

> Every corporation may at any meeting of its board of directors or governing body sell, lease or exchange all or substantially all of its property and assets . . . upon such terms and conditions and for such consideration . . . including shares of stock in, and or securities of, any other corporation or corporations, as its board of directors or governing body deems expedient, **when as authorized by a resolution adopted by the holders of a majority of the outstanding stock of the corporation entitled to vote thereon[.]** 8 Del Code Ann. tit. 8, §271 (emphasis supplied).

In short, Delaware law requires shareholder approval where, as here, the company seeks to sell "substantially all" of its assets. *Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 376 (Del. Ch. 2004); *Gimbel v. Signal Cos.*, 316 A.2d 599, 605 (Del. Ch. 1974).

In evaluating whether a given transaction constitutes the sale of "substantially all" assets, Delaware courts apply a two-part test that examines the "particular qualitative and quantitative characteristics of the transaction at issue." *Hollinger*, 858 A.2d at 377; *Oberly v. Kirby*, 592 A.2d 445, 464 (Del. 1991) ("[S]hareholder . . . approval is to be measured not by the size of a sale alone, but also by its qualitative effect upon the corporation."). More precisely, Delaware law requires a "contextual approach" that focuses "upon whether a given transaction involves the sale 'of assets quantitatively vital to the operation of the corporation and is out of the ordinary and substantially affects the existence and purpose of the corporation.'" *Hollinger Inc.*, 858 A.2d at 377 *(citing Gimbel*, 316 A.2d at 606). In short, the "unusual nature of the transaction must strike at

6

the heart of the corporate existence and purpose." *Gimbel*, 316 A.2d at 606.

The contemplated transaction here satisfies both parts of this test. With respect to the "qualitative" component, it should be noted that the broad purpose behind Section 271 is to give the owners a vote with respect to a dispositive transaction that fundamentally changes the character and assets of the company they own. *Id.* ("the purpose of the consent statutes is to protect the shareholders from fundamental change, or more specifically to protect the shareholder from the destruction of the means to accomplish the purposes or objects for which the corporation was incorporated and actually performs," *quoting* 6A Fletcher, *Cyclopedia Corporations*, § 2949). In the instant case, the contemplated transaction would change BTC in a fundamental way. BTC is in the music file-sharing and advertising business and related technology business; by contrast, Flooring Zone -- the contemplated transferee of the Qtrax subsidiary, and the company in which BTC would obtain a majority position, *see supra* at 4 -- is in the retail floor-covering business, *id.* To permit the transfer of the Qtrax subsidiary in exchange for a majority position in a floor-covering company would fundamentally change the character of the investment that the owners of BTC signed up for. *See Hollinger*, 858 A.2d at 377; *Gimbel*, 316 A.2d at 606.

Of even greater significance is the fact that BTC has repeatedly acknowledged in its public filings with the SEC that its "principal business activity consists of the development of . . . Qtrax." *See supra* at 2; (Exhibit D at F-8; Exhibit E at F-16). BTC's own statements establish that BTC is a single asset corporation. *See supra* at 2-3. If this transaction were to be consummated, BTC would, by a "one transaction revolution . . . sell the entire means of operating its business[.]" *Gimbel*, 316 A.2d at 608. This

transaction thus strikes at the very heart of BTC's existence. Moreover, the interest that BTC shareholders currently have in BTC, a technology company, would be converted into a majority position in a floor-covering business, *see supra* at 4, thus leaving the shareholders with "an investment that in economic terms is qualitatively different than the one that they now possess." *Hollinger,* 858 A.2d at 384.

With regard to the "quantitative" characteristics of the proposed transfer, *Hollinger*, 858 A.2d at 377, the Qtrax business plainly constitutes an asset "quantitatively vital to the operation of [BTC]," *id.* Indeed, BTC has acknowledged repeatedly in its public filings that it will derive "substantially all" of its revenues from the Qtrax product. *See supra* at 3. The recent press account of June 25, 2007 projects that Qtrax initial revenue will range from between $20,000,000 and $175,000,000, and further projects that Qtrax's "size and service could not only be considered a legitimate threat to Apple's iTunes... but also a better economic proposition as well...." *Id.* Further underscoring Qtrax's viability and expected profitability is the fact that Qtrax has the support of all four major recording companies, and has entered into licensing agreements with each of them. *See id.*

Moreover, if the Qtrax business is sold, BTC will essentially render itself insolvent, as none of its other assets generate any revenue. *See supra* at 2-3. BTC's own financial statements indicate that the Company is virtually insolvent. In Item 2 to the Company's Consolidated Financial Statements disclosed in the Company's Form 10-QSB for the first quarter of 2007, the Company states that there is "substantial doubt" about the Company's ability to continue as a going concern," noting that, as of March 31, 2007, "the Company had an accumulated deficit since inception of $52,437,606 and a

8

working capital deficiency and stockholder's deficiency of $21,598,529 and $19,583,195 respectively." (Exhibit D at 2).

In essence, after sinking millions of dollars into the development of Qtrax, BTC now seeks to deprive its shareholders of resulting profits and royalties to be reaped from the marketing of this asset by doing an end-run around Delaware corporate law and transferring Qtrax to another corporate entity without shareholder approval. Such brazen corporate action is improper and should not be tolerated.

In circumstances less compelling than those here, Delaware courts have held shareholder approval was required because the sale constituted a sale of substantially all of the company's assets. *See Thorpe v. CERBCO, Inc.,* 676 A.2d 436, 444 (Del. Super. Ct. 1996) (with respect to a holding company that was comprised of three subsidiaries, court held that shareholder approval was required for the sale of one of the three subsidiaries because it represented 68% of the company's assets and was the company's "primary income generating asset"); *Katz v. Bregman,* 431 A.2d 1274, 1275 (Del. Ch. 1981) (Canadian operations represented 51% of company's assets, 52.4% of its pretax net operating income, and 44.9% of the company's sales' revenues); *see also B.S.F. Company v. Philadelphia Nat'l. Bank,* 204 A.2d 746, 750 (Del. 1964) (sale of more than 75% of the total assets of the company and the only "substantial income producing asset" was a sale of "substantially all" for purposes of indenture).

A review of cases where courts found the sale did not constitute a sale of "substantially all" the assets, and consequently did not require shareholder approval, is equally instructive here. For example, in *Hollinger* the sale of a subsidiary accounting for 56-57% of company's asset value but less than 50% of the company's revenues did

9

not trigger Section 271 because the company was left with a vital economic asset. 858 A.2d at 380-385. In support of its decision, the court noted "if the portion of the business not sold constitutes a substantial, viable, ongoing component of the corporation, the sale is not subject to Section 271." *Id.* at 385. By contrast, here, if the Qtrax subsidiary is transferred, BTC will be left, quantitatively and qualitatively, with no substantial or viable asset; indeed, BTC will be bereft of any productive asset to generate any type of revenue whatsoever. *See supra* at 2-3, 8-9. In addition, the fundamental character of the Company will change from being a company that owns and manages a viable music file-sharing business recognized by major players in the music industry, to a company that owns nothing but the shares of a publicly-traded shell that is involved in the flooring business. *See supra* at 3-4.

*Gimbel* is also instructive. In *Gimbel*, the court declined to find the sale constituted substantially all of the assets where the assets being sold constituted only 26% of total assets, 41% of net worth, and produced only 15% of revenues and earnings of company. 316 A.2d at 607. By contrast, here BTC has repeatedly stated in its SEC filings that the Company expects all or substantially all of its revenues in the near term to come from the economic viability of the Qtrax technology. *See supra* at 3; (*see also* Exhibit E at F-18).

Because the sale by BTC of its principal revenue-generating asset (*i.e.*, the Qtrax technology) constitutes a sale of substantially all of its assets under Delaware corporate law, BTC is under an express duty to obtain shareholder approval before transferring

10

substantially all of its assets. Because BTC failed to do so, CVP is likely to succeed on the merits.

At a minimum, these facts present a sufficiently serious question going to the merits to make them a "fair ground for trial," *Louis Vuitton Malletier*, 454 F.3d at 113-14; *Jackson Dairy*, 596 F.2d at 72. Accordingly, CVP is entitled to a preliminary injunction if the balance of the hardships tips in its favor. *Louis Vuitton Malletier*, 454 F.3d at 113-14; *Jackson Dairy*, 596 F.2d at 72. Here, the balance of the hardships plainly weighs in CVP's favor. The injunctive relief that CVP requests would do no more than require BTC to refrain from transferring substantially all of its assets until the matter has been properly submitted to the shareholders for a vote and approved by a majority of the shareholders in accordance with Delaware law. By contrast, if the preliminary injunction were not granted then BTC would be free to finalize its agreement and transfer the Qtrax technology to Flooring Zone, thereby leaving CVP in the difficult position of attempting to undo the corporate transfer after-the fact. *See infra* at 11-12. The temporary restraining order and preliminary injunction should therefore issue.

**B.      CVP and the other Shareholders of BTC Will Be Irreparably Harmed By the Proposed Transfer of the Qtrax Technology to Flooring Zone.**

Unless BTC is preliminarily enjoined from transferring the Qtrax technology, CVP and other shareholders of BTC will be irreparably harmed. Once BTC's primary asset has been transferred to another corporation, the BTC shareholders will be unable, as a practical matter, to undo the transfer or obtain the return of that asset. "[T]he imminent threat of the closing of the sale does present a situation where it may be impossible to 'unscramble the eggs.'" *Gimbel v. Signal Cos.*, 316 A.2d 599, 603 (Del. Ch. 1974) (citing *Metro Goldwyn-Mayer, Inc. v. Transamerica Corp.*, 303 F. Supp. 1344, 1348

11

(S.D.N.Y. 1968)). While the Court doubtless has the power to rescind an unlawful corporate transfer, there are practical "obstacles" encountered in undoing such a transfer, *Gimbel*, 316 A.2d at 603, including "tax consequences, accounting practices, business reorganizations, management decisions concerning capital investments, dividends, etc. and a host of other problems which as a practical matter will make rescission very difficult indeed." *Id.* The likely inability to undo the transfer of the Qtrax technology after-the-fact constitutes irreparable harm, and argues in favor of a preliminary injunction preserving the status quo by enjoining the transaction. *Gimbel*, 316 A.2d at 603; *Consol. Gold Fields, PLC v. Minorco, S.A.*, 871 F.2d 252, 261 (2d Cir. 1989) (tender offer); *Metro Goldwyn-Mayer*, 303 F. Supp. at 1348 (merger).

Indeed, BTC's threatened violation of Delaware Corporate Law, by itself, demonstrates irreparable harm. In enacting Section 271, the Delaware legislature has implicitly stated that violation of the shareholder-meeting requirement causes harm to those affected and to the public at large; violation of such a statutory command thus warrants a finding of irreparable harm. *Concerned Residents of Taylor-Wythe v. New York City Housing Authority*, 96 Civ. 2349, 1996 WL 452432, *3 (S.D.N.Y. Aug. 9, 1996) (violation of tenant-meeting requirement enacted by New York legislature); *Heublein, Inc. v. FTC*, 539 F. Supp. 123, 128 (D. Conn. 1982) (violation of congressional statute); *see also Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2d Cir. 1966) ("[a] plaintiff asking [sic] an injunction because of the defendant's violation of a statute is not required to show that otherwise rigor mortis will set in").

12

## CONCLUSION

For all the reasons discussed above, a temporary restraining order should be issued immediately restraining and enjoining defendant, BRILLIANT TECHNOLOGY CORPORATION, including but not limited to any officer, employee, agent or other representative of BTC, from directly or indirectly transferring the Qtrax technology without first obtaining shareholder approval at a properly called shareholder's meeting. The Court should also continue the temporary restraining order at the hearing on the preliminary injunction.

Dated:   New York, New York
        July 27, 2007

                Respectfully submitted,

                DOAR RIECK KALEY & MACK
                Attorneys for Plaintiff

By:   _/s/ Edward Scarvalone_
      EDWARD SCARVALONE (ES-4880)
      JOHN F. KALEY
      217 Broadway, Suite 707
      New York, New York 10007
      Tel:   (212) 619-3730
      Fax:   (212) 962-5037