# EXHIBIT D

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCQYEVQgBAQICAfEDSgAwRwJAW2sNKK9AVtBzYZmr6aG1lWyK3XmZv3dTINen
 TWSM7Vrz1ADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 ElochNFOJPTy/AO8akCRla1GWVDpj3E/2XV9DE4kFA167NJbiAmz7A98YcZan8qn
 fmY1eifKJugs8e2ADKxsNWQ==
```

```
<SEC-DOCUMENT>0001019687-07-001581.txt : 20070521
<SEC-HEADER>0001019687-07-001581.hdr.sgml : 20070521
<ACCEPTANCE-DATETIME>20070521170836
ACCESSION NUMBER:          0001019687-07-001581
CONFORMED SUBMISSION TYPE:  10QSB
PUBLIC DOCUMENT COUNT:      3
CONFORMED PERIOD OF REPORT: 20070331
FILED AS OF DATE:           20070521
DATE AS OF CHANGE:          20070521

FILER:

    COMPANY DATA:
        COMPANY CONFORMED NAME:            Brilliant Technologies, CORP
        CENTRAL INDEX KEY:                 0001054825
        STANDARD INDUSTRIAL CLASSIFICATION: INVESTORS, NEC [6799]
        IRS NUMBER:                        134000208
        FISCAL YEAR END:                   1231

    FILING VALUES:
        FORM TYPE:                         10QSB
        SEC ACT:                           1934 Act
        SEC FILE NUMBER:                   000-23761
        FILM NUMBER:                       07868623

    BUSINESS ADDRESS:
        STREET 1:                          211 MADISON AVE #28B
        CITY:                              NEW YORK
        STATE:                             NY
        ZIP:                               10016
        BUSINESS PHONE:                    212-532-2736

    MAIL ADDRESS:
        STREET 1:                          211 MADISON AVE #28B
```

```
                    CITY:                        NEW YORK
                    STATE:                       NY
                    ZIP:                         10016

        FORMER COMPANY:
                    FORMER CONFORMED NAME:       ADVANCED TECHNOLOGY INDUSTRIES INC
                    DATE OF NAME CHANGE:         20000515

        FORMER COMPANY:
                    FORMER CONFORMED NAME:       KURCHATOV RESEARCH HOLDINGS LTD /DE/
                    DATE OF NAME CHANGE:         20000114

        FORMER COMPANY:
                    FORMER CONFORMED NAME:       ABERDEEN ACQUISITION CORP /DE/
                    DATE OF NAME CHANGE:         19980206

</SEC-HEADER>
<DOCUMENT>
<TYPE>10QSB
<SEQUENCE>1
<FILENAME>brilliant_10qsb-033107.txt
<DESCRIPTION>QUARTERLY REPORT
<TEXT>
<PAGE>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-QSB

(Mark One)

[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES
EXCHANGE ACT OF 1934.

For the quarterly period ended March 31, 2007

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES
EXCHANGE ACT OF 1934.

For the transition period from _____ to _____

COMMISSION FILE NUMBER 0-230761

BRILLIANT TECHNOLOGIES CORPORATION
------------------------------------------
(Exact name of small business issuer as specified in its charter)

District of Delaware                              13-4000208
-----------------------                          ------------
(State or other jurisdiction of                  (I.R.S. Employer
incorporation or organization)                   Identification No.)

211 Madison Avenue #28B
New York, New York 10116
------------------------
(Address of principal executive offices)

212-532-2736
------------
(Issuer's telephone number)

Check whether the issuer (1) filed all reports required to be filed by Section
13 or 15(d) of the Securities Exchange Act of 1934 during the past 12 months (or
for such shorter period that the registrant was required to file such reports),
and (2) has been subject to such filing requirements for the past 90 days.
Yes [X] No [ ]

Indicate by check mark whether the registrant is a shell company (as defined in
Rule 12b-2 of the Exchange Act)
Yes [ ] No [X]

The number of outstanding shares of the issuer's only class of common stock as
of May 16, 2007 was 657,317,311.

TRANSITIONAL SMALL BUSINESS DISCLOSURE FORMAT (CHECK ONE):
Yes [ ] No [X]

<PAGE>
<TABLE>
<S>                                                              <C>
          BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
                    (A Development Stage Company)

                       INDEX TO FORM 10-QSB
                          March 31, 2007

Page Nos.
--------

PART I - FINANCIAL INFORMATION

ITEM 1 - FINANCIAL STATEMENTS

CONDENSED CONSOLIDATED BALANCE SHEET (unaudited)
    At March 31, 2007                                                    F-1

CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (unaudited)
    For the Three Months Ended March 31, 2007 and 2006 and
    For the Period from Inception (October 31, 1999) to March 31, 2007   F-2

CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY (unaudited)
    For the Three Months Ended March 31, 2007                           F-3

CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS (unaudited)
    For the Three Months Ended March 31, 2007 and 2006 and
    For the Period from Inception (October 31, 1999) to
    March 31, 2007                                                      F-4

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (unaudited)       F-6

ITEM 2 - PLAN OF OPERATION                                               2

ITEM 3 - CONTROL AND PROCEDURES                                         5

PART II - OTHER INFORMATION

ITEM 1 - LEGAL PROCEEDINGS                                              5

ITEM 2 - UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS    6

ITEM 3 - DEFAULTS UPON SENIOR SECURITIES                                6

ITEM 4 - SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS            6

ITEM 5 - OTHER INFORMATION                                              6

ITEM 6 - EXHIBITS                                                       6

<PAGE>

1

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONDENSED CONSOLIDATED BALANCE SHEET

At March 31, 2007
(unaudited)

ASSETS
------

| Current Assets: | |
| --- | --- |
| Cash | $    339,947 |
| Prepaid expenses and other current assets | 257,677 |
| | ---------- |
| Total Current Assets | 597,624 |
| Property and equipment, net | 63,638 |
| Deferred licenses and other fees, net | 1,068,470 |
| Deferred financing costs, net | 18,293 |
| Capitalized software | 851,728 |
| Other assets | 13,205 |
| | ---------- |
| TOTAL ASSETS | $  2,612,958 |
| | ========== |

LIABILITIES AND STOCKHOLDERS' DEFICIENCY
----------------------------------------

| CURRENT LIABILITIES: | |
| --- | --- |
| Notes payable, including related parties of $27,468 | $  4,073,446 |
| Convertible debentures, net of debt discount of $39,518 | 1,720,482 |
| Accrued liabilities | 7,025,325 |

```
Accrued minimum royalties                                              1,150,667
Due to related parties                                                 1,574,528
Derivative liabilities for conversion options and warrants             6,651,705
                                                                      ------------
        TOTAL LIABILITIES                                             22,196,153

COMMITMENTS AND CONTINGENCIES

STOCKHOLDERS' DEFICIENCY:
   Preferred stock - $.001 par value; 1,000,000 shares authorized;
     - 0 - shares issued and outstanding                                     --
   Common stock - $.0001 par value; 800,000,000 shares authorized;
     640,844,081 issued and outstanding                                  64,083
   Additional paid-in capital                                         32,817,194
   Accumulated other comprehensive income                                (26,866)
   Deficit accumulated during the development stage                   (52,437,606)
                                                                      ------------
        TOTAL STOCKHOLDERS' DEFICIENCY                               (19,583,195)
                                                                      ------------
        TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIENCY              $  2,612,958
                                                                      ============
```

See Notes To Condensed Consolidated Financial Statements.

                                   F-1

<PAGE>

              BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
                         (A Development Stage Company)

              CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
                               (unaudited)

                                                              For the Period
                                                              from Inception
                                                             (October 31, 1999)
                                                                    to
                          For the Three Months Ended

|  | March 31, 2007 | March 31, 2006 | March 31, 2007 |
|---|---|---|---|
| REVENUE | $ -- | $ -- | $ 9,862 |
| OPERATING COSTS: | | | |
| Research and development | 378,326 | 166,476 | 3,554,924 |
| In-process research and development | -- | -- | 23,224,695 |
| Consulting fees | 298,805 | 390,792 | 10,107,741 |
| General and administrative, including compensatory element of stock issuances of $154,333 and $1,069,398 for the three months ended March 31, 2007 and 2006, respectively | 887,708 | 1,566,436 | 16,781,161 |
| Depreciation and amortization | 8,146 | 7,573 | 364,621 |
| Settlement provision | -- | -- | 2,200,000 |
| TOTAL OPERATING COSTS | 1,572,985 | 2,131,277 | 56,233,142 |
| LOSS FROM OPERATIONS | (1,572,985) | (2,131,277) | (56,223,280) |
| Derivative gains, net | (3,476,925) | (8,919,806) | (18,756,139) |
| Interest and amortization of debt costs and stock issuances for interest of $500,000 and $1,492,768 for the three months ended March 31, 2007 and 2006, respectively | 3,170,627 | 2,263,268 | 14,909,301 |
| Other (income) expense | (10,751) | (12,515) | 61,164 |
| NET (LOSS) INCOME | $ (1,255,936) | $ 4,537,776 | $ (52,437,606) |
| Basic net (loss) income per common share | $ (0.00) | $ 0.02 | |
| Diluted net (loss) income per common share | $ (0.00) | $ 0.01 | |

| | | |
|---|---|---|
| Weighted average number of shares outstanding – Basic | 626,467,966 | 280,693,220 |
| Weighted average number of shares outstanding – Diluted | 626,467,966 | 446,802,925 |

See Notes To Condensed Consolidated Financial Statements.

F-2

<PAGE>

## BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
### (A Development Stage Company)

### CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

### For the three months ended March 31, 2007

| | Common Stock | | Additional Paid In Capital | Unearned Compensation | Accumulated Other Comprehensive Income (Loss) | Accumulated During the Development Stage | Total Stockholders' Comprehensive Deficiency | Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | |
| Balance at January 1, 2007 | 625,849,751 | $62,584 | $32,146,193 | $(154,333) | $40,469 | $(51,181,670) | $(19,086,757) | - |
| Conversion of accrued liability into stock | 750,000 | 75 | 36,925 | - | - | - | 37,000 | |
| Conversion of convertible debenture and interest | 4,244,330 | 424 | 74,576 | - | - | - | 75,000 | |
| Issuance of common stock in connection with financing | 10,000,000 | 1,000 | 499,000 | - | - | - | 500,000 | |
| Conversion of note | - | - | - | - | - | - | - | |
| Reclassification of Debenture Options | | | | | | | | |

| | | | |
|---|---|---|---|
| From Derivative liabilities | $ 60,500 | 60,500 | |
| Amortization of Unearned Compensation | $ 154,333 | 154,333 | — |

COMPREHENSIVE INCOME:

| | | | | |
|---|---|---|---|---|
| NET LOSS | | $ (1,255,936) | (1,255,936) | (1,255,935.52) |
| FOREIGN CURRENCY TRANSLATION ADJUSTMENT | — | $ (67,335) | (67,335) | (67,335.00) |
| COMPREHENSIVE INCOME: | — | (26,866) | (52,437,606) (19,583,195) | (1,323,271) |

| | | |
|---|---|---|
| 640,844,081 | 64,083 | 32,817,194 |

See notes to condensed consolidated financial statements.

F-3

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(Unaudited)

| | For the Three Months Ended March 31, | | For the Period from Inception (October 31, 1999) to March 31, |
|---|---|---|---|
| | 2007 | 2006 | 2006 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Net (loss) income | $ (1,255,936) | $ 4,537,776 | $ (52,437,606) |
| Adjustments to reconcile net (loss) income to net cash used in operating activities: | | | |
| Acquired in process technology | (3,476,925) | — | 23,224,695 |
| Gain on derivative liabilities | — | (8,919,806) | (18,756,139) |

| | | |
|---|---:|---:|---:|
| Stock-based costs | 154,333 | 2,562,166 | 13,165,854 |
| Accrued settlement provision | -- | -- | 2,800,000 |
| Amortization of license | 258,030 | -- | 598,030 |
| Depreciation and amortization | 8,146 | 7,573 | 364,621 |
| Loss on sale of investment | -- | -- | 88,927 |
| Non-cash charges for finance and consulting | 500,000 | 76,333 | 1,337,000 |
| Amortization of deferred financing costs | 29,315 | -- | 379,626 |
| Write-off of fixed assets | -- | -- | 11,068 |
| Debt discount amortization | 2,306,280 | 417,683 | 7,486,532 |
| Changes in Operating Assets and Liabilities: | | | |
| Prepaid expenses and other current assets | (141,032) | 7,589 | (521,765) |
| Other assets | (-) | -- | (13,207) |
| Accrued liabilities | 288,741 | 332,522 | 4,355,767 |
| Net Cash Used in Operating Activities | (1,329,048) | (978,164) | (18,516,597) |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| Proceeds from sale of ATI stock prior to merger | -- | (-) | 460,000 |
| Capitalized software costs | -- | -- | (804,075) |
| Advances to ATI prior to merger | -- | -- | (2,443,619) |
| Proceeds of sale of investments | -- | -- | 21,019 |
| Capital expenditures | (-) | -- | (347,246) |
| Net Cash Used in Investing Activities | (-) | (-) | (3,114,721) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Proceeds from issuance of common stock | -- | -- | 10,507,733 |
| Capitalized financing costs | -- | (22,500) | (423,382) |
| Exercise of warrants | -- | 368,510 | 2,357,897 |
| Proceeds from loans (net) | 1,305,000 | 750,000 | 8,693,285 |
| Repayment of loans | (106,500) | -- | (719,394) |
| Due from (to) related parties, net | 383,568 | (106,580) | 1,555,126 |
| Net Cash Provided by Financing Activities | 1,582,068 | 989,430 | 21,971,265 |
| Increase (Decrease) in Cash | 253,020 | 11,266 | 339,947 |

| | | | |
|---|---|---|---|
| Cash – Beginning of Period | 86,927 | 44,281 | -- |
| Cash – End of Period | $  339,947 | $  55,547 | $  339,947 |

See Notes To Condensed Consolidated Financial Statements.

F-4

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
(Unaudited)

| | For the Three Months Ended March 31, | | For the Period from Inception (October 31, 1999) to March 31, |
|---|---|---|---|
| | 2007 | 2006 | 2007 |
| Interest paid | $  -- | $  -- | $  -- |
| Income taxes paid | $  -- | $  -- | $  -- |
| Non-Cash Investing and Financing Transactions: | | | |
| Conversion of debt and related interest | $  75,000 | $  1,303,185 | $  3,864,410 |
| Exercise of warrants satisfied by reduction in related party | $  -- | $  -- | $  460,653 |
| Conversion of advances to affiliate | $  -- | $  -- | $  1,655,000 |
| Conversion of accrued liabilities | $  37,000 | $  -- | $  3,252,176 |
| Reclassification of derivative liability | $  60,501 | $  114,117 | $  21,659,983 |
| Offering costs satisfied by transfer of ATI stock | $  -- | $  -- | $  (125,000) |
| Deferred license fee and related liability | $  -- | $  -- | $  1,444,000 |

See Notes To Condensed Consolidated Financial Statements.

</TABLE>

F-5

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 1 - BUSINESS, REVERSE MERGER AND BASIS OF PRESENTATION

REVERSE MERGER

On December 15, 2004 (the "Closing Date"), Brilliant Technologies Corporation
("BLLN") (formerly Advanced Technology Industries, Inc. ("ATI")) consummated the
acquisition of all of the issued and outstanding shares of capital stock of
LTDnetwork, Inc., a Delaware corporation ("LTDN"), LTDN and BLLN collectively
are referred to herein as "the Company".

LTDN and its wholly-owned Australian subsidiary, LTD Network PTY LTD ("LTD
PTY"), are development stage companies and their efforts have been primarily
devoted to technology identification and acquisition, research and development
and raising capital, LTDN and LTD PTY specialize in the development of
innovative technologies, software and services for online e-tailers,
advertising, media and marketing companies.

The acquisition was consummated pursuant to the Amended and Restated Agreement
and Plan of Merger, dated as of August 11, 2004, among BLLN, LTDN and LTDN
Acquisition Corp., a Delaware corporation and a wholly owned subsidiary of BLLN
("Acquisition Sub"), as amended by the First Amendment thereto, dated as of
December 15, 2004, among BLLN, LTDN and Acquisition Sub. Such acquisition was
effected pursuant to a merger (the "Merger") of LTDN with and into Acquisition
Sub. Pursuant to the terms of the Merger and taking into account the purchase
price adjustment in connection therewith, BLLN issued to the stockholders of
LTDN consideration (the "Merger Consideration") consisting of (i) 193,336 shares
of Series A Convertible Preferred Stock of BLLN ("Series A Preferred Stock") and
(ii) warrants (the "Warrants") to purchase 487,903 shares of Series A Preferred

Stock at an exercise price of $16.33 per share. The exercise period with respect to the Warrants expired on June 18, 2006. The board of directors determined to extend the exercise period of the Warrants subject to the Company having a sufficient number of authorized shares of common stock of the Company ("Common Stock") available to be issued upon the exercise of the Warrants. As a result, the definition of "Exercise Period" in the Warrant Agreement relating to the Warrants has been amended as follows:

"Exercise Period" means the period commencing on the date the Merger is consummated and terminating on June 18, 2006 and the period commencing on the date (the "Second Commencement Date") LTDN files with the Delaware Secretary of State an amendment to BLN's Certificate of Incorporation to increase the authorized capital stock of BLN in an amount equal to the greater of (x) 1,300,000,000 shares of Common Stock and (y) 120% of the sum of (A) the outstanding number of shares of Common Stock on the Second Commencement Date, (B) with respect to securities of LTDN that are convertible or exercisable into shares of Common Stock (including the Warrants), the number of shares of Common Stock that are issuable upon the conversion or exercise of such securities on the Second Commencement Date and (C) without duplication of securities referenced in clause (B) above, the number of shares of Common Stock that LTDN is obligated to issue pursuant to any binding obligation of LTDN in effect as of the Second Commencement Date and terminating (i) with respect to 25% of the aggregate Warrants under this Agreement, at 5:00 p.m. on the 60th day following the Second Commencement Date, (ii) with respect to 25% of the aggregate Warrants under this Agreement, at 5:00 p.m. on the 90th day following the Second Commencement Date, (iii) with respect to 25% of the aggregate Warrants under this Agreement, at 5:00 p.m. on the 120th day following the Second Commencement Date and (iv) with respect to 25% of the aggregate Warrants under this Agreement, at 5:00 p.m. on the 150th day following the Second Commencement Date; provided that if the Second Commencement Date does not occur prior to December 31, 2006, the Exercise Period shall terminate on December 31, 2006, as amended. As of April 15, 2007, BLN has not filed such an amendment to its Certificate of Incorporation.

<PAGE>

F-6

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 1 - BUSINESS, REVERSE MERGER AND BASIS OF PRESENTATION (CONTINUED)

REVERSE MERGER (CONTINUED)

The terms of the Series A Preferred Stock provided that each share of Series A Preferred Stock would automatically convert into 400 shares of Common Stock when the holders of the Common Stock approved an amendment to the certificate of incorporation of the Company to increase the authorized capital stock from 100,000,000 shares to at least 500,000,000 shares. The holders of the Common Stock approved such amendment at the Company's annual meeting of stockholders held on September 26, 2005 to increase the number of authorized shares of Common Stock to 500,000,000 and the Company filed such amendment with the Secretary of State of the State of Delaware on September 27, 2005. As a result, all shares of the Series A Preferred Stock were converted into shares of Common Stock and the corresponding Warrants became Warrants to purchase shares of Common Stock at approximately $0.04 per share.

BLLN agreed to file a registration statement with the Securities and Exchange Commission ("SEC") relating to the resale of the shares of Common Stock issuable upon conversion of the Series A Preferred Stock issued in the Merger. The Company has filed such registration statement and it became effective on January 26, 2006. The Company has agreed to keep such registration statement effective until the earliest of (a) the sale of all securities eligible to be sold thereunder, (b) the expiration of the period referred to in Rule 144(k) under the Securities Act of 1933 and (c) two years from the effective date of such registration statement. The use of such registration statement has been suspended by the Company until it files a post-effective amendment thereto updating certain information contained therein.

Since immediately following the Merger the former stockholders of LTDN owned a majority of the Common Stock (assuming the conversion of all the shares of the Series A Preferred Stock and the exercise of all the Warrants, in each case issued to such stockholders) and the management of LTDN controlled the Board of Directors of the Company, the Merger has been accounted for as a reverse merger with LTDN as the acquirer of BLLN. The accompanying consolidated financial statements of the Company reflect the historical results of LTDN, and the consolidated results of operations of BLLN subsequent to the Closing Date.

The common stock of LTDN has been retroactively restated to reflect the recapitalization and merger transactions discussed above.

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the

United States of America for interim financial information. Accordingly, they do not include all of the information and footnotes required by accounting principles generally accepted in the United States of America for complete financial statements. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary to make the financial statements not misleading have been included. Operating results for the three period ended March 31, 2007, is not necessarily indicative of the results that may be expected for the year ending December 31, 2007.

For further information, refer to the consolidated financial statements and footnotes included in the Company's Form 10-KSB filed April 25, 2007 for the year ended December 31, 2006.

<PAGE>

F-7

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 1 - BUSINESS, REVERSE MERGER AND BASIS OF PRESENTATION (CONTINUED)

GOING CONCERN AND MANAGEMENT'S PLAN

The accompanying unaudited condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America, which contemplate the continuation of the Company as a going concern. As shown in the accompanying unaudited condensed consolidated financial statements, the Company has incurred losses from operations since inception. Management anticipates incurring substantial additional losses in 2007. Further, the Company may incur additional losses thereafter, depending on its ability to generate revenues from the licensing or sale of its technologies and products, or to enter into any or a sufficient number of joint ventures. The Company has no significant revenue to date. There is no assurance that the Company can successfully commercialize any of its technologies and products and realize any revenues there from. The Company's technologies and products have never been utilized on a large-scale commercial basis and there is no assurance that any of its technologies or products will receive market acceptance. There is no assurance that the Company can continue to identify and acquire new technologies. These factors raise substantial doubt about the Company's ability

http://www.sec.gov/Archives/edgar/data/1054825/000101968707001581/000101968707-07-001581.txt

to continue as a going concern. As of March 31, 2007, the Company had an accumulated deficit since inception of $52,437,606 and a working capital deficiency and stockholder's deficiency of $21,598,529 and $19,583,195 respectively.

While no assurance can be given, management believes the Company can raise adequate capital to keep the Company functioning during 2007. During the quarter ended March 31, 2007 the Company received proceeds from Bridge notes of $1,305,000. No assurance can be given that the Company can obtain additional working capital, or if obtained, that such funding will not cause substantial dilution to stockholders of the Company. If the Company is unable to raise additional funds, it may be forced to change or delay its contemplated marketing and business plans. During the year ended December 31, 2006, the Company has raised from various financing sources approximately $6,680,000 through the issuance of common stock, convertible debt, bridge notes and issuance of warrants (Notes 6 and 7). The Company has been late filing three of its periodic filings with the Securities and Exchange Commission and accordingly the Company is not eligible for quotation on the Over the Counter Bulletin Board. (See Note 7)

The Company's principal business activity consists of the development of a technology referred to as Qtrax. Qtrax is a music file sharing technology-based internet service, which when available will provide consumers the ability at no charge to download music files. This free service will allow a consumer to play the ad-supported music files only on the computer such consumer uses to download such music files as well as a portable device with DRM rules attached to the service. It is the intention that Qtrax will also operate as an online music store where a consumer can purchase music files as a permanent download so that the consumer can play such music files on any device that plays MP3 files. In addition, LTDN and Brilliant Technologies will be able to offer online e-tailers, advertising, media and marketing companies the ability to provide highly targeted advertising, promotional and other marketing information to consumers who may have a strong interest in such advertisers' products.

To date, the Company has entered into license agreements with Major Labels and Publishers for use of their catalogues and publishing rights. These include EMI Music & EMI Publishing, TVT Records, SonyATV Publishing, SonyBMG, Warner Music Group, Universal Music Publishing. The Company has also entered into license agreements with several independent record labels for use of their catalogues.

To date, Qtrax has not been launched and additional development activities and various collaborative agreements need to be completed. There is no assurance that the development activities and agreements can be successfully completed and, if so, there is no assurance that Qtrax will be commercially successful.

Being a development stage company, the Company is subject to all the risks inherent in the establishment of a new enterprise and the marketing and manufacturing of a new product, many of which risks are beyond the control of the Company. All of the factors discussed above raise substantial doubt about the Company's ability to continue as a going concern.

These condensed consolidated financial statements do not include any adjustments relating to the recoverability of recorded asset amounts that might be necessary as a result of the above uncertainty.

F-8

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

PRINCIPLES OF CONSOLIDATION

The unaudited condensed consolidated financial statements include the accounts of LTDN and its subsidiaries and Brilliant and all of its wholly-owned and its majority-owned subsidiaries commencing with the Closing Date. All significant intercompany accounts and transactions have been eliminated in consolidation. Investments in unconsolidated affiliates are accounted for using the equity method when the Company owns at least 20%, but no more than 50% of such affiliates and under the cost method when the Company owns less than 20%. Under the equity method, the Company records its proportionate shares of profits and losses based on its percentage interest in earnings.

USE OF ESTIMATES

The preparation of financial statements, in conformity with accounting principles generally accepted in the United States of America, requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ

from those estimates.

EQUITY METHOD OF ACCOUNTING FOR UNCONSOLIDATED AFFILIATES

At March 31, 2007, investments in companies accounted for under the equity
method consist of the following inactive foreign development-stage technology
companies:

| | %<br>Owned | Country of<br>Operations |
|---|---|---|
| Flexitech,Ltd | 20.00% | Israel |
| Pirocat,Ltd. | 20.00% | Israel |
| Sibconvers | 50.00% | Russia |
| Container Engineering, Ltd | 50.00% | Russia |

The Company does not have sufficient control over management, the board of
directors or financial matters and accordingly the Company does not consolidate
such entities. The above companies do not have any revenue nor any significant
assets, liabilities, commitments and contingencies. The Company's carrying
values in these equity-method investments is zero as of March 31, 2007.

F-9

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

IMPAIRMENT OF LONG-LIVED ASSETS

In accordance with Statement of Financial Accounting Standards ("SFAS") No. 144,
"Accounting for the Impairment or Disposal On Long-Lived Assets," the Company
reviews the carrying amount of long-lived assets on a regular basis for the
existence of facts or circumstances, both internally and externally, that
suggest impairment. The Company determines if the carrying amount of a
long-lived asset is impaired based on anticipated undiscounted cash flows before

interest from the use of the asset. In the event of impairment, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the asset. Fair value is determined based on appraised value of the assets or the anticipated cash flows from the use of the asset, discounted at a rate commensurate with the risk involved.

INCOME TAXES

Effective January 1, 2007, the company adopted the provisions of FASB Interpretation No. 48, "Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109" ("FIN48"). FIN 48 prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more-likely-than-not to be sustained upon examination by taxing authorities. Differences between tax positions taken or expected to be taken in a tax return and the benefit recognized and measured pursuant to the interpretation are referred to as "unrecognized benefits". A liability is recognized (or amount of net operating loss carry forward or amount of tax refundable is reduced) for an unrecognized tax benefit because it represents an enterprise's potential future obligation to the taxing authority for a tax position that was not recognized as a result of applying the provisions of FIN 48.

In accordance with FIN 48, interest costs related to unrecognized tax benefits are required to be calculated (if applicable) and would be classified as "Interest Expense, net" in the consolidated statements of operations. Penalties would be recognized as a component of "General and administrative expenses".

The Company files income tax returns in the United States (federal) and in various state and local jurisdictions. The Company is delinquent in its findings of its 2004 and 2005 tax returns. The Company is subject to federal, state and local income tax examinations by tax authorities for years after December 31, 2003.

The adoption of the provisions of FIN 48 did not have a material impact on the company's consolidated financial position and results of operations. As of March 31, 2007, no liability for unrecognized tax benefits was required to be recorded.

The Company recognized a deferred tax asset (for its US operations excluding pre-merger net operating losses subject to limitations) of approximately $6.1 million as of March 31, 2007, primarily relating to net operating loss carryforwards of approximately $17.9 million, available to offset future taxable income through 2025. The ultimate realization of deferred tax assets is

dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. The Company considers projected future taxable income as tax planning strategies in making this assessment. At present, the Company does not have a sufficient history of income to conclude that it is more likely than not that the Company does not have a sufficient history of income to conclude that it is more likely than not that the Company will be able to realize all of its tax benefits in the near future and therefore a valuation allowance was established in the full value of the deferred tax asset.

A valuation allowance will be maintained until sufficient positive evidence exists to support the reversal of any portion or all of the valuation allowance net of appropriate reserves. Should the Company continue to be profitable in future periods with supportable trends, the valuation allowance will be reversed accordingly.

REVENUE RECOGNITION

The Company expects that it will derive substantially all of its revenues for the sale of advertising on its Qtrax product. The Company anticipates to have four major advertising revenues streams; Click Ad, revenues will be recognized when an ad is placed in Qtrax is successfully Clicked' and linked to another website or area; Video revenues will be recognized when ads are played within the Qtrax product; Banner revenues will be recognized when an ad is displayed on the Qtrax site; and Imprint revenues will be recognized one the established number of time an ad is to be shown is shown. Any prepaid advertising payments received will be treated as deferred revenues.

<PAGE>

F-10

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES  (CONTINUED)

CAPITALIZED SOFTWARE

Capitalization of computer software development costs begins upon the

establishment of technological feasibility. Technological feasibility for the Company's computer software is generally based upon achievement of a detailed program design free of high risk development issues and the completion of a detailed research and development on the product hardware in which it is to be used. The establishment of technological feasibility and the ongoing assessment of recoverability of capitalized computer software development costs require considerable judgment by management with respect to certain external factors, including, but not limited to, technological feasibility, anticipated future gross revenue, estimated economic life and changes in software and hardware technology.

Amortization of capitalized computer software development costs commences when the related products become available for general release to customers. Amortization is provided on a product by product basis. The annual amortization is the greater of the amount computed using (a) the ratio that current gross revenue for a product bears to the total of current and anticipated future gross revenue for that product, or (b) the straight-line method over the remaining estimated economic life of the product.

The Company periodically performs reviews of the recoverability of such capitalized software development costs. At the time a determination is made that capitalized amounts are not recoverable based on the estimated cash flows to be generated from the applicable software, the capitalized costs of each software product is then valued at the lower of its remaining unamortized costs or net realizable value. There were no costs capitalized during the three months ended March 31, 2007. There was no amortization expense for the three months ended March 31, 2007 and 2006 as the software product was not placed into use.

COMPREHENSIVE LOSS

SFAS No. 130, "Accounting for Comprehensive Income," establishes standards for reporting and disclosure of comprehensive income and its components (including revenues, expenses, gains and losses) in a full set of general-purpose financial statements. The items of other comprehensive income that are typically required to be disclosed are foreign currency items, minimum pension liability adjustments, and unrealized gains and losses on certain investments in debt and equity securities.

Accumulated other comprehensive loss, at March 31, 2007, consists of foreign currency translation adjustments in the amount of $26,866.

F-11

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

TRANSLATION OF FOREIGN CURRENCIES

The U.S. dollar is the functional currency for all of the Company's businesses,
except its operations in Australia and Europe. Foreign currency denominated
assets and liabilities for these units are translated into U.S. dollars based on
exchange rates prevailing at the end of each period presented, and revenues and
expenses are translated at average exchange rates during the period presented.
The effects of foreign exchange gains and losses arising from these translations
of assets and liabilities are included as a component of equity.

NET INCOME (LOSS) PER SHARE OF COMMON STOCK

Basic net income (loss) per share of common stock are computed by dividing net
income (loss) available to common stockholders by the weighted average number of
shares of common stock outstanding during the periods presented.

Diluted net income (loss) per share reflects per share amounts that result if
dilutive common stock equivalents are converted to common stock.

Common stock equivalents, consisting of convertible debt, options and warrants,
discussed in Note 6, were not included in the calculation of diluted loss per
share for the three months ended March 31, 2007 because their inclusion would
have had been anti-dilutive.

Basic and diluted loss per share have been calculated assuming the Series A
Preferred Stock has been converted under the "if converted method" since each
share of Series A Preferred Stock automatically converts into 400 shares of
common stock upon the increase in authorized common shares to 500 million. The
Series A Preferred Stock was converted into common shares on September 27, 2005.

F-12

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

NET INCOME (LOSS) PER SHARE OF COMMON STOCK (CONTINUED)

The following table sets forth the components used in the computation of basic
and diluted income (loss) per common share:

Net Income (Loss) Per Share of Common Stock:

<TABLE>
<CAPTION>

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2007 | 2006 |
| <S> | <C> | <C> |
| Numerator: | | |
| Net (loss) income - numerator for basic income (loss) per share | $ (1,255,936) | $ 4,494,494 |
| Effect of dilutive securities: | | |
| Interest related to Convertible Debentures | N/A | 486,635 |
| Numerator for diluted (loss) income per share - income after assumed conversions | $ (1,255,936) | $ 4,981,584 |
| Denominator: | | |
| Denominator for basic (loss) income per share - weighted average shares | 626,467,966 | 280,693,220 |
| Effect of diluted securities: | | |
| Convertible debentures and accrued interest | N/A | 103,707,111 |
| Warrants | N/A | 62,402,594 |

| | | |
|---|---|---|
| Total potentially dilutive securities | N/A | 166,109,705 |
| | | |
| Denominator for diluted (loss) income per share – adjusted weighted average shares and assumed conversions | 626,467,966 | 446,802,925 |
| | | |
| Basic net (loss) income per share | $ (0.00) | $ 0.02 |
| Diluted net (loss) income per share | $ (0.00) | $ 0.01 |

</TABLE>

BUSINESS SEGMENT

SFAS No. 131, "Disclosures About Segments of an Enterprise and Related Information," establishes standards for the way public enterprises report information about operating segments in annual consolidated financial statements and requires reporting of selected information about operating segments in interim financial statements regarding products and services, geographical areas and major customers. The Company has determined that under SFAS No. 131, it operates in three geographic segments (see Note 8).

F-13

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

CONVERTIBLE NOTES AND WARRANTS

The Company accounts for conversion options embedded in convertible notes in accordance with SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities" ("SFAS 133") and ("EITF") 00-19, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock" ("EITF 00-19"). SFAS 133 generally requires companies to bifurcate

conversion options embedded in convertible notes from their host instruments and to account for them as free standing derivative financial instruments in accordance with EITF 00-19. SFAS 133 provides for an exception to this rule when convertible notes, as host instruments, are deemed to be conventional as that term is described in the implementation guidance under Appendix A to SFAS 133 and further clarified in EITF 05-2 "The Meaning of "Conventional Convertible Debt Instrument" in Issue No. 00-19.

The Company accounts for convertible notes deemed conventional and conversion options embedded in non-convertible notes which qualify as equity under EITF 00-19, in accordance with the provisions of Emerging Issues Task Force Issue ("EITF") 98-5 "Accounting for Convertible Securities with Beneficial Conversion Features," and EITF 00-27 "Application of EITF 98-5 to Certain Convertible Instruments." Accordingly, the Company records, as a discount to convertible notes, the intrinsic value of such conversion options based upon the differences between the fair value of the underlying common stock at the commitment date of the note transaction and the effective conversion price embedded in the note. Debt discounts under these arrangements are amortized over the term of the related debt to their earliest date of redemption.

The Company accounts for embedded conversion options in non-conventional convertible notes which do not qualify as equity under EITF 00-19, as derivation liabilities. Accordingly, the Company determines the fair value (as determined under the Black-Scholes Valuation Method) of all embedded derivatives (usually conversion option and warrants). Such fair value is recorded as a debt discount up to the proceeds of the debt and any amount in excess of the proceeds of the debt is charged to operations at the security issuance date.

The Company's 2005 and 2006 Convertible Notes host embedded conversion options that are deemed to be free standing derivatives financial instruments which have been accounted for as derivative liabilities (Note 4).

The Company accounts for the issuance of common stock purchase warrants issued and other free standing derivative financial instruments in accordance with the provisions of EITF 00-19. Based on the provisions of EITF 00-19, the Company classifies as equity any contracts that (i) require physical settlement or net-share settlement or (ii) gives the Company a choice of net-cash settlement or settlement in its own shares (physical settlement or net-share settlement). The Company classifies as assets or liabilities any contracts that (i) require net-cash settlement (including a requirement to net cash settle the contract if an event occurs and if that event is outside the control of the Company and (ii) give the counterparty a choice of net-cash settlement or settlement in shares (physical settlement or net-share settlement). All of the outstanding warrants have been classified as free standing derivative liabilities (Note 4).

<PAGE>

F-14

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

STOCK BASED COMPENSATION

Effective January 1, 2006, the Company adopted SFAS No. 123R, "Share Based
Payment," using the modified-prospective-transition method. There was no effect
to the accompanying financial statements pursuant to the adoption of SFAS No.
123R since at the date of the adoption, all employee stock options were fully
vested. SFAS No. 123R is a revision of SFAS No. 123, and supersedes APB Opinion
No. 25, and its related implementation guidance. SFAS No. 123R addresses all
forms of share-based payment awards including shares issued under employee stock
purchase plans, stock options, restricted stock and stock appreciation rights.
Under SFAS No. 123R, stock-based awards result in a cost that will be measured
at fair value on the award's grant date, based on the estimated number of awards
that are expected to vest that will result in a charge to operations.

There were no stock options granted to employees or unvested stock options
during the three months ended March 31, 2007 and the Company had no unvested
options.

The cost of stock-based compensation awards issued to non-employees for services
are recorded at either the fair value of the services rendered or of the
instruments issued in exchange for such services, whichever is more readily
determinable, using the measurement date guidelines enumerated in Emerging
Issues Task Force ("EITF") Issue No. 96-18, "Accounting for Equity Instruments
That Are Issued to Other Than Employees for Acquiring, or in Conjunction with
Selling, Goods or Services."

F-15

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS

In February 2006, the FASB issued SFAS No. 155 "Accounting for Certain Hybrid Financial Instruments-an amendment of FASB Statements No. 133 and 140" ("FAS 155"). FAS 155 addresses the following: a) permits fair value re-measurement for any hybrid financial instrument that contains an embedded derivative that otherwise would require bifurcation; b) clarifies which interest-only strips and principal-only strips are not subject to the requirements of Statement 133; c) establishes a requirement to evaluate interests in securitized financial assets to identify interests that are freestanding derivatives or that are hybrid financial instruments that contain an embedded derivative requiring bifurcation; d) clarifies that concentrations of credit risk in the form of subordination are not embedded derivatives; and e) amends Statement 140 to eliminate the prohibition on a qualifying special-purpose entity from holding a derivative financial instrument that pertains to a beneficial interest other than another derivative financial instrument. FAS 155 is effective for all financial instruments acquired or issued after the beginning of an entity's first fiscal year that begins after September 15, 2006. The Company's adoption of this pronouncement did not have an impact on the Company's financial position, results of operations and cash flows.

In March 2006, the FASB issued SFAS 156 - "Accounting for Servicing of Financial Assets - an amendment of FASB Statement No. 140" ("SFAS 156"). SFAS 156 is effective for the first fiscal year beginning after September 15, 2006. SFAS 156 changes the way entities account for servicing assets and obligations associated with financial assets acquired or disposed of. The Company's adoption of this pronouncement did not have an impact on the Company's financial position, results of operations and cash flows.

In September 2006, the FASB issued Statement of Financial Accounting Standard ("SFAS") No. 157, "Fair Value Measurements." This statement defines fair value, establishes a fair value hierarchy to be used in generally accepted accounting principles and expands disclosures about fair value measurements. Although this statement does not require any new fair value measurements, the application could change current practice. The statement is effective for fiscal years

<PAGE>

F-16

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS (CONTINUED)

beginning after November 15, 2007. The Company's adoption of this pronouncement did not have an impact on the Company's financial position, results of operations and cash flows.

In September 2006, the staff of the Securities and Exchange Commission issued SAB No. 108 which provides interpretive guidance on how the effects of the carryover or reversal of prior year misstatements should be considered in quantifying a current year misstatement. SAB 108 becomes effective in fiscal 2007. The Company's adoption of this pronouncement did not have an impact on the Company's financial position, results of operations and cash flows.

In December 2006, the FASB approved FASB Staff Position (FSP) No. EITF 00-19-2, "Accounting for Registration Payment Arrangements" ("FSP EITF 00-19-2"), which specifies that the contingent obligation to make future payments or otherwise transfer consideration under a registration payment arrangement, whether issued as a separate agreement or included as a provision of a financial instrument or other agreement, should be separately recognized and measured in accordance with SFAS No. 5, "Accounting for Contingencies". FSP EITF 00-19-2 also requires additional disclosure regarding the nature of any registration payment arrangements, alternative settlement methods, the maximum potential amount of consideration and the current carrying amount of the liability, if any. The guidance in FSP EITF 00-19-2 amends FASB Statements No. 133, "Accounting for Derivative Instruments and Hedging Activities", and No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity", and FASB Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others", to include scope exceptions for registration payment arrangements.

FSP EITF 00-19-2 is effective immediately for registration payment arrangements

and the financial instruments subject to those arrangements that are entered into or modified subsequent to the issuance date of this FSP, or for financial statements issued for fiscal years beginning after December 15, 2006, and interim periods within those fiscal years, for registration payment arrangements entered into prior to the issuance date of this FSP. The Company's adoption of this pronouncement did not have a material impact on the Company's financial position, results of operations and cash flows.

In June 2006, the EITF reached a consensus on Issue No. 06-3 ("EITF 06-03"), "Disclosure Requirements for Taxes Assessed by a Governmental Authority on Revenue-Producing Transactions." The consensus allows companies to choose between two acceptable alternatives based on their accounting policies for transactions in which the company collects taxes on behalf of a governmental authority, such as sales taxes. Under the gross method, taxes collected are accounted for as a component of sales revenue with an offsetting expense. Conversely, the net method allows a reduction to sales revenue. If such taxes are reported gross and are significant, companies should disclose the amount of those taxes. The guidance should be applied to financial reports through retrospective application for all periods presented, if amounts are significant, for interim and annual reporting beginning after December 15, 2006 with early adoption is permitted. The Company's adoption of this pronouncement did not have an impact on the Company's financial position, results of operations and cash flows.

.

F-17

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 3 - ROYALTY/LICENSE AGREEMENTS

The Company entered into nine Royalty and License Agreements. The Company has made various payments and is obligated to make additional non-refundable recoupable prepayments. At March 31, 2007 such fees aggregated as follows:

Deferred license and other fees          $1,666,500
Less: accumulated amortization             (598,030)
                                         ------------

$1,068,470

Royalty/license payments are accounted for in accordance with statement of Financial Accounting Standard ("SFAS") No. 50 "Financial Reporting for the Record and Music Industry". The Company reports such minimum guaranteed license payments as an asset and charged to expense in accordance with the terms of the license agreements. In May 2006 and August 2006, the Company signed agreements with EMI Music Publishing And EMI Records ("EMI") whereby EMI has licensed its music publishing properties for listening and download on the Company's Qtrax legal P2P music network. Under the terms of the agreement, the Company is required to make non-refundable, recoupable prepayments to EMI in the amount of $385,000. These payments are recoupable against payments due under various subscription agreements. Under the terms of the agreement, the payments are due as follows: (a) upon execution of the agreement, the Company shall pay $225,000 with a remaining payment of $162,500 to be paid to EMI at least 14 days prior to the commercial launch of the service. As of March 31, 2007, the Company has paid EMI $222,500 under these agreements.

In November 2006, the Company signed an agreement with Sony/ATV Music Publishing LLC ("ATV") whereby ATV has licensed its music publishing properties for listening and download on the Company's Qtrax legal P2P music network. Under the terms of the agreement, the Company is required to make two non-refundable, recoupable prepayments to ATV in the amount of $15,000 and $15,000 for a total of $30,000. These payments shall be recoupable against payments due under various subscription agreements. Under the terms of the agreement, the payments are due as follows: (a) upon execution of the agreement, the Company shall pay $15,000 with remaining payment of $15,000 to be paid to ATV no later than March 31, 2007. As of March 31, 2007, the Company has made such payments totaling $30,000.

In April 2006, the Company signed an agreement with TVT Music Inc. and TVT Records ("TVT"), which was amended in December 2006, whereby TVT has licensed its music publishing properties for listening and download on the Company's Qtrax legal P2P music network. Under the terms of the agreement, the Company is required to make a non-refundable, recoupable prepayments to TVT in the amount of $30,000. This payment shall be recoupable against payments due under various subscription agreements. Under the terms of the agreement, the payments are due by December 2006. As of March 31, 2007, the Company has made such payments totaling $30,000.

In August 2006, the Company signed an agreement with Warner Music Inc ("Warner") whereby ATV has licensed its music publishing properties for listening and

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

download on the Company's Qtrax legal P2P music network. Under the terms of the agreement, the Company is required to make recoupable non-refundable payment of $100,000, $50,000 and $75,000 for a total of $225,000. These payments shall be recoupable against payments due under various subscription agreements. Under the terms of the agreement, the payments are due as follows: (a) upon execution of the agreement, the Company shall pay $100,000, with $50,000 due in 3 months of the signing date with remaining payments of $25,000 each to be paid in November and December 2006 and January 2007. As of December 31, 2006, the Company paid Warner $33,333 under the agreement, and was in default under the terms of the agreement. In February 2007, the Company paid an additional $33,333.

On April 17, 2007, the above payment terms were amended as follows: $85,000 payable upon signing of the amended agreement; $23,333 on May 15, 2007; $25,000 on June 15, 2007; and the final payment on June 17, 2007.

F-18

NOTE 3 - ROYALTY/LICENSE AGREEMENTS (CONTINUED)

In October 2006, the Company signed an agreement with Sony BMG ("BMG"), whereby BMG has licensed its music publishing properties for listening and download on the Company's Qtrax legal P2P music network. Under the terms of the agreement, the Company is required to make a non-refundable, recoupable prepayments to BMG in the amount of $1,000,000. This payment shall be recoupable against payments due under various subscription agreements. Under the terms of the agreement, the payments are due as follows: (a) upon execution of the agreement, the Company shall pay $200,000 with the remaining payment of $800,000 to be paid in equal monthly installments commencing in November. On March 26, 2007, the Company amended its payment terms with BMG. The new payment terms are as follows: $200,000 upon the execution of the amended agreement and $800,000 in 12 equal payments of $66,666 commencing on July 1, 2007. As of March 31, 2007, the Company has paid $200,000 under this agreement.

The terms of the licenses vary from twelve to twenty two months and provide for various conditions to be met. As of April 17, 2007 the Company was renegotiating

http://www.sec.gov/Archives/edgar/data/1054825/000101968707/001581/000101968707-07-001581.txt

the terms of some of the agreements that had certain milestones which as of April 17, 2007 had not been met and included the launching of the Qtrax site. The Company is in the process of renegotiating the terms of payment and milestones and is anticipating that these terms will be extended and milestones reset, however there is no guarantee that the record companies will alter the terms of the agreements. The inability to have terms and milestones adjusted will significantly impact the viability of the Qtrax product.

In September 2006, the Company signed an agreement with Universal Music Publishing Group ("UMP"), whereby UMP has licensed its music publishing properties for listening and download on the Company's Qtrax legal P2P music network. Under the terms of the agreement, the Company is required to make a non-refundable, recoupable prepayments to UMP in the amount of $30,000. This payment shall be recoupable against payments due under various subscription agreements with the amount due upon execution of the agreement. As of March 31, 2007, the Company has paid $30,000 under the terms of the agreement.

Amortization expense under these contracts totaled $258,030 for the three months ended March 31, 2007. This amount is included in general and administrative expenses in the accompanying statement of operations.

F-19

&lt;PAGE&gt;

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 4 - CONVERTIBLE DEBENTURES

Convertible Debentures consist of the following at March 31, 2007:

2005 CONVERTIBLE DEBENTURES

The total dollar value of the Debentures and number of Debenture Warrants sold to investors during 2005 totaled $2,745,000 and 39,214,285, respectively. The Debentures bear interest at 9% per annum on a simple non-compounded basis and are due and payable on August 20, 2006. The Debentures are convertible, at the holder's option, into shares of Common Stock at a conversion rate equal to the lesser of $0.07 (subject to adjustment for subsequent lower price issuances by

the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs) or 75% of the average of the 10 lowest closing bid prices of the Common Stock for the 30 trading days immediately preceding the applicable date of conversion. If a holder elects to convert all or a portion of the Debentures and the conversion price is less than $0.07 (subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs), in lieu of effecting such conversion, the Company may elect to redeem the amount of the Debentures requested to be so converted at a purchase price equal to 150% of the principal amount of the Debentures plus accrued and unpaid interest to the date of redemption. The holder may accelerate the maturity date of the Debentures following the occurrence of customary events of default, including, without limitation, certain payment defaults, breaches of certain covenants and representations, certain events of bankruptcy, certain judgment defaults and the suspension of the Common Stock from trading on the Over the Counter Bulletin Board.

The Debenture Warrants are exercisable at a per share exercise price of $0.10, such exercise price subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs. Each Debenture Warrant is exercisable until the second anniversary of the effective date of the registration statement described below. If the average of the closing bid prices of the Common Stock during any period of 20 consecutive trading days is equal to or greater than $0.50 and the closing bid price of the Common Stock is equal to or greater than $0.50 for at least 10 trading days during such period then with respect to each Debenture Warrant that the holder does not exercise during the 15 trading day period following the receipt by the holder of a notice from the Company that such average price and closing bid prices have occurred, the exercise price for such Debenture Warrants will each be adjusted to $0.25 per share (subject to adjustment for customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs). Holders of Debenture Warrants are entitled to effect a cashless exercise of the Debenture Warrants if the registration statement (as described below) has not been declared effective prior the first anniversary of the issuance of the Debenture Warrants.

In 2006, $2,958,438 of Debentures (including related accrued interest) were converted into 132,976,205 shares of Common Stock. None of the Debenture warrants were exercised as of December 31, 2006. As of December 31, 2006, there was no principal amount outstanding.

The Company has filed a registration statement to register the shares of Common Stock issuable upon the conversion of the Debentures and the exercise of the

Debenture Warrants. The Company was obligated to pay the holder of the Debentures certain liquidated damages since such registration statement was not filed by October 5, 2005 and was not declared effective by November 30, 2005. The Company has filed such registration statement and it became effective on January 26, 2006. In connection with the late effectiveness of the registration statement, the Company incurred liquidating damages of approximately $82,500.

<PAGE>

F-20

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 4 - CONVERTIBLE DEBENTURES (CONTINUED)

2005 CONVERTIBLE DEBENTURES (CONTINUED)

As a result of a floorless conversion option held by the holders of the Debentures, the derivatives embedded in the Debentures (the Conversion Option and Debenture Warrants) have been classified as derivative liabilities. The combined liabilities recorded during 2005 totaled $5,912,806. Of such amount, $2,745,000 was recorded as a debt discount and is being amortized over the term of the Debentures and $3,167,806 was immediately charged to loss on derivative obligations during 2005.

As a result of the conversion feature contained in the 2005 Convertible Debentures, the Company's outstanding LPDN Warrants at such time no longer qualified as equity. Accordingly, during 2005, these Warrants were reclassified to derivative obligations resulting in an increase to liabilities of $20,565,700 and a reduction to stockholders' equity of an equal amount.

2006 CONVERTIBLE DEBENTURES

In February 2006, the Company issued to an investor $100,000 aggregate principal amount of its 9% Convertible Debentures and warrants to purchase 1,428,571 shares of Common Stock at a per share exercise price of $.10 per share. The terms of these securities are substantially the same as the securities issued in 2005.

In March 2006, the Company issued to an investor $300,000 aggregate principal amount of its 9% Convertible Debentures and warrants to purchase 4,285,714 shares of Common Stock at a per share exercise price of $.10 per share. The terms of these securities are substantially the same as the securities issued in 2005.

In March 2006, the Company issued to an investor $350,000 aggregate principal amount of its 9% Convertible Debentures (the "New Debentures") and warrants (the "New Debenture Warrants") to purchase 5,000,000 shares of Common Stock at a per share exercise price of $.07 per share. In addition, subject to certain conditions such investor has agreed to purchase (i) at least three days prior to the filing of the registration statement registering the shares of Common Stock issuable upon the conversion of such New Debentures and the exercise of such New Debenture Warrants, an aggregate of $250,000 principal amount of New Debentures and New Debenture Warrants to purchase 3,571,428 shares of Common Stock for an aggregate purchase price of $250,000 and (ii) at least three days prior to the effective date of such registration statement, an aggregate of $600,000 principal amount of such New Debentures and New Debenture Warrants to purchase 8,571,428 shares of Common Stock for an aggregate purchase price of $600,000. The New Debentures bear interest at 9% per annum on a simple non-compounded basis and are due and payable on March 24, 2007. The New Debentures are convertible, at the holder's option, into shares of Common Stock at a conversion rate equal to the lesser of $0.07 (subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs) and 75% of the average of the 5 lowest closing bid prices of the Common Stock for the 30 trading days immediately preceding the applicable date of conversion. If a holder elects to convert all or a portion of the New Debentures and the conversion price is less than $0.07 (subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs), in lieu of effecting such conversion, the Company may elect to redeem the amount of the New Debentures requested to be so converted at a purchase price equal to 150% of the principal amount of the New Debentures plus accrued and unpaid interest to the date of redemption. The holder may accelerate the maturity date of the New Debentures following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy, certain judgment defaults and the suspension of the Common Stock from trading on the Over the Counter Bulletin Board.

F-21

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 4 – CONVERTIBLE DEBENTURES (CONTINUED)

2006 CONVERTIBLE DEBENTURES (CONTINUED)

The New Debenture Warrants are exercisable at a per share exercise price of
$0.07, such exercise price subject to adjustment for subsequent lower price
issuances by the Company and other customary events including stock splits,
reverse stock splits, dividends of Common Stock and spin-offs. Each New
Debenture Warrant is exercisable until the second anniversary of the effective
date of the registration statement registering the shares of Common Stock
issuable upon the conversion of such New Debentures and the exercise of such New
Debenture Warrants. If the average of the closing bid prices of the Common Stock
during any period of 20 consecutive trading days is equal to or greater than
$0.50 and the closing bid price of the Common Stock is equal to or greater than
$0.50 for at least 10 trading days during such period then with respect to each
New Debenture Warrant that the holder does not exercise during the 15 trading
day period following the receipt by the holder of a notice from the Company that
such average price and closing bid prices have occurred, the exercise price for
such New Debenture Warrants will each be adjusted to $0.25 per share (subject to
adjustment for customary events including stock splits, reverse stock splits,
dividends of Common Stock and spin-offs). Holders of Debenture Warrants are
entitled to effect a cashless exercise of the New Debenture Warrants if such
registration statement has not been declared effective prior the first
anniversary of the issuance of the New Debenture Warrants. The Company has
agreed to file a registration statement to register the shares of Common Stock
issuable upon the conversion of the New Debentures and the exercise of the New
Debenture Warrants.

In April 2006, the Company issued to a group of investors $575,000 aggregate
principal amount of its 9% Convertible Debentures and warrants to purchase
8,214,285 shares of Common Stock at a per share exercise price of $.07 per
share. The terms of these securities are substantially the same as debentures
and debenture warrants issued in March 2006.

In May 2006, the Company issued to a group of investors $200,000 aggregate
principal amount of its 9% Convertible Debentures due on May 2, 2007 and

warrants to purchase 4,285,714 shares of Common Stock at a per share exercise price of $.07 per share. In addition, the Company issued to such investors $40,000 aggregate principal amount of such 9% convertible debentures as a diligence fee and $200,000 aggregate principal amount of such 9% Convertible Debentures as a penalty for not filing its Annual Report on Form 10-KSB with the Securities and Exchange Commission ("SEC") on or prior to May 17, 2006. The terms of these securities are substantially the same as the New Debenture and New Debenture Warrants.

In May 2006 the Company issued to a group of investors $170,000 aggregate principal amount of its 9% Convertible Debentures due April 3, 2007 and warrants to purchase 1,857,140 shares of Common Stock at a per share exercise price of $.07 per share. The terms of these securities are substantially the same as the New Debentures and New Debenture Warrants. In June 2006, the Company issued to a group of investors $150,000 aggregate principal amount of its 9% Convertible Debentures due April 3, 2007 and Warrants to purchase 2,142,857 shares of Common Stock at a per share exercise price of $.07 per share. The terms of these securities are substantially the same as the New Debentures and the New Debenture Warrants.

During 2006, $250,000 of debentures issued in 2006 and related accrued interest were converted into 17,381,312 shares of Common Stock.

During the first quarter of 2007, $75,000 of debentures issued in 2006 and related accrued interest were converted into 4,244,330 shares of common stock. None of the new warrants issued in 2006 were exercised as of March 31, 2007

The Company is obligated to file a registration statement to register the shares of Common Stock issuable upon the conversion of the Debentures and the exercise of the Debenture Warrants. The Company is obligated to pay the holder of the Debentures certain liquidated damages in the event that such registration statement was not timely filed and was not declared effective by a stated date. As of May 15, 2007, the Company has not filed such registration statement and, accordingly, liable for liquidating damages. As of March 31, 2007, the Company accrued liquidating damages of approximately $354,800.

F-22

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

<PAGE>

(unaudited)

NOTE 4 - CONVERTIBLE DEBENTURES (CONTINUED)

2006 CONVERTIBLE DEBENTURES (CONTINUED)

The holders of Debentures have a lien on all of the Company's assets (including the Intellectual Property) and could foreclose in the event that the Company defaults under the Debentures. As of March 31, 2007, the Company was not in full compliance with the Debenture agreements, including the required repayment terms.

As a result of a floorless conversion option held by the holders of the Convertible Debentures, the derivatives embedded in the Convertible Debenture (the Conversion Option and Debenture Warrant) have been classified as derivative liabilities. The combined liabilities recorded in 2006 totaled $1,007,816. This amount was recorded as a debt discount and is being amortized over the term of the debentures.

The fair value of all of the derivative obligations including the embedded conversion options and warrants related to the Bridge Notes (Note 7) at March 31, 2007 totaled $6,651,705. The change in the fair value of the derivative liabilities during 2007 and 2006 was recorded as a gain on derivative liabilities during the three months ended March 31, 2007 and 2006 resulted in a gain of $3,476,925 and $8,919,806, respectively.

Amortization of debt discount related to the 2005 and 2006 Convertible Debentures for the three months ended March 31, 2007 and 2006 was $175,963 and $417,683, respectively.

NOTE 5 - CONVERTIBLE LOANS AND NOTES PAYABLE

Pursuant to 2006 Bridge Loan Agreements between the Company and six investors, the Company borrowed an aggregate of $1,960,000. The Company issued to the investors' Notes (the "Notes") in the aggregate principal amount of $2,087,000 (an amount equal to approximately 107% of the purchase price of the Notes) and warrants ("Note Warrants") to purchase 55,183,286 shares of Common Stock. The Company received net proceeds in such sale of $1,942,910, after the payment of offering related fees and expenses.

The Notes do not bear interest but, as noted above, the face value of the Notes at issuance was equal to approximately 107% of the purchase price thereof. The Notes are due and payable between October 25, 2006 and January 15, 2007. When

http://www.sec.gov/Archives/edgar/data/1054825/000101968707001581/000101968707-07-001581.txt

7/18/2007

the Company amends the certificate of incorporation as described below, and if an event of default under the Note occurs then the Note will be convertible, at the holder's option, into shares of Common Stock at a conversion rate equal to 75% of the average of the 5 lowest closing bid price of the Common Stock for the 30 trading days immediately preceding the applicable date of conversion. The Company may, at its option, prepay the Notes at any time. The holder may accelerate the maturity date of the Note following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy and certain judgment defaults. If an event of default occurs, the Notes provide for interest at 14% per annum commencing with the date of the default.

As of March 31, 2007, the Company was in default under the terms of the 2006 Bridge Loan agreements.

F-23

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

<PAGE>

NOTE 5 - CONVERTIBLE LOANS AND NOTES PAYABLE (CONTINUED)

If the holders of Common Stock approve an amendment to the Company's certificate of incorporation to increase its authorized capital stock to an amount sufficient to permit the exercise of the Note Warrants, then each Note Warrant will be exercisable from the date the Company files such amendment with the Secretary of State of the State of Delaware until June 27, 2011. The Note Warrants are exercisable at $0.07 per share, such exercise price subject to adjustment for subsequent lower price issuances by the Company and other adjustment events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs. The holders of Note Warrants are entitled to effect a cashless exercise of the Note Warrants in certain circumstances. The holders of Note Warrants have been granted registration rights for the shares they receive upon exercise of the Note Warrants. The Company could be subject to certain penalties if after the amendment to the articles of incorporation the Company does not file a registration nor if the registration statement does not become effective after a certain period of time.

As a result of a floorless conversion option held by the holders of the Convertible Debentures, the derivatives embedded in the Convertible Debenture (the Conversion Option and Debenture Warrant) have been classified as derivative liabilities.

A debt discount of $1,642,916 was recorded in 2006 representing the value of the conversion options and warrants issued to the 2006 Bridge note holders. This amount was amortized to interest expense during 2006.

During 2006, the Company repaid $322,500 of the Bridge loans.

During the quarter ended March 31, 2007, the Company repaid $106,500 of the 2006 Bridge loans.

2007 Bridge Loans

Pursuant to 2007 Bridge Loan Agreements between the Company and three investors, the Company borrowed an aggregate of $1,310,000. The Bridge Loans are as follows:

In January 2007, the Company borrowed $150,000. The Company issued to the investor a Note ("Note") in the aggregate principal amount of $159,000 (an amount equal to approximately 106% of the purchase price of the Note) and warrants ("Note Warrants") to purchase 5,714,286 shares of Common Stock. The Company received net proceeds in such sale of $150,000. The Note was due on March 10, 2007 and the Company is currently in default under the terms of the agreement.

In February 2007, the Company borrowed $410,000. The Company issued to the investor a Note in the aggregate principal amount of $500,000 (an amount equal to the amount borrowed plus interest in the amount of $90,000) and Note Warrants to purchase 2,500,000 shares of Common Stock. The Company received net proceeds in such sale of $410,000. The Note is due in October 2007.

The Notes do not bear interest. When the Company amends the certificate of incorporation as described below, and if an event of default under the Note occurs then the Note will be convertible, at the holder's option, into shares of Common Stock at a conversion rate equal to 75% of the average of the 5 lowest closing bid prices of the Common Stock for the 30 trading days immediately preceding the applicable date of conversion. The Company may, at its option, prepay the Notes at any time. The holder may accelerate the maturity date of the Note following the occurrence of customary events of default, including without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy and certain judgment defaults. If an event of

default occurs, the Notes provide for interest at 14% per annum commencing with the date of the default.

If the holders of Common Stock approve an amendment to the Company's certificate of incorporation to increase its authorized capital stock to an amount sufficient to permit the exercise of the Note Warrants, then each Note Warrant will be exercisable from the date the Company files such amendment with the Secretary of State of the State of Delaware until June 27, 2011. The Note Warrants are exercisable at $0.07 per share, such exercise price subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs. The holders of Note Warrants are entitled to effect a cashless exercise of the Note Warrants in certain circumstances. The holders of Note Warrants have been granted registration rights for the shares they receive upon exercise of the Note Warrants.

                                      F-24

<PAGE>

                BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
                          (A Development Stage Company)

                  NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
                                    (unaudited)


NOTE 5 - CONVERTIBLE LOANS AND NOTES PAYABLE (CONTINUED)

In March 2007, the Company borrowed $750,000. The Company issued to the investor a Note in the aggregate principal amount of $750,000, Note warrants to purchase 54,000,000 shares of Common Stock, and 10,000,000 shares of the Common Stock. The Company received net proceeds in such sale of $745,000. The Note is due in December 2007.

The Notes do not bear interest. From and after the date, the Company amends the certificate of incorporation as described below, if an event of default under the Note occurs then the Note will be convertible, at the holder's option, into shares of Common Stock at a conversion rate equal to 75% of the average of the 5 lowest closing bid prices of the Common Stock for the 30 trading days immediately preceding the applicable date of conversion. The Company may, at its option, prepay the Notes at any time. The holder may accelerate the maturity date of the Note following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants

http://www.sec.gov/Archives/edgar/data/1054825/000101968707001581/0001019687-07-001581.txt

and representations, certain events of bankruptcy and certain judgment defaults. If an event of default occurs, the Notes provide for interest at 14% per annum commencing with the date of the default.

If the holders of Common Stock approve an amendment to the Company's certificate of incorporation to increase its authorized capital stock to an amount sufficient to permit the exercise of the Note Warrants, then each Note Warrant will be exercisable from the date the Company files such amendment with the Secretary of State of the State of Delaware until June 27, 2011. The Note Warrants are exercisable at a range of $0.07 to $0.36 per share, such exercise price subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs. The holders of Note Warrants are entitled to effect a cashless exercise of the Note Warrants in certain circumstances. The holders of Note Warrants have been granted registration rights for the shares they receive upon exercise of the Note Warrants.

Regarding the above 2007 Bridge loans, the Company could be subject to certain penalties if after the amendment to the articles of incorporation the Company does not file a registration nor if the registration statement does not become effective after a certain period of time.

In the first quarter of 2007, a debt discount of $2,130,317 was recorded representing the value of the conversion options and warrants issued to the Bridge note holders. This amount was amortized to interest expense during the three months ended March 31, 2007.

Other Loans Payable

During June 2001, Brilliant borrowed $260,000 from an individual and issued a promissory note, which is in default and provides for interest at the rate of 1% per month. This loan is still outstanding at December 31, 2006. Also on July 13, 2001, an officer of Brilliant advanced $10,000 pursuant to a promissory note, which is in default and provides for interest at the rate of 1% per month.

On November 27, 2001, Brilliant borrowed $10,000 from an individual and issued a promissory note which is in default and provides for interest at the rate of 1% per month.

During October 2002, Brilliant received an advance of $120,000 from an individual, payable on demand. The loan accrues interest at 10% per annum.

LTDN has loans outstanding payable to four unrelated parties that aggregate $463,117 at March 31, 2007 and December 31, 2006. These loans are all payable on

demand and do not provide for interest.

As of December 31, 2005, LYTN had a loan payable to a related party of $211,440. This loan is payable on demand and provides for interest of 12% per annum. This loan was not repaid during 2006 nor in the first quarter of 2007.

As of March 31, 2007, Brilliant owed its Chief Executive Officer and another director/shareholder $1,574,529 related to advances and accrued salaries. These advances are payable on demand and do not provide for interest. This balance is included in due to related parties on the accompanying consolidated balance sheet.

<PAGE>

F-25

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 6 - STOCKHOLDERS' EQUITY

PREFERRED STOCK

The Company has authorized 1,000,000 shares of preferred stock, par value $.001 per share. The Board of Directors of the Company has broad discretion to create one or more series of preferred stock and to determine the rights, preferences and privileges of any such series.

As described in Note 1, the Company has designated 950,000 shares of Series A Convertible Preferred Stock. In connection with the Merger and Recapitalization between BRILLIANT and LYTN (Note 1), 193,336 shares of Series A Convertible Preferred Stock were issued to the stockholders of LYTN and 50,000 shares were issued to the stockholders of BRILLIANT.

At the Annual Meeting of Stockholders held on September 26, 2005, the stockholders approved an amendment to the articles of incorporation of BRILLIANT whereby the number of shares of common stock authorized for issuance by the Company was increased from 100,000,000 shares to 800,000,000 shares. Accordingly, as a result of this stockholder approval, 293,406 shares of the Company's Series A Preferred Stock automatically converted into 117,731,600

shares of the Company's Common Stock pursuant to terms of the merger agreement.

COMMON STOCK ISSUANCES FOR THE THREE MONTHS ENDED MARCH 31, 2007

During the quarter ended March 31, 2007, the Company issued 750,000 of common shares in settlement for liabilities in the amount of $37,000 related to consulting expenses incurred in 2004.

During the quarter ended March 31, 2007, The Company issued shares in the total amount of 4,244,330 related to the conversion of convertible debt and note payable including accrued interest totaling $75,000.

During the quarter ended March 31, 2007, the Company issued shares in the total amount of 10,000,000 related to a financing expense valued at $500,000 based the price of the Company's common stock of $.05 per share.

<PAGE>

F-26

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 6 - STOCKHOLDERS' EQUITY(CONTINUED)

WARRANTS

At March 31, 2007, there were outstanding warrants to purchase 1,000,000 shares of Common Stock at $0.165 per share (the "Old Warrants"), outstanding Warrants issued to the LTDN shareholders (the "LTDN Warrants") to purchase 107,884,680 shares of Common Stock at an exercise price of $0.04 per share and there were outstanding Debenture Warrants to purchase 44,928,570 shares of Common Stock at an exercise price of $0.10 per share and outstanding Debenture and Note Warrants to purchase 76,683,280 shares of Common Stock at an exercise price of $0.07 per share. In addition, in connection with the 2007 Bridge Notes, the Company issued Warrants to purchase 62,214,286 shares of Common Stock at exercise prices ranging from $0.07 to $0.36 per share. Each Old Warrant is exercisable until December 19, 2008. Each Debenture Warrant is exercisable until the second anniversary of the effective date of the registration statement registering the shares of Common Stock issuable upon exercise of the Debenture Warrants. The

Note warrants are exercisable over a five-year period.

During the year ended December 31, 2006, various holders of LTDN warrants exercised warrants and purchased 58,896,477 shares of Company's Common Stock resulting in proceeds of $2,357,897, all of which was received in 2006.

<PAGE>

F-27

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 6 - STOCKHOLDERS' EQUITY (CONTINUED)

WARRANTS (CONTINUED)

The following is a summary of the Company's warrant activity:

<TABLE>

| | COMPENSATORY WARRANTS | DEBENTURE AND NOTE WARRANTS | LTDN WARRANTS | WEIGHTED AVERAGE EXERCISE PRICE |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Outstanding January 1, 2007 | 1,000,000 | 121,611,850 | 107,884,680 | $    .06 |
| Issued | -- | 62,214,286 | -- | .17 |
| Cancelled | -- | -- | -- | -- |
| Exercised | -- | -- | -- | -- |
| Balance March 31, 2007 | 1,000,000 | 183,826,136 | 107,884,680 | $    .08 |

</TABLE>

EARNINGS PER SHARE

Securities that could potentially dilute basic earnings per share ("EPS") in the future that were not included in the computation of diluted EPS because to do so would have been anti-dilutive for the periods presented consist of the following:

Bridge loans                        (a) 48,466,667
Convertible Debentures              (b) 52,716,068
Options to purchase Common Stock        1,712,777
Warrants to purchase Common Stock      292,710,816
                                       --------------
Total as March 31, 2007                395,606,328
                                       ==============

(a)  $1,817,500 / $.0375 (75% of market price at March 31, 2007
     for note in default).
(b)  $1,976,853 / $.0375 (75% of market price at March 31,
     2007).

Substantial issuances after March 31, 2007:

Common Stock issued for conversions of
Convertible Debentures                  12,473,230

The Company will not have sufficient Common shares available to issue should all of the above conversions and exercises occur. Accordingly, the Company may have to settle these contracts in cash if they are not successful in increasing the authorized number of shares (Note 9).

F-28

<PAGE>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 7 - COMMITMENTS AND OTHER MATTERS

CONSULTING AND EMPLOYMENT AGREEMENT

During October 2005, the Company entered into a one-year consulting agreement with a stockholder which provides for monthly payments of approximately $12,000. The agreement is automatically renewable for an additional year, unless both parties mutually agree not to renew. As of March 31, 2007, amounts owed to such individual approximated $186,000.

During October 2006, the Company entered into an employment contract with an individual to act as Chief Operating Officer with an annual base salary of $333,000. As of March 31, 2007, amount owed under this agreement is $83,250. In April of 2007, the COO resigned and the Company accepted his resignation "with Regret" (see Note 9).

COMPENSATION AGREEMENT

Pursuant to a 2005 compensation arrangement, the Company's Chief Executive officer is being paid a salary of $275,000 per annum plus an expense allowance of approximately $7,600 per month. Accrued amounts under this agreement total $456,550 as of March 31, 2007.

RUSSIAN CONTRACTS FOR RESEARCH AND DEVELOPMENT

The Company is a party to a research and development agreement with a Moscow-based State Scientific Research Institute Scientific Production Company named Lutch pursuant to which such entity has agreed to perform various contract research and development services related to technology obtained by the Company for a total price of $985,000. The Company paid $100,000 in a previous year under this agreement and was recorded as research and development expense. As a continued result of limited funding, no services have been performed under this agreement to date. It is uncertain when or if any services will eventually be completed under this contract.

The Company is a party to a research and development agreement with a branch of the Ministry of the Atomic Energy of the Russian Federation pursuant to which such entity has agreed to perform various contract research and development services to develop an industrial fireproof swelling cable coating for a total price of $462,000. As a result of limited funding of this contract, the performance of services were rescheduled to occur commencing with the quarter ended December 31, 2003 and to be completed within one year. The work under the contracts has not been completed as of December 31, 2006 and at this time the completion date can not be determined as a continued result of limited funding.

ACQUISITION OF IN-PROCESS TECHNOLOGIES

In connection with an oral agreement, the Company has agreed to acquire the

rights to certain in-process technologies now held by a German bank, for an estimated purchase price of $500,000 payable in cash and/or common stock. Management of the Company has indicated that this transaction is expected to close during 2007 although there is no assurance it will be consummated. As of March 31, 2007, LTDN has paid $352,089 to the German bank as part of this oral agreement.

<PAGE>

F-29

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 7 - COMMITMENTS AND OTHER MATTERS (CONTINUED)

LEGAL DISPUTES

On March 31, 2007, Leslie Dick Worldwide, LTD filed a complaint in the Supreme Court of the State of New York against us. Such complaint relates to claims of breach of contract. The Company has counter-claimed against the petitioner, management believes that the eventual outcome of these matters will not have a material adverse effect on our consolidated financial position, results of operations, or cash flow.

During the quarter ended June 30, 2003, the Company was notified that Dr. Jurgen Lempert intended to commence legal proceedings against Brilliant relating to his termination as Chief Executive Officer of Brilliant Nuklear. A German court ruled that Dr. Lempert is entitled to collect $69,629. As of March 31, 2007, the Company has accrued such amounts.

On March 2, 2007, Nancy L. Donenfeld and Thelma L. Donenfeld, as trustee of the Nancy L. Donenfeld Trust filed a complaint in the Supreme Court of the State of New York, County of New York against us, Allan Klepfisz, our Chief Executive Officer, and Ethel Griffin, the public administratrix of the estate of Kurt Seligman. Such complaint relates to the alleged default by us under a loan agreement with the plaintiffs. Such complaint seeks compensatory damages in the amount of $459,892.67 plus interest and late fees of approximately $900,000 and the value of certain restricted shares issued to such plaintiffs and punitive damages in the amount of $5,000,000. Management believes that the eventual outcome of these

matters will not have a material adverse effect on our consolidated financial position, results of operations, or cash flow.

TPG Capital have filed for arbitration against the Company regarding a purported reset provision in an agreement entered into during 1999. TPG believes it is entitled to receive an additional 1,465,671 shares of Common Stock under an agreement previously executed between the parties. Should litigation arise, the Company believes that it has sufficient defenses and intends to vigorously defend itself against such claims.

Dr. Alexander Kaul, former Chairman of the Supervisory Board of Brilliant Nuklear, initiated legal proceedings against Brilliant for monies he believes are due him under his terminated employment contract. A German court ruled that Dr. Kaul is entitled to collect approximately $67,808. As of March 31, 2007, the Company has accrued such amounts.

Peter Goerke, a former Vice President of Brilliant, initiated legal proceedings against Brilliant for the value of his remaining employment agreement, accrued wages and expenses. A German court ruled that Mr. Goerke is not entitled to the remaining value of his employment contract and is only entitled to collect approximately $197,486. As of March 31, 2007, Brilliant has accrued such amount. Mr. Goerke has filed for a lien against certain assets of Cetoni Umwelttechnologie Entwicklungs Gmbh ("Cetoni"), one of Brilliant's wholly owned subsidiaries.

Cnet Networks, Inc. initiated proceedings against LTDN for amounts due it by a former third party affiliate of LTDN. During June 2005, Cnet Networks, Inc. received a judgment in the amount of $100,000 against LTDN. LTDN believes that it is not liable for this amount and intends to appeal the verdict. Additionally, LTDN believes that it has a cause of action against Cnet Networks, Inc. relating to a breach of contract and other claims relating to a contract between it and Cnet Networks, Inc. As of March 31, 2007, LTDN accrued $100,000 related to this judgment.

A German court has suspended the corporate registration of Cetoni. The Company does not intend to appeal this decision as it is consistent with the restructuring of all German operations. The Company does not believe this ruling will have a material impact on the Company's operations as Cetoni no longer has any significant tangible or intangible assets.

The Company may be subject to additional litigation during its normal course of operations. Management believes that the eventual outcome of these matters will not have a material adverse effect on the Company's consolidated financial position, results of operations, or cash flows.

<PAGE>

F-30

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 7 - COMMITMENTS AND OTHER MATTERS (CONTINUED)

LIEN ON STAR CAN PATENTS

During June 2003, the Company became aware that a lien had been placed against
the patents relating to the Reseal Technology by Paxays Ltd., a Bermuda
corporation, in connection with a failed financing. The Company continues to
dispute the validity of the claim.

SETTLEMENT WITH FORMER LTD SHAREHOLDERS

On January 26, 2006, the Company issued 21,795,061 shares of Common Stock in
connection with the settlement of claims made by certain former stockholders of
LTDN. These stockholders claimed that they were entitled to receive more shares
of Common Stock in connection with the merger with BRILLIANT. At December 31,
2005, the Company recorded a liability of approximately $2,200,000 related to
the settlement of these claims.

SUPPORT AGREEMENT

In connection with a Support Agreement entered into on November 17, 2005 between
the Company and one of its stockholders, Aperchance Ltd. ("Aperchance"), in
consideration of inducing Aperchance to exercise their Warrants to purchase
4,841,200 shares of Common Stock, the Company provided Aperchance with certain
price protection on shares of Common Stock held by Aperchance. The price
protection terminated in February of 2006. As a result of stock price decline in
2006, the Company has issued an additional 5,630,075 shares of Common Stock to
Aperchance.

PERIODIC FILINGS

Under a 2005 rule change, OTC Bulletin Board ("OTCBB") issuers that are cited

for filing delinquency three times in a 24-month period and those removed for failure to file two times in a 24-month period will be ineligible for quotation by an NASD member. Following removal under this new rule, an issuer's securities would again become eligible for quotation on the OTCBB when the issuer has filed periodic reports for one year in a timely manner.

The Company has been late in three of its periodic filings with the Securities and Exchange Commission ("SEC") during 2006, of which the December 31, 2006 10-KSB was the last late filing. Accordingly, currently the Company is ineligible for quotation by an NASD member. The Company has requested relief from the SEC under a hardship provision. If the Company is not successful with its request from the SEC, the Company will remain listed on the "Pink Sheets."

NOTE 8 - SEGMENT REPORTING

The Company's business is organized on a geographic basis, and the Company's Chief Operating Decision Maker assesses performance and allocates resources on this basis. The information provided in the following section is representative of the information used by the Chief Operating Decision Maker in deciding how to allocate resources and in assessing performance.

The Company has three geographic reportable segments: United States of America (U.S.A.), Australia and Germany. The accounting policies of the segments are the same as described in the summary of significant accounting policies. The Company evaluates segment performance based on net income (loss).

F-31

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(unaudited)

NOTE 8 - SEGMENT REPORTING (CONTINUED)

Segment results for the three months ended March 31, 2007 and 2006 are as follows:

<PAGE>

<TABLE>

| 2007: | U.S.A. | Australia | Germany | Eliminations | Consolidated |
|---|---|---|---|---|---|
| | <S> | <C> | <C> | <C> | <C> |
| Net income (loss) | $ (1,071,975) | $ (183,961) | $ -- | $ -- | $ (1,255,936) |
| Depreciation and amortization | $ -- | $ 8,146 | $ -- | $ -- | $ 8,146 |
| Identifiable assets | $ 1,917,173 | $ 695,676 | $ 109 | $ -- | $ 2,612,958 |

| 2006: | U.S.A. | Australia | Germany | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Net income (loss) | $ 6,035,970 | $(1,498,194) | $ -- | $ -- | $ 4,537,776 |
| Depreciation and amortization | $ -- | $ 7,573 | $ -- | $ -- | $ 7,573 |
| Identifiable assets | $ 55,547 | $ 938,031 | $ 99 | $ -- | $ 993,677 |

</TABLE>

NOTE 9 - SUBSEQUENT EVENTS

Subsequent to March 31, 2007, the Company issued shares in the total amount of
12,473,230 related to the conversion of convertible debt and note payable
including accrued interest totaling approximately of $362,000.

On March 14, 2007, the Company filed a definitive proxy pursuant to which the
shareholders will vote on an increase in the number of authorized common shares
from 800 million to 1.5 billion. The meeting was to be held on April 23, 2007.
The meeting was subsequently postponed. As of May 14, 2008, the meeting has not
been rescheduled.

On April 17, 2007, the Company entered into a separation agreement with its
current COO. The agreement requires the Company to pay approximately $250,000
due May 30, 2007 and 4,000,000 shares of the Company's Common Stock.

F-32

```
<PAGE>
```

ITEM 2.  PLAN OF OPERATION

As used in this quarterly report, references to "we", "us" and "our" refer to
Brilliant Technologies Corporation and its consolidated subsidiaries. The
following discussion and analysis should be read in conjunction with the
financial statements and notes thereto included elsewhere in this quarterly
report and with our annual report on Form 10-KSB for the fiscal year ended
December 31, 2006. In addition, this quarterly report contains certain
statements that are "forward looking statements", which relate to future events
or our future financial performance. Any statements contained in this quarterly
report which are not statements of historical fact may be deemed to be forward
looking statements. Without limiting the generality of the foregoing, forward
looking statements can be identified by the use of words such as "believes,"
"expects," "intends," "projects," "anticipates," "contemplates," or "estimates."
Although we believe that the expectations reflected in the forward looking
statements are reasonable, management can give no assurance that such
expectations will prove to have been correct. Generally, forward looking
statements relate to business plans or strategies, projected or anticipated
benefits or other consequences of such plans or strategies, or projections
involving anticipated revenues, expenses, earnings, levels of capital
expenditures, liquidity or indebtedness, ability to raise working capital, or
other aspects of operating results or financial position. All phases of our
operations are subject to a number of uncertainties, risks and other influences
which are set forth in detail in Item 1A of our annual report on Form 10-KSB for
the fiscal year ended December 31, 2006 under the caption entitled "Risk
Factors", many of which are outside of our control and any one of which, or a
combination of which, could materially affect our results of operations and
whether the forward looking statements made by us ultimately prove to be
accurate.

GOING CONCERN AND MANAGEMENT'S PLAN

The accompanying unaudited condensed consolidated financial statements have been
prepared in conformity with accounting principles generally accepted in the
United States of America, which contemplate the continuation of the Company as a
going concern. As shown in the accompanying unaudited condensed consolidated
financial statements the Company has incurred losses from operations since
inception. Management anticipates incurring substantial additional losses in
2007. Further, the Company may incur additional losses thereafter, depending on
its ability to generate revenues from the licensing or sale of its technologies
and products, or to enter into any or a sufficient number of joint ventures. The
Company has no significant revenue to date. There is no assurance that the

Company can successfully commercialize any of its technologies and products and realize any revenues there from. The Company's technologies and products have never been utilized on a large-scale commercial basis and there is no assurance that any of its technologies or products will receive market acceptance. There is no assurance that the Company can continue to identify and acquire new technologies. These factors raise substantial doubt about the Company's ability to continue as a going concern. As of March 31, 2007, the Company had an accumulated deficit since inception of $52,437,606 and a working capital deficiency and stockholder's deficiency of $21,598,529 and $19,583,195 respectively.

We are a development stage company and our efforts have been primarily devoted to technology identification and acquisition, research and development and raising capital. This discussion provides an analysis of our anticipated plan of operation for the next 12 months.

During the next 12 months we intend to concentrate on the (i) continued development and marketing of the software products of LTDnetwork, Inc., which is referred to in this quarterly report as "LTDN", including our Qtrax service, (ii) commercialization of our proprietary resealable metal beverage can, and (iii) commercialization of products developed by Alfa-Pro Products GmbH and from the intellectual property acquired from Schlatti GBR.

As we prepare to launch the Qtrax service in 2007, we have obtained the necessary music licensing agreements from several prominent record companies in order to provide the digital music content of the site. The music license contracts allow us to make available on Qtrax, the electronic libraries of the record companies in an unrestricted manner for downloading. It is our intention to have all music available on the various record companies' libraries available for access upon commercial launch.

The terms of the licenses vary from twelve to twenty-two months and provide for various conditions to be met. As of May 17, 2007 we were renegotiating the terms of some of the agreements that had certain milestones which as of May 17, 2007 had not been met and included the launching of the Qtrax site. We are in the process of renegotiating the terms of payment and milestones and we are confident that these terms will be extended and milestones reset, however there is no guarantee that the record companies will alter the terms of our agreements. The inability to have terms and milestones adjusted will significantly impact the viability of the Qtrax service.

2

&lt;PAGE&gt;

Except for a nominal amount of revenue from the sale of products of one of our subsidiaries in a prior period, we have not generated any revenue from operations since our inception and we have not been profitable since our inception. We will require additional financing to continue our planned operations during the next 12-month period. We believe that we will be able to raise the necessary financing to continue planned operations. We will attempt to raise this additional capital through the public or private placement of our securities, debt or equity financing, joint ventures, or the licensing or sale of our technologies and products. However, there is no guarantee that we will be able to successfully raise the required funds for operations or that such funds will be available on terms satisfactory to us. Any inability to raise additional funds would require that we significantly scale back our planned operations.

In particular, we need to obtain financing for the production of machine-fabricated samples of our resaleable beverage can for distribution to beverage producers who have previously expressed an interest in our resaleable beverage can. It is anticipated that production of those samples, marketing and general operational expenses will require less than $450,000. We anticipate that in the event we are required to purchase capital equipment for the full scale production of our resaleable beverage cans, an additional $2,000,000 would be required. The production of the machine produced samples has been delayed by a failed financing, the proceeds of which were to be used to complete this production run.

Also, we have launched our IntelliPrice product developed by LTDN. We need to raise additional funds in order to put us in a position to successfully market and distribute such product.

Ideally, upon the commercialization of our products, including IntelliPrice and Qtrax, and implementation of operational cost controls, we would hope that sustainable revenues will be able to be generated so as to avoid the necessity to raise significant funds in the longer term. There can be no assurances as to when and whether we will be able to commercialize our products and technologies and realize any revenues therefrom.

No assurance can be given that we can complete the development of any technology or that, if any technology is fully developed, it can be manufactured and marketed on a commercially viable basis. Furthermore, no assurance can be given that any technology will receive market acceptance. Being a development stage company, we are subject to all the risks inherent in the establishment of a developing or new business.

As of May 17, 2007, $1,760,000 of our 9% Convertible Debentures are outstanding.

In addition, we have raised from various financing sources $2,841,000 in bridge loan financing.

DEBENTURES DUE AUGUST 20, 2006

An aggregate of $150,000 of such 9% Convertible Debentures were due and payable on August 20, 2006 and bear interest at 9% per annum on a simple non-compounded basis. Such 9% Convertible Debentures are in default but the holders thereof have taken no action with respect to the collection of such 9% Convertible Debentures. Such 9% Convertible Debentures are convertible, at the holder's option, into shares of our common stock at a conversion rate equal to the lesser of $0.07 (subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs) and 75% of the average of the 10 lowest closing bid prices of our common stock for the 30 trading days immediately preceding the applicable date of conversion. Subject to limited exceptions, a holder shall not be entitled to convert a 9% Convertible Debenture held by such holder if such conversion would result in such holder beneficially owning more than 9.99% of our common stock following such conversion. If a holder elects to convert all or a portion of such 9% Convertible Debentures and the conversion price is less than $0.07 (subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs), in lieu of effecting such conversion, we may elect to redeem the amount of such 9% Convertible Debentures requested to be so converted at a purchase price equal to 150% of the principal amount of such 9% Convertible Debentures plus accrued and unpaid interest to the date of redemption. The holder may accelerate the maturity date of such 9% Convertible Debentures following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy, certain judgment defaults and the suspension of our common stock from trading on the OTC Bulletin Board. Such 9% Convertible Debentures are secured by a security interest in all of our assets.

Each warrant issued in connection with such 9% Convertible Debentures and $2,995,000 of our 9% Convertible Debentures previously repurchased by us or converted is exercisable until the second anniversary of the effective date of the registration statement registering our shares of common stock issuable upon the exercise of such warrants. Such warrants are exercisable at $0.10 per share, such exercise price subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs. Subject to limited exceptions, a holder shall not be entitled to convert a warrant held by such holder if such

&lt;PAGE&gt;

3

conversion would result in such holder beneficially owning more than 4.99% of our common stock following such conversion (in lieu of such restriction, an aggregate of 4,285,714 of such warrants provided that the holder thereof shall not be entitled to convert such warrants held by such holder if such conversion would result in such holder beneficially owning more than 9.99% of our common stock following such conversion). If the average of the closing bid prices of our common stock during any period of 20 consecutive trading days is equal to or greater than $0.50 and the closing bid price of our common stock is equal to or greater than $0.50 for at least 10 trading days during such period then with respect to each such warrant that the holder does not exercise during the 15 trading day period following the receipt by the holder of a notice from us that such average price and closing bid prices have occurred, the exercise price for such warrants will each be adjusted to $0.25 per share (subject to adjustment for customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs). Holders of such warrants are entitled to effect a cashless exercise of such warrants if the registration statement registering our shares of common stock issuable upon the exercise of such warrants has not been declared effective prior the first anniversary of the issuance of such warrants.

DEBENTURES DUE MARCH 24, 2007

An aggregate of $325,000 of such 9% Convertible Debentures were due and payable on March 24, 2007 and bear interest at 9% per annum on a simple non-compounded basis. Such 9% Convertible Debentures are in default but the holders thereof have taken no action with respect to the collection of such 9% Convertible Debentures. Such 9% Convertible Debentures are convertible, at the holder's option, into shares of our common stock at a conversion rate equal to the lesser of $0.07 (subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs) and 75% of the average of the 5 lowest closing bid prices of our common stock for the 30 trading days immediately preceding the applicable date of conversion. Subject to limited exceptions, a holder shall not be entitled to convert a 9% Convertible Debenture held by such holder if such conversion would result in such holder beneficially owning more than 4.99% of our common stock following such conversion. If a holder elects to convert all or a portion of such 9% Convertible Debentures and the conversion price is less than $0.07 (subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs), in lieu of effecting such conversion, we may elect to redeem the amount of such 9% Convertible Debentures requested to be so converted at a purchase price equal to 150% of the principal amount of such 9%

Convertible Debentures plus accrued and unpaid interest to the date of redemption. The holder may accelerate the maturity date of such 9% Convertible Debentures following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy, certain judgment defaults and the suspension of our common stock from trading on the OTC Bulletin Board. Such 9% Convertible Debentures are secured by a security interest in all of our assets.

Each warrant issued in connection with such 9% Convertible Debentures is exercisable until the second anniversary of the effective date of the registration statement registering our shares of common stock issuable upon the exercise of such warrants. Such warrants are exercisable at $0.07 per share, such exercise price subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs. Subject to limited exceptions, a holder shall not be entitled to convert a warrant held by such holder if such conversion would result in such holder beneficially owning more than 4.99% of our common stock following such conversion. If the average of the closing bid prices of our common stock during any period of 20 consecutive trading days is equal to or greater than $0.50 and the closing bid price of our common stock is equal to or greater than $0.50 for at least 10 trading days during such period then with respect to each such warrant that the holder does not exercise during the 15 trading day period following the receipt by the holder of a notice from us that such average price and closing bid prices have occurred, the exercise price for such warrants will each be adjusted to $0.25 per share (subject to adjustment for customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs). Holders of such warrants are entitled to effect a cashless exercise of such warrants if the registration statement registering our shares of common stock issuable upon the exercise of such warrants has not been declared effective prior the first anniversary of the issuance of such warrants.

DEBENTURES DUE APRIL 3, 2007

An aggregate of $575,000 of such 9% Convertible Debentures were due and payable on April 3, 2007 and bear interest at 9% per annum on a simple non-compounded basis. Such 9% Convertible Debentures are in default but the holders thereof have taken no action with respect to the collection of such Convertible Debentures. Such 9% Convertible Debentures are otherwise on the same terms as our 9% Convertible Debentures due on March 24, 2007 described above.

DEBENTURES DUE MAY 2, 2007

An aggregate of $440,000 of such 9% Convertible Debentures are due and payable

on May 2, 2007 and bear interest at 9% per annum on a simple non-compounded basis. Such 9% Convertible Debentures are otherwise on the same terms as our 9% Convertible Debentures due on March 24, 2007 described above. Such 9% Convertible Debentures are in default but the holders thereof have taken no action with respect to the collection of such 9% Convertible Debentures.

<PAGE>

4

**DEBENTURES DUE MAY 31, 2007**

An aggregate of $80,000 of such 9% Convertible Debentures are due and payable on May 31, 2007 and bear interest at 9% per annum on a simple non-compounded basis. Such 9% Convertible Debentures are otherwise on the same terms as our 9% Convertible Debentures due on March 24, 2007 described above. Such 9% Convertible Debentures are in default but the holders thereof have taken no action with respect to the collection of such 9% Convertible Debentures.

**DEBENTURES DUE JUNE 1, 2007**

An aggregate of $190,000 of such 9% Convertible Debentures are due and payable on June 1, 2007 and bear interest at 9% per annum on a simple non-compounded basis. Such 9% Convertible Debentures are otherwise on the same terms as our 9% Convertible Debentures due on March 24, 2007 described above. Such 9% Convertible Debentures are in default but the holders thereof have taken no action with respect to the collection of such 9% Convertible Debentures.

**BRIDGE LOAN FINANCING**

We have borrowed an aggregate of $2,841,000 from various investors. In connection with such financing, we issued warrants to purchase 117,397,572 shares of our common stock.

Such Notes do not bear interest but, as noted above, the face value of such Notes at issuance was equal to a certain percentage above the purchase price thereof. All such Notes are due and payable prior to the end of 2006. >From and after the date we amend our certificate of incorporation as described below, if an event of default under such Notes occurs then such Notes will be convertible, at the holder's option, into shares of our common stock at a conversion rate equal to 75% of the average of the 5 lowest closing bid prices of our common stock for the 30 trading days immediately preceding the applicable date of conversion. We may, at our option, prepay such Notes at any time. The holders of such Notes may accelerate the maturity date of such Notes following the

occurrence of customary events of default, including, without limitation,
payment defaults, breaches of certain covenants and representations, certain
events of bankruptcy and certain judgment defaults.

If the holders of our common stock approve an amendment to our certificate of
incorporation to increase our authorized capital stock to an amount sufficient
to permit the exercise of such warrants, then each such warrant will be
exercisable from the date we file such amendment with the Secretary of State of
the State of Delaware until the expiration date provided in each such warrant.
Such warrants are exercisable at $0.07 per share, such exercise price subject to
adjustment for subsequent lower price issuances by us and other customary events
including stock splits, reverse stock splits, dividends of our common stock and
spin-offs. The holders of such warrants are entitled to effect a cashless
exercise of such warrants in certain circumstances. Such Notes are in default
but the holders thereof have taken no action with respect to the collection of
such Notes.

ITEM 3.  CONTROLS AND PROCEDURES.

We maintain a set of disclosure controls and procedures designed to ensure that
information required to be disclosed by us in the reports filed under the
Securities Exchange Act of 1934, is recorded, processed, summarized and reported
within the time periods specified by the Securities and Exchange Commission's
rules and forms. Disclosure controls are also designed with the objective of
ensuring that this information is accumulated and communicated to our management
to allow timely decisions regarding required disclosure.

Based upon our management's evaluation as of the end of the period covered by
this report, our chief executive officer concluded that, our disclosure controls
and procedures are not effective to ensure that information required to be
included in our periodic Securities and Exchange Commission filings is recorded,
processed, summarized, and reported within the time periods specified in the
Securities and Exchange Commission's rules and forms.

In connection with the audit of our financial statements for the year ended
December 31, 2006 our auditors identified the following material weaknesses (and
such weaknesses continued during the quarter ended March 31, 2007):

    o    the lack of segregation of duties in the process of cash receipts
         and disbursements;

    o    the lack of a timely closing of our books and records and
         preparation of our financial statements;

    o    the lack of controls with respect to the documentation and
         accounting for the issuance of our equity securities; and

o    inadequate accounting resources to account for and analyze technical
     accounting issues, including, without limitation, accounting for
     derivative obligations.

There have not been any changes in our internal control over financial reporting
during the quarter ended March 31, 2007 that have materially affected, or are
reasonably likely to materially affect, our internal control over financial
reporting.

<PAGE>

                                         5

                          PART II--OTHER INFORMATION

ITEM 1. LEGAL PROCEEDINGS

On March 2, 2007, Nancy L. Donenfeld and Thelma L. Donenfeld, as trustee of the
Nancy L. Donenfeld Trust filed a complaint in the Supreme Court of the State of
New York, County of New York against us, Allan Klepfisz, our Chief Executive
Officer, and Ethel Griffin, public administratrix of the estate of Kurt Seifman.
Such complaint relates to the alleged default by us under a loan agreement with
the plaintiffs. Such complaint seeks compensatory damages in the amount of
$459,892.67 plus interest and late fees of approximately $900,000 and the value
of certain restricted shares issued to such plaintiffs and punitive damages in
the amount of $5,000,000. Management believes that the eventual outcome of these
matters will not have a material adverse effect on our consolidated financial
position, results of operations, or cash flow.

We are subject to various matters of litigation during our normal course of
operations. Management believes that the eventual outcome of these matters will
not have a material adverse effect on our consolidated financial position,
results of operations, or cash flows.

ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

We have not purchased any of our equity securities during the quarter ended
March 31, 2007. Except as described below, all unregistered sales of our equity
securities during the quarter ended March 31, 2007 have previously been reported
on Current Reports on Form 8-K.

We issued 750,000 shares of our common stock in settlement for liabilities in
the amount of $37,000 related to consulting expenses incurred in 2004.

We issued 4,244,330 shares of our common stock related to the conversion of convertible debt and note payable including accrued interest totaling $75,000.

We issued 10,000,000 shares of our common stock related to a financing expense valued at $500,000.

ITEM 3.  DEFAULTS UPON SENIOR SECURITIES.

We are currently in default on all of the indebtedness described in Item 2 (Plan of Operation) above, except for 1,160,000 of the Bridge Loans.

In addition, on March 2, 2007, Nancy L. Donenfeld and Thelma L. Donenfeld, as trustee of the Nancy L. Donenfeld Trust filed a complaint in the Supreme Court of the State of New York, County of New York against us, Allan Klepfisz, our Chief Executive Officer, and Ethel Griffin, public administratrix of the estate of Kurt Seifman. Such complaint relates to the alleged default by us under a loan agreement with the plaintiffs. Such complaint seeks compensatory damages in the amount of $459,892.67 plus interest and late fees of approximately $900,000 and the value of certain restricted shares issued to such plaintiffs and punitive damages in the amount of $5,000,000.

ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS.

There were no matters submitted to a vote of security holders during the quarter ended March 31, 2007.

ITEM 5.  OTHER INFORMATION.

None.

ITEM 6.  EXHIBITS

Exhibit 31    Certification of the Principal Executive Officer and Principal
              Financial Officer pursuant to Section 302 of the
              Sarbanes-Oxley Act of 2002

Exhibit 32    Certification of the Principal Executive Officer and Principal
              Financial Officer pursuant to Section 906 of the
              Sarbanes-Oxley Act of 2002

6

<PAGE>

SIGNATURES
---------

In accordance with the requirements of the Securities Exchange Act of
1934, the registrant caused this report to be signed on its behalf by the
undersigned, thereunto duly authorized.

BRILLIANT TECHNOLOGIES CORPORATION

Dated: May 19, 2007            By /s/ Allan Klepfisz
                                  ------------------------------
                                  Allan Klepfisz
                                  Chief Executive Officer, President and
                                  Acting Chief Financial Officer

                                  7

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-31.1
<SEQUENCE>2
<FILENAME>brilliant_10qsb-ex3101.txt
<DESCRIPTION>CERTIFICATION
<TEXT>
<PAGE>

EXHIBIT 31

CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER AND PRINCIPAL FINANCIAL OFFICER

I, Allan Klepfisz, certify that:

(1) I have reviewed the quarterly report on Form 10-QSB of Brilliant
Technologies Corporation (the "Company") for the quarter ended March 31, 2007;

(2) Based on my knowledge, such quarterly report does not contain any untrue
statement of a material fact or omit to state a material fact necessary to make
the statements made, in light of the circumstances under which such statements
were made, not misleading with respect to the period covered by such quarterly
report;

(3) Based on my knowledge, the financial statements, and other financial information included in such quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in such quarterly report;

(4) I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under my supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to me by others within those entities, particularly during the period in which such quarterly report is being prepared;

(b) [Intentionally Omitted];

(c) evaluated the effectiveness of the Company's disclosure controls and procedures and presented in such quarterly report my conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by such quarterly report based on such evaluation; and

(d) disclosed in such quarterly report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

(5) I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons fulfilling the equivalent function):

(a) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls over financial reporting.

Date: May 19, 2007          By: /s/ Allan Klepfisz          _____

```
                                         Allan Klepfisz
                                         President, Chief Executive Officer and
                                            Acting Chief Financial Officer
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-32
<SEQUENCE>3
<FILENAME>brilliant_10qsb-ex3200.txt
<DESCRIPTION>CERTIFICATION
<TEXT>
<PAGE>

EXHIBIT 32

          AS ADOPTED PURSUANT BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

     In connection with the quarterly report on Form 10-QSB of Brilliant Technologies
Corporation for the quarter ended March 31, 2007 as filed with the Securities
and Exchange Commission on the date hereof (the "Report"), the undersigned,
Allan Klepfisz, Chief Executive Officer, President and acting Chief Financial
Officer of the Company, certifies, pursuant to 18 U.S.C. ss.1350, as adopted
pursuant to ss. 906 of the Sarbanes-Oxley Act of 2002, that:

     (1) The Report fully complies with the requirements of Section 13 (a) or
15 (d) of the Securities Exchange Act of 1934; and

     (2) The information contained in the Report fairly presents, in all
material respects, the financial condition and result of operations of the
Company.

Date: May 19, 2007        By: /s/ Allan Klepfisz
                              -----------------------------
                              Allan Klepfisz
                              President, Chief Executive Officer and
                                 Acting Chief Financial Officer


</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```