# EXHIBIT E

# EXHIBIT E consists of excerpts from
## Brilliant Technology Corporation's
## Form 10-KSB for year end
## December 31, 2006

7/18/2007

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGj1WyK3XmZv3dTINen
 TWSM7VrzlADbmYQa1onwg5sDW3P6oaM5D3tdezXtWn7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 JwLZ7aEY2Xczci1+ZRx8wHv1O3aYneV9QjbNGpt9JtuJZ3BDHKbLlNA43EOCDGNz
 NUEa+7G1QfNawglK2xPGCw==
```

```
<SEC-DOCUMENT>0001019687-07-001189.txt : 20070425
<SEC-HEADER>0001019687-07-001189.hdr.sgml : 20070425
<ACCEPTANCE-DATETIME>20070425172935
ACCESSION NUMBER:          0001019687-07-001189
CONFORMED SUBMISSION TYPE: 10KSB
PUBLIC DOCUMENT COUNT:     9
CONFORMED PERIOD OF REPORT: 20061231
FILED AS OF DATE:          20070425
DATE AS OF CHANGE:         20070425
```

```
FILER:

	COMPANY DATA:
		COMPANY CONFORMED NAME:            Brilliant Technologies, CORP
		CENTRAL INDEX KEY:                 0001054825
		STANDARD INDUSTRIAL CLASSIFICATION: INVESTORS, NEC [6799]
		IRS NUMBER:                        134000208
		FISCAL YEAR END:                   1231

	FILING VALUES:
		FORM TYPE:                         10KSB
		SEC ACT:                           1934 Act
		SEC FILE NUMBER:                   000-23761
		FILM NUMBER:                       07788546

	BUSINESS ADDRESS:
		STREET 1:                          211 MADISON AVE #28B
		CITY:                              NEW YORK
		STATE:                             NY
		ZIP:                               10016
		BUSINESS PHONE:                    212-532-2736

	MAIL ADDRESS:
		STREET 1:                          211 MADISON AVE #28B
```

```
                    CITY:                        NEW YORK
                    STATE:                       NY
                    ZIP:                         10016

        FORMER COMPANY:
                FORMER CONFORMED NAME:    ADVANCED TECHNOLOGY INDUSTRIES INC
                DATE OF NAME CHANGE:      20000515

        FORMER COMPANY:
                FORMER CONFORMED NAME:    KURCHATOV RESEARCH HOLDINGS LTD /DE/
                DATE OF NAME CHANGE:      20000114

        FORMER COMPANY:
                FORMER CONFORMED NAME:    ABERDEEN ACQUISITION CORP /DE/
                DATE OF NAME CHANGE:      19980206

</SEC-HEADER>
<DOCUMENT>
<TYPE>10KSB
<SEQUENCE>1
<FILENAME>brilliant_10ksb-123106.txt
<DESCRIPTION>ANNUAL REPORT
<TEXT>
<Page>

                        UNITED STATES
            SECURITIES AND EXCHANGE COMMISSION
                 WASHINGTON, D.C. 20549

                       FORM 10-KSB

[X]  ANNUAL REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT
OF 1934

        FOR THE YEAR ENDED DECEMBER 31, 2006

[ ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

        FOR THE TRANSITION PERIOD FROM _____ TO _____

              COMMISSION FILE NUMBER 0-23761
```

BRILLIANT TECHNOLOGIES CORPORATION
(Name of small business issuer in its charter)

DELAWARE                                    13-4000208
(State or other jurisdiction of            (I.R.S. Employer
incorporation or organization)             Identification No.)

211 MADISON AVENUE APT. 20B, NEW YORK, NEW YORK          10116
(Address of principal executive offices)               (Zip Code)

Issuer's telephone number: (212) 532-2736

Securities Registered Pursuant to Section 12(b) of the Act: NONE

Securities Registered Pursuant to Section 12(G) of the Act:
COMMON STOCK $0.0001 PAR VALUE PER COMMON SHARE

Check whether the issuer is not required to file reports pursuant
Section 13 or 15(d) of the Exchange Act. []

Check whether the issuer (1) filed all reports required to be filed by
Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such
shorter period that the registrant was required to file such reports), and (2)
has been subject to such filing requirements for the past 90 days.
Yes [X] No [ ]

Check if there is no disclosure of delinquent filers in response to
Item 405 of Regulation S-B contained in this form, and no disclosure will be
contained, to the best of registrant's knowledge, in definitive proxy or
information statements incorporated by reference in Part III of this Form 10-KSB
or any amendment to this Form 10-KSB. (X )

Indicate by check mark whether the registrant is a shell company (as
defined in Rule 12b-2 of the Exchange Act). Yes [ ] No [X]

Issuer's revenues for its most recent fiscal year.     $0

As of April 17, 2007 there were 636,442,533 outstanding shares of the
issuer's common stock held by non-affiliates with an aggregate market value of
approximately $36,913,667 based on a closing bid quotation on the OTC Bulletin
Board of $0.058 on such date.

As of April 17, 2007 there were 636,966,344 outstanding shares of the
issuer's common stock.

Transitional Small Business Disclosure Format (check one):

Yes [ ] No [X]

1

<Page>

PART I

ITEM 1. DESCRIPTION OF BUSINESS

Brilliant Technologies Corporation was incorporated in Delaware in October 1995. As used in this annual report, references to "we", "us" and "our" refer to Brilliant Technologies Corporation and its consolidated subsidiaries.

ACQUISITIONS
- ------------

ACQUISITION OF LffDNETWORK, INC.

On December 15, 2004, we consummated the acquisition of all of the issued and outstanding shares of capital stock of LffDnetwork, Inc., which is referred to in this annual report as "LffDN". Such acquisition was effected pursuant to a merger of LffDN with and into one of our subsidiaries. Pursuant to the terms of the merger we issued to the stockholders of LffDN consideration consisting of (i) 193,336 shares of our Series A Convertible Preferred Stock and (ii) warrants to purchase 487,903 shares of our Series A Convertible Preferred Stock at an exercise price of $16.33 per share. In June 2006 we extended the exercise period for such warrants subject to our stockholders approving an amendment to our certificate of incorporation increasing our authorized capital stock. 25% of such warrants will expire 60 days following the date of such amendment, 25% of such warrants will expire 90 days following the date of such amendment, 25% of such warrants will expire 120 days following the date of such amendment and 25% of such warrants will expire 150 days following the date of such amendment.

The terms of our Series A Convertible Preferred Stock provided that each share of our Series A Convertible Preferred Stock would automatically convert into 400 shares of our common stock if the holders of our common stock approved an amendment to our certificate of incorporation to increase our authorized capital stock from 100,000,000 shares to at least 500,000,000 shares. The holders of our

common stock approved such amendment at our annual meeting of stockholders held on September 26, 2005 and we filed such amendment with the Secretary of State of the State of Delaware on September 27, 2005. As a result, all shares of our Series A Convertible Preferred Stock were converted into shares of our common stock and the corresponding warrants became warrants to purchase shares of our common stock at approximately $0.04 per share.

We agreed to file a registration statement with the Securities and Exchange Commission relating to the resale of the shares of our common stock issuable upon conversion of our Series A Convertible Preferred Stock issued in such merger within 90 days following the date of such amendment to our certificate of incorporation. In addition, we agreed to use our reasonable efforts to cause such registration statement to be declared effective within 180 days following the date of such amendment to our certificate of incorporation. We have filed such registration statement and it became effective on January 26, 2006. We have agreed to keep such registration statement effective until the earliest of (a) the sale of all securities eligible to be sold thereunder, (b) the expiration of the period referred to in Rule 144(k) under the Securities Act of 1933 and (c) two years from the effective date of such registration statement.

Since immediately following such merger the former stockholders of LTDN owned a majority of our common stock (assuming the conversion of all the shares of our Series A Convertible Preferred Stock and the exercise of all the warrants to purchase shares of our Series A Convertible Preferred Stock, in each case issued to such stockholders) and the former management of LTDN constituted a majority of our Board of Directors, we have accounted for the acquisition of LTDN as a reverse merger with LTDN as the acquirer of us. LTDN was formed on October 1, 1999.

2

<Page>

ALFA-PRO PRODUCTS GMBH--ACQUISITION OF STOCK AND ASSETS.

Prior to the reverse merger with LTDN, on December 13, 2004, we entered into, and consummated the acquisitions contemplated by a Stock and Intellectual Property Purchase Agreement with Alice Schlattl, Schlattl GBR, Claudia Schreiner, Susanne Schlattl and Ralph Schlattl.

Pursuant to such Stock and Intellectual Property Purchase Agreement, we

purchased (a) all of the equity interests of Alfa-Pro Products GmbH, referred to in this annual report as "Alfa-Pro", from Alice Schlattl in consideration for 43,600 shares of our Series A Convertible Preferred Stock and $90,000, and (b) certain intellectual property rights from Schlattl GBR in consideration for 6,400 shares of our Series A Convertible Preferred Stock. Such $90,000 amount was due and payable prior to June 11, 2005, however, we have not yet made such payment. As a result of the acquisition of Alfa-Pro and such intellectual property rights, we obtained the intellectual property rights to over 40 consumer products. Such products are in varying stages of the development process and none have yet been commercialized.

COMPANY OPERATIONS
-----------------

GENERAL. We are a development stage company and our efforts have been primarily devoted to technology identification and acquisition, research and development and raising capital.

Our primary strategy is to acquire and commercialize new or previously existing but non-commercialized technologies. Directly or through a subsidiary, we may acquire a direct interest in these technologies, a right to use these technologies, and/or an ownership interest in the entity owning these technologies. The acquisition of technologies by us may be made by the issuance of our common stock or other securities, cash or other consideration, or a combination thereof. Our principal activities include identifying, reviewing and assessing technologies for their commercial applicability and potential.

Described below are the various technologies which we presently own.

LTDNETWORK, INC.

LTDN specializes in the development of innovative technologies, software and services for online e-tailers, advertising, media and marketing companies. LTDN's software and services include the following:

We believe that Qtrax, a unique music file sharing technology based Internet service, will be the first music file sharing application that provides consumers the ability, at no charge, to download music files from the Gnutella peer to peer network with the permission of the record companies that own the rights to such music to the extent that such record companies have executed licensing agreements with LTDN and Brilliant Technologies. This revolutionary free service will allow a consumer to play the ad-supported music files only on the computer such consumer uses to download such music files as well as a portable device with DRM rules attached to the service. QTrax will also operate

as an online music store where a consumer can purchase music files as a permanent download so that the consumer can play such music files on any device that plays MP3 files. Through the integration of LTDN's innovative Xpeer software application as part of the Qtrax service, LTDN and Brilliant Technologies will be able to offer online e-tailers, advertising, media and marketing companies the ability to provide highly targeted advertising, promotional and other marketing information to consumers who may have a strong interest in such advertisers' products. For example, if a consumer downloads music files of a particular artist, Xpeer will display books, music and other products that feature such artist as well as providing an enormous inventory of related merchandise, links, info and highly targeted promotions (including marketing campaigns).

3

<Page>

Given the current and growing publicity surrounding the music download industry, we believe that Qtrax is still uniquely positioned to provide a product that is in demand by consumers. To date, we have entered into license agreements with Major Labels and Publishers for use of their catalogues and publishing rights. These include EMI Music & EMI Publishing, TVT Records, SonyATV Publishing, SonyBMG, Warner Music Group, Universal Music Publishing. We have also entered into license Agreements with several independent record labels for use of their catalogues. These labels include V2 Records, Inc., a member of the Virgin Group, Digital Hardcore Recordings Ltd., Geist Ltd., Cooking Vinyl Limited and TVT Records.

Currently, we anticipate launching Qtrax during the 3rd Quarter 2007. For us to launch, all that is necessary is (i) finalizing an agreement with a "digital storefront" that we would refer traffic to when a user of our service desires to purchase a song download, (ii) finalizing Agreements with the Major Labels which is expected in the near term and (iii) integrating all the components into our new Qtrax GUI and application, which is being co-developed with external developers and partners providing additional services related to the Qtrax application and service in the US. Qtrax has also put into place the ability to generate substantial advertising revenue through agreements and partnerships with relevant companies about to be finalized

The delay in launching Qtrax has been primarily due to (i) the length of time it has taken the Major Labels to finalize the terms and contracts for Brilliant

Technologies to form a licensing partnership with them, (ii) The Digital Storefront was initially delayed due to our potential suppliers need (internal decision, unrelated to Qtrax) to develop a new platform for which Brilliant Technologies subsequently re-assessed its potential partners based on the new parameters and requirements of our development partners and development strategy and (iii) the requirement of additional financing which is required to complete the integration of all of the above components into a new Qtrax GUI and application in order to satisfy the terms and requirements of all associated parties to finalize their licensing agreements.

INTELLIPRICE. IntelliPrice is a fully customizable, event driven Internet Explorer browser add-in that automatically performs price comparisons on recognized products that a consumer is viewing on an alternate or a competitor's website. IntelliPrice can boost referral and commission revenues to portals by increasing the visibility and accessibility of products and services available from portal affiliates. IntelliPrice can also be used by large independent Internet retailing partners to promote their products directly to their customers when they are at alternative websites. As shoppers browse, IntelliPrice is able to identify what is being viewed and can deliver current price comparisons, targeted advertising and personalized information from portal partners in either a slide-out panel, a toolbar, or an alert window from the task bar. We believe that IntelliPrice is unobtrusive yet significantly enhances the price- and value-seeking shopper experience.

PROMOSENSE. PromoSense is an event driven and fully customizable web browser add-in that enables an advertiser to deliver highly targeted information depending on customizable rules and the web page the PromoSense user is currently viewing by performing basic promotional alerts (window pane, pop-up or Windows Taskbar notification).

XPER. XPeer is an interactive component designed for price comparison providers that want to promote themselves within P2P file sharing applications. Xpeer offers end users product information and price comparison data based off keyword searches performed while searching for files or music. As an example, if a user searches for a particular music artist, XPeer will display a list of all music and books that feature references to that artist.

4

&lt;Page&gt;

DYNAAD. DynaAd enables an advertiser to build and display exact match product ads on any website/web page as opposed to broad, category level based ads.

MESSAGERETRIEVER. MessageRetriever is a web based proprietary software that enables the automatic retrieval of e-mail by the simple provision of a user's standard e-mail address and password from any ISP and from any computer with a web browser. If an e-tailer integrates their own branded version of MessageRetriever on its website, it will encourage repeat visitors to such site so such visitors can check their e-mail.

PAGEQUERY WEB SERVICE. PageQuery Web Service is a high performance URL query system that allows a business to automatically extract specific or user defined nuggets of data from a web page. Any number of items can be configured into a system for extraction and once they are, the PageQuery Web Service will automatically detect their presence on any page across an entire domain.

FREE TEXT ANALYSIS WEB SERVICE. Free Text Analysis Web Service is a URL query system that automatically catalogues the information presented in a web page into a structured, hierarchical view of visually important ranked data. All existing page data is preserved along with a collection of meta data that allows a business to further process, manipulate or extract specific information from the results.

RESEAL, LTD.
-----------

Reseal, Ltd, a 96% owned subsidiary referred to in this annual report as "Reseal", holds the intellectual property related to our proprietary resealable metal beverage can. This innovative product allows a beverage can to be resealed while maintaining the carbonation and/or freshness of the contents longer than a pop top feature of most beverage cans. To date, Reseal has not entered into any distribution or sales agreements and there can be no assurance that Reseal will enter into distribution or sales agreements, or if entered into that the agreements will result in significant sales or revenue. The ability to successfully commercialize the resealable metal beverage can is heavily dependent upon our ability to raise additional funds.

ALFA-PRO
--------

Alfa-Pro is a German based firm focused on developing and patenting technologies and products for the consumer market. Alfa Pro's products are designed to fill a gap in a market where products do not exist or to make a significant improvement over products currently serving the target markets. The products of Alfa-Pro are

in various stages of development and none of such products have reached the commercialization stage.

INTELLECTUAL PROPERTY
---------------------

Our success depends substantially upon our intellectual property. We have a portfolio of approximately 28 patents and/or patents pending. We may be unsuccessful in prosecuting our patent applications or patents may not be issued from our patent applications. Even if patents are issued and maintained, these patents may not be of adequate scope to benefit us or may be held invalid and unenforceable against third parties.

MARKETING AND DISTRIBUTION
--------------------------

We believe that several of our acquired technologies and products are ready for commercialization and marketing, specifically the Qtrax and intelliPrice services.

5

<Page>

As a result, we will devote significant business activities and resources to the successful commercialization and marketing of our acquired technologies and products. We have little experience marketing products of a technological or consumer nature. The introduction of a new product or technology into the market place requires vast capital resources and an increase in corporate personnel. Our product marketing with respect to our consumer products relies on the development of strategic alliances with global distributors. This would place the burden of marketing the products directly on the strategic partners and would keep our cost risk low and reduce the amount of capital resources we need to operate successfully. Conversely, the risks include the inability to locate the proper partner and that any such partner is not effective.

COMPETITION
-----------

Competition in all of the areas in which we own and propose to purchase technologies is intense. We compete against a wide range of companies,

universities, think tanks, consumer product companies and others, most which possess substantially greater financial and marketing resources and experience than us. Competition in our core business segments is typically based on product recognition and acceptance, price, and sales and marketing expertise and resources. Any one or more of our competitors or other enterprises not presently identified by or known to us may develop technologies and/or products which are superior to, or less expensive than, our products and technologies or market more successfully existing or new competing products and technologies. To date, we have not generated any revenues from our products or technologies and are competing against companies that may have significantly greater financial and human resources.

RESEARCH AND DEVELOPMENT
-----------------------

In the fiscal year ended December 31, 2006, we incurred expenses of $1,005,221 on research and development and $3,176,598 since inception. By comparison, in the fiscal year ended December 31, 2005, we incurred expenses of $812,175 on research and development.

GOVERNMENTAL REGULATION
-----------------------

Few U.S. or foreign laws and regulations specifically apply to the marketing, sale or use of any of our present technologies, other than laws and regulations generally applicable to businesses. Many laws and regulations, however, are pending and may be adopted in the United States and other countries with respect to the Internet and intellectual property rights relating to the products of our subsidiary, LYTON. There can be no assurance that such laws and regulations or different standards if adopted or applied in the future will not materially increase the cost of licensing and using such products, or prevent their use altogether. Moreover, there can be no assurance that any or all jurisdictions in which we presently operate or in the future may conduct our business will not enact laws or adopt regulations which increase the cost of or prevent us from licensing or marketing our other technologies or otherwise doing business therein.

EMPLOYEES
---------

We currently employ no part-time and 12 full-time employees of which 5 are in the USA and 7 in Australia. We believe that we have satisfactory relations with our current employees.

<Page>

ITEM 1A. RISK FACTORS

RISK FACTORS

AN INVESTMENT IN OUR COMMON STOCK INVOLVES A HIGH DEGREE OF RISK. IF ANY OF THESE RISKS OR UNCERTAINTIES ACTUALLY OCCURS, OUR BUSINESS, FINANCIAL CONDITION OR RESULTS OF OPERATIONS COULD BE MATERIALLY ADVERSELY AFFECTED.

RISKS RELATED TO OUR BUSINESS IN GENERAL

WE HAVE ONLY GENERATED NOMINAL REVENUES FROM OPERATIONS AND WE EXPECT TO INCUR ADDITIONAL SIGNIFICANT LOSSES.

We have conducted only limited operations to date consisting primarily of activities related to identifying and acquiring our technologies and products. We are subject to all of the business risks associated with a development company, including, but not limited to:

o    an inability to successfully market our technologies and products;

o    risks of unforeseen capital requirements;

o    failure of market acceptance of our technologies and products;

o    failure to establish business relationships; and

o    competitive disadvantages as against larger and more established companies.

We anticipate that we will continue to incur significant operating losses for the foreseeable future as our operating expenses will increase as we continue to develop, enhance and commence the commercialization of our products. We have generated no meaningful revenues to date. As of December 31, 2006, we had an accumulated deficit of $51,181,670. Although our management believes that we may recognize revenues once we launch our products in the marketplace, there can be no assurance as to when or whether we will be able to commercialize our products and technologies and realize any revenues therefrom.

6

WE WILL REQUIRE SIGNIFICANT ADDITIONAL CAPITAL IN ORDER TO FULLY IMPLEMENT OUR
BUSINESS PLAN AND MARKETING STRATEGY.

Our future capital requirements could vary significantly and will depend upon
certain factors, many of which are not within our control. Factors that may bear
on our future capital requirements include:

o    the timing of licensing of technologies and sales of products;

o    market acceptance of our technologies and products;

o    the existence and terms of any licensing and/or joint venture
     agreements for the marketing and sales of technologies and products;

7

<Page>

o    the ongoing development and testing of technologies and products; and

o    the availability of financing.

We will require substantial additional capital to expand our business, for
research and development activities and to hire administrative, marketing,
technical and operational support personnel. We cannot provide any assurances
that we ever will obtain the additional capital necessary to fully effectuate
our business goals or obtain such capital on commercially reasonable terms.
Moreover, we cannot provide assurances that additional capital requirements will
not arise, or that we will generate sufficient revenues to cover expenses or
generate profits. If adequate financing is not available, we may be required to
delay, scale back or eliminate certain of our research and development programs
and marketing and sales programs, forego technology acquisition opportunities,
or license third parties to commercialize technologies that we would otherwise
seek to develop. In addition, we may have to issue our common stock or
securities convertible into our common stock in order to obtain the funding
necessary to support operations which will dilute shareholdings and may
negatively impact the price of our common stock.

THE HOLDERS OF OUR 9% CONVERTIBLE DEBENTURES HAVE A LIEN ON ALL OF OUR ASSETS
(INCLUDING OUR INTELLECTUAL PROPERTY) AND COULD FORECLOSE IN THE EVENT THAT WE

DEFAULT UNDER THOSE DEBENTURES.

Under the terms of the Security Agreement among us and the holders of our 9% Convertible Debentures we have granted a security interest to such holders on all our assets (including our intellectual property). If we default under the terms of our 9% Convertible Debentures, the holders of such 9% Convertible Debentures would be entitled, among other things, to foreclose on our assets in order to satisfy our obligations under such 9% Convertible Debentures. A foreclosure on our assets would have a material adverse effect on our business, financial condition and results of operations.

OUR CURRENT AND NEW PRODUCTS MAY NOT COMPETE SUCCESSFULLY WITH COMPETITOR'S PRODUCTS.

The markets for our products experience and will continue to experience rapidly changing technologies, evolving industry standards and new product introductions by our competitors. These market characteristics and the activities of our competitors, including their introduction of new products and product upgrades, could render our technology obsolete. We may not successfully develop, introduce or manage the transition of new products or do so on a timely basis in response to changing technologies and standards and new products and product upgrades introduced by our competitors.

Many of our current and potential competitors have larger technical staffs, more established and larger marketing and sales organizations and significantly greater financial resources. Our inability to compete in the following factors could have a material adverse effect on our business: product performance, product features, ease of use, reliability, hardware and competitor compatibility, brand name recognition, product reputation, pricing, levels of advertising, availability and quality of customer support and timeliness of product upgrades.

ANY INABILITY TO PROTECT OUR INTELLECTUAL PROPERTY MAY LIMIT OUR ABILITY TO COMPETE AND RESULT IN A LOSS OF A COMPETITIVE ADVANTAGE.

We rely principally on copyright, trademark, patent, trade secret and contract laws to protect our proprietary technology. We cannot be certain that we have taken adequate steps to prevent misappropriation of our technology or that our competitors will not independently develop technologies that are substantially equivalent or superior to our technology.

8

`<Page>`

We have prepared and filed patent applications covering several of our software and consumer products. Our success depends, in part, on our ability to obtain and protect patents covering, and maintain trade secrecy protection of, technologies, as well as other, future technologies, and to operate without infringing on the proprietary rights of third parties. There can be no assurance that any of our pending or future patent applications will be approved, that we will develop additional proprietary technology that is patentable, that any patents issued will provide us with a competitive advantage or will not be challenged by third parties or that the patents of others will not have an adverse effect on our ability to conduct business.

In addition to patent protection, we rely on trade secrets, proprietary know-how and technology which we seek to protect. There can be no assurance that our trade secrets and proprietary know-how will not become known or be independently discovered by others.

WE MAY BE SUBJECT TO INTELLECTUAL PROPERTY INFRINGEMENT CLAIMS THAT ARE COSTLY TO DEFEND AND COULD LIMIT OUR ABILITY TO USE SOME TECHNOLOGIES IN THE FUTURE.

Although we believe that none of the technologies or products we have developed or the trademarks we use or any of the other elements of our business infringe on the proprietary rights of any third parties, third parties may assert claims against us for infringement of their proprietary rights and these claims may be successful. We could incur substantial costs and diversion of management resources in the defense of any claims relating to proprietary rights, which could materially adversely affect our business, results of operations or financial condition. Parties making these claims could secure a judgment awarding substantial damages as well as injunctive or other equitable relief that could effectively block our ability to market or license our products. Such a judgment could have a material adverse effect on our ability to sell our products or on our costs of doing business. If a third party asserts a claim relating to proprietary technology or information against us, we may seek licenses to the intellectual property from such third party. However, we cannot be certain that third parties will extend licenses to us on commercially reasonable terms, or at all. Our failure to obtain the necessary licenses or other rights or to obtain those rights at a reasonable cost could materially adversely affect our ability to sell our products or our costs of doing business.

IF WE ARE UNABLE TO HIRE AND RETAIN KEY PERSONNEL, WE MAY BE UNABLE TO DEVELOP

PRODUCTS OR ACHIEVE SALES OF PRODUCTS.

Our success depends to a significant extent on the performance of our executive officers and key technical personnel. The loss of one or more of our key employees could have a material adverse effect on our ability to develop and sell products. We believe that our future success will depend in large part on our ability to attract and retain highly skilled technical, managerial and sales and marketing personnel. There can be no assurance that we will be successful in attracting and retaining these personnel.

WE MAY NOT SUCCESSFULLY OVERCOME PROBLEMS ENCOUNTERED IN CONNECTION WITH POTENTIAL FUTURE ACQUISITIONS.

As part of our long-term growth strategy, we may seek to acquire or make investments in complementary businesses, technologies, services or products or enter into strategic relationships with parties who can provide access to those assets, if appropriate opportunities arise. From time to time, we may enter into discussions and negotiations with companies regarding our acquiring, investing in, or partnering with their businesses, products, services or technologies. We may not identify suitable acquisition, investment or strategic partnership candidates, or if we do identify suitable candidates, may not complete those transactions on commercially acceptable terms or at all.

9

<Page>

Acquisitions often involve a number of special risks, including the following:

o    difficulty integrating acquired operations, products, services and
     personnel;

o    the acquisition may disrupt our ongoing business;

o    we may not be able to retain the key personnel of the acquired
     company;

o    the acquired businesses may fail to achieve the revenues and earnings
     anticipated; and

o    we may ultimately be liable for contingent and other liabilities, not

previously disclosed to us, of the companies that we acquire.

Any of these factors could have a material adverse effect on our business. These difficulties could distract our management and employees and increase our expenses. Furthermore, we may incur indebtedness or issue equity securities to pay for any future acquisitions.

WE MAY NOT BE SUCCESSFUL IN ENTERING INTO STRATEGIC ALLIANCES.

We intend to enter into strategic partnerships, joint ventures and/or teaming arrangements with regional and multinational corporations to promote our technologies and products. In the event that we are unable to develop these relationships or once developed maintain them for any reason, our business, operating results and financial condition could be materially adversely affected. Moreover, we can give no assurances that any such relationships will result in the sale or licensing of our technologies or products.

CERTAIN RISKS MAY ATTACH TO OPERATIONS IN FOREIGN COUNTRIES.

We conduct a significant portion of our development activities in Australia. Certain risks attach to operations in foreign countries. Legal systems in some of the nations in which we conduct operations, including the licensing of technologies and selling products, may not be as developed as the United States legal system. Consequently, certain contract rights may be unenforceable in some of these jurisdictions. Any inability to enforce contracts or collect payment from clients located in these areas could have a material adverse effect on our business and results of operations. In addition, changes in a specific country's political or economic condition and unexpected changes in foreign laws and regulatory requirements could have a material adverse effect on our business and results of operations.

Our expenses are recorded in different currencies. As a result, we will be subject to the effects of exchange rate fluctuations with respect to these currencies.

RISKS RELATED TO OUR QTRAX BUSINESS

WE ARE SUBJECT TO RISKS ASSOCIATED WITH GOVERNMENTAL REGULATION.

We do not know for certain how existing laws governing issues such as property ownership, copyright and other intellectual property issues, digital rights management, taxation, security, retransmitting of media, personal privacy and data protection apply to the Internet. The vast majority of such laws were adopted before the advent of the Internet and related technologies and do not

10

<Page>

address the unique issues associated with the Internet and related technologies. Most of the laws that relate to the Internet have not yet been interpreted. In addition to potential legislation from local, state and federal governments, labor guild agreements and other laws and regulations that impose fees, royalties or unanticipated payments regarding the distribution of media over the Internet may directly or indirectly affect our business. While we, and our potential customers, may be directly affected by such agreements, we are not a party to such agreements and have little ability to influence the degree such agreements favor or disfavor Internet distribution. Changes to or the interpretation of these laws and the entry into such industry agreements could:

o   limit the growth of the Internet;

o   create uncertainty in the marketplace that could reduce demand for our
    products and services;

o   increase our cost of doing business;

o   expose us to increased litigation risk, substantial defense costs and
    significant liabilities associated with content available on our
    Websites or distributed or accessed through our products or services;

o   lead to increased product development costs or otherwise harm our
    business; or

o   decrease the rate of growth of our user base and limit our ability to
    effectively communicate with and market to our user base.

There are a large number of legislative proposals before the United States Congress and various state legislatures regarding intellectual property, digital rights management and copy protection requirements. It is not possible to predict whether or when such legislation may be adopted, and certain proposals, if adopted, could materially and adversely affect our business.

WE ARE SUBJECT TO RISKS ASSOCIATED WITH LEGAL UNCERTAINTIES.

We do not know for certain how the Supreme Court case, Metro-Goldwyn v. Grokster, will affect our business model. The Court found that companies that distribute music file sharing software with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, are liable for the resulting acts of infringement by third parties. Record companies may assert claims against us for infringement of their proprietary rights and these claims may be successful. We could incur substantial costs and diversion of management resources in the defense of any claims relating to proprietary rights, which could materially adversely affect our business, results of operations or financial condition. Parties making these claims could secure a judgment awarding substantial damages as well as injunctive or other equitable relief that could effectively block our ability to market Qtrax.

WE FACE COMPETITION FROM OTHER "FREE" PEER-TO-PEER SERVICES, FROM TRADITIONAL RETAIL MUSIC DISTRIBUTORS AND FROM EMERGING PAID ONLINE MUSIC SERVICES DELIVERED ELECTRONICALLY.

Our online music services will face significant competition from other "free" peer-to-peer services, such as KaZaa, Morphues, Grokster and a variety of other similar services that allow computer users to connect with each other and to copy many types of program files, including music and other media, from one another's hard drives, all without securing licenses from content providers. The legal status of these other "free" services is questionable since the Supreme Court ruled that certain of such services violate copyright laws. However, it is not clear what effect such ruling will have on users of such services, and there can be no assurance that these services will ever be shut down.

11

<Page>

Our paid online music services will also face competition from traditional retail music distributors such as Tower Records as well as online retailers such as Amazon.com. These retailers may include regional and national mail-based music mail-in services, international chains, deep-discount retailers, mass merchandisers, consumer electronics outlets, mail order, record clubs, independent operators and online physical retail music distributors, some of which have greater financial and other resources than we do. To the extent that consumers choose to purchase media in non-electronic formats, it may reduce our sales, reduce our gross margins, increase our operating expense and decrease profit margins in

specific markets.

Online music services competitors will include Napster, RealNetworks, Inc., Apple Computer's iTunes Music Store, Sony Connect, Walmart.com, Yahoo!, MSN and online music services powered by MusicNet such as AOL Music and Virgin.

ONLINE MUSIC DISTRIBUTION SERVICES IN GENERAL ARE NEW AND RAPIDLY EVOLVING AND MAY NOT PROVE TO BE A PROFITABLE OR EVEN A VIABLE BUSINESS MODEL.

Online music distribution services that principally rely on advertising as a source of revenue are a relatively new business model for delivering digital media over the Internet. It is too early to predict whether consumers and advertisers will accept in significant numbers online music services and accordingly whether the services will be financially viable. If online music distribution services do not prove to be popular with consumers, or if these services cannot sustain any such popularity, our business and prospects would be harmed.

WE RELY ON CONTENT PROVIDED BY THIRD PARTIES, WHICH MAY NOT BE AVAILABLE TO US ON COMMERCIALLY REASONABLE TERMS OR AT ALL.

We rely on third-party content providers to offer music online content that can be delivered to users of our service. These third party providers include music publishers and music labels. Rights to provide this content to our customers, particularly publishing rights, may be difficult to obtain and will require significant time and expense. In some cases, we may have to pay substantial fees to obtain this third party content. We cannot guarantee that we will be able to secure licenses to music content or that such licenses will be available on commercially reasonable terms.

WE MUST PROVIDE DIGITAL RIGHTS MANAGEMENT SOLUTIONS THAT ARE ACCEPTABLE TO BOTH CONTENT PROVIDERS AND CONSUMERS.

We must provide digital rights management solutions and other security mechanisms in our online music distribution services in order to address concerns of content providers and artists, and we cannot be certain that we can develop, license or acquire such solutions, or that content licensors or consumers will accept them. Consumers may be unwilling to accept the use of digital rights management technologies that limit their use of content.

OUR BUSINESS COULD BE HARMED BY A LACK OF AVAILABILITY OF POPULAR CONTENT.

Our business could be affected by the release of "hit" music titles, which can create cyclical trends in sales distinctive to the music industry. It is not

possible to determine the timing of these cycles or the future availability of

12

<Page>

hit titles. Hit products are important because they generate customer interest. We will depend upon the music content providers to continue to produce hit products. To the extent that new hits are not available, or not available at prices attractive to consumers, our sales and margins may be adversely affected.

THE GROWTH OF OUR BUSINESS DEPENDS ON THE INCREASED USE OF THE INTERNET FOR COMMUNICATIONS, ELECTRONIC COMMERCE AND ADVERTISING.

The growth of our business depends on the continued growth of the Internet as a medium for media consumption, communications, electronic commerce and advertising. Our business could be harmed if Internet usage does not continue to grow, particularly as a source of media information and entertainment and as a vehicle for commerce in goods and services. Our success also depends on the efforts of third parties to develop the infrastructure and complementary products and services necessary to maintain and expand the Internet as a viable commercial medium. We believe that other Internet-related issues, such as security, privacy, reliability, cost, speed, ease of use and access, quality of service and necessary increases in bandwith availability, remain largely unresolved and may affect the amount and type of business that is conducted over the Internet, and may impact our ability to sell our products and services and ultimately impact our business results and prospects.

If Internet usage grows, the Internet infrastructure may not be able to support the demands placed on it by such growth, specifically the demands of delivering high-quality media content. As a result, its performance and reliability may decline. In addition, Websites have experienced interruptions in service as a result of outages, system attacks and other delays occurring throughout the Internet network infrastructure. If these outages, attacks or delays occur frequently or on a broad scale in the future, Internet usage, as well as the usage of our products, services and Websites, could grow more slowly or decline.

MORE CONSUMERS ARE UTILIZING NON-PC DEVICES TO ACCESS DIGITAL CONTENT, AND WE MAY NOT BE SUCCESSFUL IN DEVELOPING VERSIONS OF OUR PRODUCTS AND SERVICES THAT WILL GAIN WIDESPREAD ADOPTION BY USERS OF SUCH DEVICES.

In the coming years, the number of individuals who access digital content through devices other than a personal computer, such as personal digital assistants, cellular telephones, televisions, set-top devices, game consoles and Internet appliances, is expected to increase dramatically. Manufacturers of these types of products are increasingly investing in media-related applications, but development of these devices is still in an experimental stage and business models are new and unproven. If we are unable to offer our services on these alternative non-PC devices, we may fail to capture a sufficient share of an increasingly important portion of the market for digital media services or our costs may increase significantly.

OUR NETWORK WILL BE SUBJECT TO SECURITY AND STABILITY RISKS THAT COULD HARM OUR BUSINESS AND REPUTATION AND EXPOSE US TO LITIGATION OR LIABILITY.

Online commerce and communications depend on the ability to transmit confidential information and licensed intellectual property securely over private and public networks. Any compromise of our ability to transmit such information and data securely or reliably, and any costs associated with preventing or eliminating such problems, could harm our business. Online transmissions are subject to a number of security and stability risks, including:

o     our own or licensed encryption and authentication technology, and access and security procedures, may be compromised, breached or otherwise be insufficient to ensure the security of customer information or intellectual property;

13

<Page>

o     we could experience unauthorized access, computer viruses, system interference or destruction, "denial of service" attacks and other disruptive problems, whether intentional or accidental, that may inhibit or prevent access to our Websites or use of our products and services;

o     someone could circumvent our security measures and misappropriate our, our partners' or our customers' proprietary information or content or interrupt operations;

o  our computer systems could fail and lead to service interruptions;

o  we may be unable to scale our infrastructure with increases in customer demand; or

o  our network of facilities may be affected by a natural disaster, terrorist attack or other catastrophic events.

The occurrence of any of these or similar events could damage our business, hurt our ability to distribute products and services and collect revenue, threaten the proprietary or confidential nature of our technology, harm our reputation and expose us to litigation or liability. We may be required to expend significant capital or other resources to protect against the threat of security breaches, hacker attacks or system malfunctions or to alleviate problems caused by such breaches, attacks or failures.

RISKS RELATED TO THE SECURITIES MARKETS AND OWNERSHIP OF OUR COMMON STOCK

HOLDERS OF OUR COMMON STOCK MAY HAVE THEIR PERCENTAGE OWNERSHIP DILUTED AS A RESULT OF THE CONVERSION OF OUR 9% CONVERTIBLE DEBENTURES AND BRIDGE NOTES, THE EXERCISE OF WARRANTS ISSUED IN CONNECTION WITH SUCH 9% CONVERTIBLE DEBENTURES AND BRIDGE NOTES AND THE EXERCISE OF WARRANTS ISSUED IN CONNECTION WITH OUR ACQUISITION OF LIDNETWORK, INC.

If all our 9% Convertible Debentures and Bridge Notes outstanding as of December 31, 2006 are converted at the conversion price as of such date and all the warrants issued in connection with such securities are exercised at their exercise price as of such date, then 202,810,680 of our common stock will be issued with respect to such conversion (not including any shares of our common stock to be issued on the conversion of interest accrued on such 9% Convertible Debentures) and exercise. In addition, if all the warrants issued in connection with our acquisition of LYDN outstanding as of December 31, 2006 are exercised, then 107,884,680 of our common stock will be issued with respect to such exercise. The exercise price for such warrants is equal to approximately $0.04 per share. Such warrants are exercisable only if we amend our certificate of incorporation to increase the number of shares of our authorized common stock. The additional shares in the market will dilute the percentage interest of our stockholders and may have a material adverse effect on the market price of our common stock. Any such decline in the market price of our common stock could impede our efforts to obtain additional financing through the sale of additional equity or equity- related securities or could make such financing more costly.

The Company also has an additional warrants and stock options if exercised, 1,000,000 and 1,712,777 , respectively shares of common stock will be issued.

THE ADJUSTABLE CONVERSION PRICE OF OUR 9% CONVERTIBLE DEBENTURES COULD REQUIRE US TO ISSUE A SUBSTANTIALLY GREATER NUMBER OF SHARES OF OUR COMMON STOCK.

Our 9% Convertible Debentures are convertible at a conversion rate equal to the lesser of $0.07 (subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits,

14

<Page>

dividends of our common stock and spin-offs) and 75% of the average of the 10 or 5, as the case may be, lowest closing bid prices of our common stock for the 30 trading days immediately preceding the applicable date of conversion. Accordingly, the conversion price may fluctuate with the market price of our common stock and the number of shares we would be required to issue would increase, perhaps substantially, while the market price of our common stock trades below $0.09. Also, since such conversion price has no lower limit (i.e. a "floorless" conversion feature), the market price of our common stock could decline to a level requiring us to issue more shares than are currently authorized under our certificate of incorporation resulting in a default under our 9% Convertible Debentures. In addition, since our 9% Convertible Debentures are convertible at a discount to the trading price of our common stock prior to the conversion, the significant downward pressure on the price of our common stock as the selling stockholders convert and sell material amounts of our common stock could encourage short sales by investors. The selling stockholders could sell our common stock into the market in anticipation of covering the short sale by converting their securities, which could cause the further downward pressure on the stock price.

THE PRICE OF OUR COMMON STOCK HAS BEEN AND MAY IN THE FUTURE BE AFFECTED BY PRICE AND VOLUME FLUCTUATION IN THE MARKET FOR DEVELOPMENTAL STAGE COMPANIES.

The OTC Bulletin Board, where many developmental stage companies are traded, experiences extreme price and volume fluctuations. These fluctuations often have been unrelated or disproportionate to the operating performance of these companies. These broad market and industry factors may materially adversely affect the market price of our common stock, regardless of our actual operating performance. In the past, following periods of volatility in the market price of an individual company's securities, securities class action litigation often has

been instituted against that company. We have not been subject to any lawsuits alleging that we have violated any provisions of federal securities laws. The filing of litigation against us, or any other claims, if made, could result in substantial costs and a diversion of the attention and resources of our management.

OUR COMMON STOCK IS CURRENTLY INELIGIBLE FOR QUOTATION ON THE OTC BULLETIN BOARD AS A RESULT OF OUR FAILURE TO FILE OUR PERIODIC REPORTS UNDER THE EXCHANGE ACT OF 1934 WITH THE SECURITIES AND EXCHANGE COMMISSION IN A TIMELY MANNER.

On November 16, 2005, the Securities and Exchange Commission approved a change to NASD Rule 6530 providing that if an issuer with securities quoted by a NASD member on the OTC Bulletin Board is cited for delinquent filing of its periodic reports under the Exchange Act of 1934 with the Securities and Exchange Commission three times in a 24 month period or is removed from such quotation for failure to timely make such filings three times in a 24 month period then the securities of such issuer will be ineligible for quotation by a NASD member on the OTC Bulletin Board. If an issuer becomes ineligible to be so quoted, such issuer would not become eligible for quotation on the OTC Bulletin Board until it has filed such periodic reports for one year in a timely manner.

The Company has been late in three of its periodic filings with the Securities and Exchange Commission ("SEC") during 2006, of which the December 31, 2006 10-KSB was the last late filing. Accordingly, currently, the Company is ineligible for quotation by an NASD member. The Company has requested a hearing with the NASD to see if the Company can continue to be listed as an NASD member. If the Company is not successful at the hearing, the Company will remain listed on the "Pink Sheets."

OUR COMMON STOCK IS PRESENTLY SUBJECT TO THE "PENNY STOCK" RULES WHICH MAY MAKE IT A LESS ATTRACTIVE INVESTMENT.

15

<Page>

Since the trading price of our common stock is less than $5.00 per share, trading in our common stock is also subject to the requirements of Rule 15g-9 of the Securities Exchange Act of 1934. Our common stock is also considered a penny stock under the Securities Enforcement Remedies and Penny Stock Reform Act of 1990, which defines a penny stock, generally, as any equity security not traded

on an exchange or quoted on the NASDAQ SmallCap Market that has a market price of less than $5.00 per share. Under such Rule 15g-9, brokers who recommend our common stock to persons who are not established customers and accredited investors, as defined in the Securities Exchange Act of 1934, must satisfy special sales practice requirements, including requirements that they make an individualized written suitability determination for the purchaser and receive the purchaser's written consent prior to the transaction. The Securities Enforcement Remedies and Penny Stock Reform Act of 1990 also requires additional disclosures in connection with any trades involving a penny stock, including the delivery, prior to any penny stock transaction, of a disclosure schedule explaining the penny stock market and the risks associated with that market. Such requirements may severely limit the market liquidity of our common stock and the ability of purchasers of our equity securities to sell their securities in the secondary market.

ITEM 2. DESCRIPTION OF PROPERTY

Our principal executive offices are located in a 142.9 square foot office space at 211 Madison Avenue, Apt. #28B New York, New York 10016.

LTDN's principal executive offices are located in a 250 square meter space at 459 Collins Street Level 11, Melbourne, Victoria 3000, Australia.

ITEM 3. LEGAL PROCEEDINGS

On March 7, 2006, Leslie Dick Worldwide, Ltd filed a complaint in the Supreme Court of the State of New York against us. Such complaint relates to claims for breach of contract. The Company has counterclaimed against the petitioner. Management believes that the eventual outcome of these matters will not have a material adverse effect on our consolidated financial position, results of operations, or cash flows.

On March 2, 2007, Nancy L. Donenfeld and Thelma L. Donenfeld, as trustee of the Nancy L. Donenfeld Trust filed a complaint in the Supreme Court of the State of New York, County of New York against us, Allan Klepfisz, our Chief Executive Officer, and Ethel Griffin, public administratrix of New York County, as administratrix of the estate of Kurt Seifman. Such complaint relates to the alleged default by us under a loan agreement with the plaintiffs. Such complaint seeks compensatory damages in the amount of $459,892.67 plus interest and late fees of approximately $900,000 and the value of certain restricted shares issued to such plaintiffs and punitive damages in the amount of $5,000,000. We are also subject to various matters of litigation during our normal course of operations. Management believes that the eventual outcome of these matters will not have a material adverse effect on our consolidated financial position, results of

operations, or cash flows.

16

<Page>

ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

There were no matters submitted to a vote of security holders during the fourth quarter of the year ended December 31, 2006.

On March 14, 2007, the Company filed a definitive proxy, pursuant to the shareholders voting on an increase in t he number of authorized common shares from 800 million to 1.5 billion.

17

<Page>

PART II

ITEM 5. MARKET FOR COMMON EQUITY AND RELATED STOCKHOLDER MATTERS AND SMALL BUSINESS ISSUER PURCHASES OF EQUITY SECURITIES

Market Information.
- -----------------

Our common stock is traded on the OTC Bulletin Board currently under the symbol BLLN.

The table below sets forth the range of high and low bid quotes of our common stock for each quarter for the last two fiscal years, as reported by the OTC Bulletin Board. The bid prices represent inter-dealer quotations, without

adjustments for retail mark-ups, markdowns or commissions and may not represent actual transactions.

| 2005 | HIGH | | LOW | |
|------|------|------|-----|------|
| First Quarter | $ | 0.24 | $ | 0.12 |
| Second Quarter | $ | 0.25 | $ | 0.10 |
| Third Quarter | $ | 0.14 | $ | 0.07 |
| Fourth Quarter | $ | 0.12 | $ | 0.07 |

| 2006 | HIGH | | LOW | |
|------|------|------|-----|------|
| First Quarter | $ | 0.105 | $ | 0.032 |
| Second Quarter | $ | 0.520 | $ | 0.018 |
| Third Quarter | $ | 0.037 | $ | 0.020 |
| Fourth Quarter | $ | 0.069 | $ | 0.022 |

Holders
-------

There were approximately 361 stockholders of record of our common stock as of April 17, 2007.

Dividends
---------

We have never declared or paid cash dividends on our common stock, and we anticipate that future earnings, if any, will be retained for development of our business. Payment of cash dividends in the future will be wholly dependent upon our earnings, financial condition, capital requirements and other factors deemed relevant by us.

Stock Issuances
---------------

On January 26, 2006, the Company issued 21,795,061 shares of Common Stock in connection with the settlement of claims made by certain former stockholders of LTDN. These stockholders claimed that they were entitled to receive more shares of Common Stock in connection with the merger with Brilliant. At December 31, 2005, the Company recorded a liability of $2,200,000 related to the settlement of these claims.

In connection with a Support Agreement entered into on November 17, 2005 between the Company and one of its stockholders, Aperchance Ltd. ("Aperchance"), in

consideration of inducing Aperchance to exercise their Warrants to purchase 4,841,204 shares of Common Stock, the Company provided Aperchance with certain price protection on shares of Common Stock held by Aperchance. The price protection guarantee took effect during February of 2006. As a result of a stock price decline in 2006, the Company was required to issue an additional 5,630,075 shares of Common Stock to Aperchance.

During the period from January 1, 2006 through March 31, 2006, various holders of warrants exercised warrants and purchased 9,161,802 shares of common stock resulting in proceeds of $368,510.

During the quarter ended March 31, 2006, the Company issued 8,236,000 of shares for services related to financing activities valued at $873,460.

18

<Page>

During the quarter ended March 31, 2006, the Company issued to five of its stockholders 8,221,800 shares of Common Stock for services valued at $904,398.

During the quarter ended March 31, 2006, $1,303,185 principal amount and related interest of Convertible Debentures were converted and 28,268,178 shares of Common Stock were issued pursuant to these conversions.

During the quarter ended March 31, 2006, the Company issued 16,183,333 shares of its common stock valued at $1,277,325 pursuant to various one-year consulting agreements with four of its stockholders.

During the quarter ended June 30, 2006, the Company issued 3,700,000 of shares of Common Stock for services valued at $73,677.

During the quarter ended June 30, 2006, $1,099,480 principal amount of Convertible Debentures and related accrued interest were converted and 72,894,981 shares of Common Stock were issued pursuant to these conversions.

During the quarter ended September 30, 2006, the Company sold 10,000,000 shares of Common Stock for $310,000.

During the quarter ended September 30, 2006, various holders of warrants exercised Warrants and purchased 49,734,679 shares of Common Stock resulting in

proceeds of $1,989,387 of which $510,455 was received in the third quarter with the remaining $1,478,932 to be received in the fourth quarter.

During the quarter ended September 30, 2006, the Company issued 38,802,195 shares for services related to financing activities valued at $1,164,066.

During the quarter ended September 30, 2006 the Company issued 45,500,000 of shares of Common Stock for services valued at $1,145,000.

During the quarter ended September 30, 2006, $420,000 principal amount of Convertible Debentures and related accrued interest were converted and 29,984,095 shares of Common Stock were issued pursuant to this conversion.

During the quarter ended December 31, 2006, we issued 7,000,000 shares of our common shares for consulting services for services valued at $308,700. In addition we issued 5,500,000 related to Compensation expense valued at $174,000.

During the quarter ended December 31, 2006 we issued 750,000 shares related to financing expenses valued at $40,500.

The Company issued 11,000,000 shares for cash in the fourth quarter for proceeds of $210,000.

During the period from October 1, 2006 through December 31, 2006, $283,000 principal amount of Convertible Debentures including related interest and penalty of $214,922 were converted and 19,210,243 shares of common stock were issued pursuant to these conversions.

During the period from October 1, 2006 through December 31, 2006 $100,000 principal amount of Convertible Debentures and related accrued interest of $5,995 were converted and 2,792,889 number of shares of common stock were issued pursuant to these conversions.

19

<Page>

ITEM 6.   MANAGEMENT'S DISCUSSION AND ANALYSIS OR PLAN OF    OPERATIONS

The following discussion and analysis should be read in conjunction with the remainder of this annual report including, but not limited to, the financial

statements and notes thereto included herein. In addition, this annual report contains certain statements that are "forward looking statements", which relate to future events or our future financial performance. Any statements contained in this annual report which are not statements of historical fact may be deemed to be forward looking statements. Without limiting the generality of the foregoing, forward looking statements can be identified by the use of words such as "believes," "expects," "intends," "projects," "anticipates," "contemplates," or "estimates," Although we believe that the expectations reflected in the forward looking statements are reasonable, management can give no assurance that such expectations will prove to have been correct. Generally, forward looking statements relate to business plans or strategies, projected or anticipated benefits or other consequences of such plans or strategies, or projections involving anticipated revenues, expenses, earnings, levels of capital expenditures, liquidity or indebtedness, ability to raise working capital, or other aspects of operating results or financial position. All phases of our operations are subject to a number of uncertainties, risks and other influences which are set forth below under the caption entitled "Risk Factors", many of which, or a combination of which, or any one of which, could materially affect our results of operations and whether the forward looking statements made by us ultimately prove to be accurate.

We are a development stage company and our efforts have been primarily devoted to technology identification and acquisition, research and development and raising capital. This discussion provides an analysis of our anticipated plan of operation for the next 12 months.

Introduction
------------

LTDN is a development company and has yet to establish it self with a revenue generating product. The company is using the previously purchased patents, rights and other intellectual assets in order to develop a market valued product.

The company has the Qtrax product in development and expects this product to be commercially launched in q3 of 2007.

During the next 12 months we intend to concentrate on the (i) continued development and marketing of the software products of LTDN, (ii) commercialization of our proprietary resealable metal beverage can, and (iii) commercialization of products developed by Alfa-Pro and from the intellectual property acquired from Schiatti GSR, (iv) complete the development of Qtrax and provide for its commercial launch.

As the company prepares to launch the Qtrax product in 2007, it has obtained the necessary music licensing agreements from several prominent record companies in order to provide the digital music content of the site. The music license contracts allow the company to make available on Qtrax, the electronic libraries of the record company in an unrestricted manner for downloading. It is the company's intention to have all music available on the various record company library available for access upon commercial launch.

The terms of the licenses vary from twelve to eighteen months and provide for various conditions to be met. As of April 17, 2007 the Company was renegotiating the terms of some of the agreements that had certain milestones which as of April 17, 2007 had not been met and included the launching of the Qtrax site. We are in the process of renegotiating the terms of payment and milestones and we are confident that these terms will be extended and milestones reset, however there is no guarantees that the record companies will alter the terms of our agreements. The inability to have terms and milestones adjusted will significantly impact the viability of the Qtrax product.

20

<Page>

Except for a nominal amount of revenue from the sale of products of one of our subsidiaries in a prior period, we have not generated any revenue from operations since our inception and we have not been profitable since our inception. We will require additional financing to continue our planned operations during the next 12-month period. We believe that we will be able to raise the necessary financing to continue planned operations. We will attempt to raise this additional capital through the public or private placement of our securities, debt or equity financing, joint ventures, or the licensing or sale of our technologies and products. However, there is no guarantee that we will be able to successfully raise the required funds for operations or that such funds will be available on terms satisfactory to us. Any inability to raise additional funds would require that we significantly scale back our planned operations.

In particular, we need to obtain financing for the production of machine-fabricated samples of our resaleable beverage for distribution to beverage producers who have previously expressed an interest in our resaleable beverage can. It is anticipated that production of those samples, marketing and general operational expenses will require less than $450,000. We anticipate that in the event we are required to purchase capital equipment for the full scale

production of our reseable beverage cans, an additional $2,000,000 would be required. The production of the machine produced samples has been delayed by a failed financing, the proceeds of which were to be used to complete this production run.

Also, we have launched our intelliPrice product developed by LTDN. We need to raise additional funds in order to put us in a position to successfully market and distribute such product. We also plan on launching our Qtrax product in the near future.

Ideally, upon the commercialization of our products, including intelliPrice and Qtrax, and implementation of operational cost controls, we would hope that sustainable revenues will be able to be generated so as to avoid the necessity to raise significant funds in the longer term. There can be no assurances as to when and whether we will be able to commercialize our products and technologies and realize any revenues therefrom.

No assurance can be given that we can complete the development of any technology or that, if any technology is fully developed, it can be manufactured and marketed on a commercially viable basis. Furthermore, no assurance can be given that technology will receive market acceptance. Being a development stage company, we are subject to all the risks inherent in the establishment of a developing or new business.

CRITICAL ACCOUNTING POLICIES

We have identified the policies below as critical to our business operations and the understanding of our financial results.

Income Taxes
- ------------

Income taxes are calculated using an asset and liability approach as prescribed by SFAS No. 109, Accounting for Income Taxes. The provision for income taxes includes federal and state taxes currently payable and deferred taxes, due to temporary differences between financial statement and tax bases of assets and liabilities. In addition, future tax benefits are recognized to the extent that realization of such benefits is more likely than not. Valuation allowances are established when management determines that it is more likely than not that some portion or all of the deferred asset will not be realized. The effect of a change in tax rates is recognized as income or expense in the period of change.

21

<Page>

The Company provides deferred taxes on the tax effects of differences between the financial reporting and tax bases of the Company's assets and liabilities at the enacted tax rates in effect for the years in which the differences are expected to reverse. The Company evaluates the recoverability of deferred tax assets and establishes a valuation allowance when it is more likely than not that some portion or all of the deferred tax assets will not be realized. Income tax expense consists of the tax payable for the period and the change during the period in deferred tax assets and liabilities.

Revenue Recognition
-------------------

The Company expects that it will derive substantially all of its revenues for the sale of advertising on its Qtrax product. The Company anticipates to have four major advertising revenues streams; Click Ad, revenues will be recognized when an ad that is placed in Qtrax is successfully 'Clicked' and linked to another website or area; Video revenues will be recognized when ads are played within the Qtrax product; Banner revenues will be recognized when an ad is displayed on the Qtrax site; and Imprint revenues will be recognized once the established number of times an ad is to be shown is shown. Any prepaid advertising payments received will be treated as deferred revenues.

Research And Development
------------------------

In accordance with SFAS No. 2, "Accounting for Research and Development Costs," all research and development ("R&D") costs are expensed when they are incurred, unless they are reimbursed under specific contracts. Assets used in R&D activity, such as machinery, equipment, facilities and patents that have alternative future use either in R&D activities or otherwise are capitalized. In connection with the merger of Brilliant and LTDN, $23,224,695 was allocated to in-process research and development costs and was charged to R&D costs during the period ended December 31, 2004.

Capitalized Software
--------------------

Capitalization of computer software development costs begins upon the establishment of technological feasibility. Technological feasibility for the

Company's computer software is generally based upon achievement of a detailed program design free of high risk development issues and the completion of research and development on the product hardware in which it is to be used. The establishment of technological feasibility and the ongoing assessment of recoverability of capitalized computer software development costs require considerable judgment by management with respect to certain external factors, including, but not limited to, technological feasibility, anticipated future gross revenue, estimated economic life and changes in software and hardware technology.

Amortization of capitalized computer software development costs commences when the related products become available for general release to customers. Amortization is provided on a product by product basis. The annual amortization is the greater of the amount computed using (a) the ratio that current gross revenue for a product bears to the total of current and anticipated future gross revenue for that product, or (b) the straight-line method over the remaining estimated economic life of the product.

The Company periodically performs reviews of the recoverability of such capitalized software development costs. At the time a determination is made that capitalized amounts are not recoverable based on the estimated cash flows to be generated from the applicable software, the capitalized costs of each software product is then valued at the lower of its remaining unamortized costs or net realizable value. Amounts capitalized during the years ended December 31, 2006 and 2005 totaled $-0- and $325,499 respectively. There was no amortization expense for the years ended December 31, 2006 and 2005 as the software product was not placed into use as of December 31, 2006.

22

<Page>

Convertible Notes and Warrants
--------------------------------

The Company accounts for conversion options embedded in convertible notes in accordance with SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities" ("SFAS 133") and ("EITF") 00-19, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock" ("EITF 00-19"). SFAS 133 generally requires companies to bifurcate conversion options embedded in convertible notes from their host instruments and

to account for them as free standing derivative financial instruments in accordance with EITF 00-19. SFAS 133 provides for an exception to this rule when convertible notes, as host instruments, are deemed to be conventional as that term is described in the implementation guidance under Appendix A to SFAS 133 and further clarified in EITF 05-2 "The Meaning of "Conventional Convertible Debt Instrument" in Issue No. 00-19.

The Company accounts for convertible notes deemed conventional and conversion options embedded in non-convertible notes which qualify as equity under EITF 00-19, in accordance with the provisions of Emerging Issues Task Force Issue ("EITF") 98-5 "Accounting for Convertible Securities with Beneficial Conversion Features," and EITF 00-27 "Application of EITF 98-5 to Certain Convertible Instruments." Accordingly, the Company records, as a discount to convertible notes, the intrinsic value of such conversion options based upon the differences between the fair value of the underlying common stock at the commitment date of the note transaction and the effective conversion price embedded in the note. Debt discounts under these arrangements are amortized over the term of the related debt to their earliest date of redemption.

The Company accounts for embedded conversion options in non-conventional convertible notes which do not qualify as equity under EITF 00-19, as derivation liabilities. Accordingly, the Company determines the fair value (as determined under the Black-Scholes Valuation Method) of all embedded derivatives (usually conversion option and warrants). Such fair value is recorded as a debt discount up to the proceeds of the debt and any amount in excess of the proceeds of the debt is charged to operations at the security issuance date.

The Company's 2005 and 2006 Convertible Notes and Bridge Notes host embedded conversion options that are deemed to be free standing derivatives financial instruments which have been accounted for as derivative liabilities.

Convertible Notes and Warrants
-----------------------------

The Company accounts for the issuance of common stock purchase warrants issued and other free standing derivative financial instruments in accordance with the provisions of EITF 00-19. Based on the provisions of EITF 00-19, the Company classifies as equity any contracts that (i) require physical settlement or net-share settlement or (ii) gives the Company a choice of net-cash settlement or settlement in its own shares (physical settlement or net-share settlement). The Company classifies as assets or liabilities any contracts that (i) require net-cash settlement (including a requirement to net cash settle the contract if an event occurs and if that event is outside the control of the Company and (ii) give the counterparty a choice of net-cash settlement or settlement in shares

(physical settlement or net-share settlement). All of the outstanding warrants have been classified as free standing derivative liabilities (Note 6).

Stock Based Compensation
-------------------------

Effective January 1, 2006, the Company adopted SFAS No. 123R, "Share Based Payment," using the modified-prospective-transition method, as a result, the Company's net income for the year ended December 31, 2006 is lower than if it continued to account for share-based compensation under APB No. 25. SFAS No. 123R is a revision of SFAS No. 123, and supersedes APB Opinion No. 25, and its

23

<Page>

related implementation guidance. SFAS No. 123R addresses all forms of share-based payment awards including shares issued under employee stock purchase plans, stock options, restricted stock and stock appreciation rights. Under SFAS No. 123R, stock-based awards result in a cost that will be measured at fair value on the award's grant date, based on the estimated number of awards that are expected to vest that will result in a charge to operations.

Prior to January 1, 2006, the Company accounted for employee stock transactions in accordance with Accounting Principle Board ("APB") Opinion No. 25. "Accounting for Stock Issued to Employees." The Company had adopted the pro forma disclosure requirements of SFAS No. 123, "Accounting for Stock-Based Compensation."

Prior to the Company's adoption of SFAS No. 123R, SFAS No. 123 required that the Company provide pro-forma information regarding net earnings and net earnings per share as if the Company's stock-based awards had been determined in accordance with the fair value method prescribed therein. The Company had previously adopted the disclosure portion of SFAS No. 148 "Accounting for Stock-Based Compensation – Transition and Disclosure," requiring quarterly SFAS No. 123 pro-forma disclosures. The pro-forma charge for compensation cost related to stock-based awards granted was recognized over the service period. The pro-forma impact upon adoption, the service period represents the period of time between the date of grant and the date each option becomes exercisable without consideration of acceleration provisions (e.g., retirement, change of control, etc.).

There were no stock options granted to employees or unvested stock options during the years ended December 31, 2006 and 2005 and, accordingly, there was no difference between the reported net income (loss) and proforma net income(loss). As of December 31, 2006, the Company had no unvested options.

The cost of stock-based compensation awards issued to non-employees for services are recorded at either the fair value of the services rendered or of the instruments issued in exchange for such services, whichever is more readily determinable, using the measurement date guidelines enumerated in Emerging Issues Task Force ("EITF") Issue No. 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services."

Debentures due August 20, 2006

An aggregate of $400,000 of such 9% Convertible Debentures were due and payable on August 20, 2006 and bear interest at 9% per annum on a simple non-compounded basis. Such 9% Convertible Debentures are in default but the holders thereof have taken no action with respect to the collection of such 9% Convertible Debentures. Such 9% Convertible Debentures are convertible, at the holder's option, into shares of our common stock at a conversion rate equal to the lesser of $0.07 (subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs) and 75% of the average of the 10 lowest closing bid prices of our common stock for the 30 trading days immediately preceding the applicable date of conversion. Subject to limited exceptions, a holder shall not be entitled to convert a 9% Convertible Debenture held by such holder if such conversion would result in such holder beneficially owning more than 9.99% of our common stock following such conversion. If a holder elects to convert all or a portion of such 9% Convertible Debentures and the conversion price is less than $0.07 (subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs), in lieu of effecting such conversion, we may elect to redeem the amount of such 9% Convertible Debentures requested to be so converted at a purchase price equal to 150% of the principal amount of such 9% Convertible Debentures plus accrued and unpaid interest to the date of redemption. The holder may accelerate the maturity date of such 9% Convertible

24

<Page>

Debentures following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy, certain judgment defaults and the suspension of our common stock from trading on the OTC Bulletin Board. Such 9% Convertible Debentures are secured by a security interest in all of our assets.

Currently, the Company has not made all of its required payments under these Convertible notes.

Each warrant issued in connection with such 9% Convertible Debentures and $2,995,000 of our 9% Convertible Debentures previously repurchased by us or converted is exercisable until the second anniversary of the effective date of the registration statement registering our shares of common stock issuable upon the exercise of such warrants. Such warrants are exercisable at $0.10 per share, such exercise price subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs. Subject to limited exceptions, a holder shall not be entitled to convert a warrant held by such holder if such conversion would result in such holder beneficially owning more than 4.99% of our common stock following such conversion (in lieu of such restriction, an aggregate of 4,285,714 of such warrants provided that the holder thereof shall not be entitled to convert such warrants held by such holder if such conversion would result in such holder beneficially owning more than 9.99% of our common stock following such conversion). If the average of the closing bid prices of our common stock during any period of 20 consecutive trading days is equal to or greater than $0.50 and the closing bid price of our common stock is equal to or greater than $0.50 for at least 10 trading days during such period then with respect to each such warrant that the holder does not exercise during the 15 trading day period following the receipt by the holder of a notice from us that such average price and closing bid prices have occurred, the exercise price for such warrants will each be adjusted to $0.25 per share (subject to adjustment for customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs). Holders of such warrants are entitled to effect a cashless exercise of such warrants if the registration statement registering our shares of common stock issuable upon the exercise of such warrants has not been declared effective prior the first anniversary of the issuance of such warrants.

Debentures due March 24, 2007
_____

An aggregate of $350,000 of such 9% Convertible Debentures were due and payable on March 24, 2007 and bear interest at 9% per annum on a simple non-compounded

basis. Such 9% Convertible Debentures are in default but the holders thereof have taken no action with respect to the collection of such 9% Convertible Debentures. Such 9% Convertible Debentures are convertible, at the holder's option, into shares of our common stock at a conversion rate equal to the lesser of $0.07 (subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs) and 75% of the average of the 5 lowest closing bid prices of our common stock for the 30 trading days immediately preceding the applicable date of conversion. Subject to limited exceptions, a holder shall not be entitled to convert a 9% Convertible Debenture held by such holder if such conversion would result in such holder beneficially owning more than 4.99% of our common stock following such conversion. If a holder elects to convert all or a portion of such 9% Convertible Debentures and the conversion price is less than $0.07 (subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs), in lieu of effecting such conversion, we may elect to redeem the amount of such 9% Convertible Debentures requested to be so converted at a purchase price equal to 150% of the principal amount of such 9% Convertible Debentures plus accrued and unpaid interest to the date of redemption. The holder may accelerate the maturity date of such 9% Convertible Debentures following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy, certain judgment defaults and the suspension of our common stock from trading on the OTC Bulletin Board. Such 9% Convertible Debentures are secured by a security interest in all of our assets.

25

<Page>

Each warrant issued in connection with such 9% Convertible Debentures is exercisable until the second anniversary of the effective date of the registration statement registering our shares of common stock issuable upon the exercise of such warrants. Such warrants are exercisable at $0.07 per share, such exercise price subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs. Subject to limited exceptions, a holder shall not be entitled to convert a warrant held by such holder if such conversion would result in such holder beneficially owning more than 4.99% of our common stock following such conversion. If the average of the closing bid prices of our common stock during any period of 20 consecutive trading days is

equal to or greater than $0.50 and the closing bid price of our common stock is equal to or greater than $0.50 for at least 10 trading days during such period then with respect to each such warrant that the holder does not exercise during the 15 trading day period following the receipt by the holder of a notice from us that such average price and closing bid prices have occurred, the exercise price for such warrants will each be adjusted to $0.25 per share (subject to adjustment for customary events including stock splits, reverse stock splits, dividends of common stock and spin-offs). Holders of such warrants are entitled to effect a cashless exercise of such warrants if the registration statement registering our shares of common stock issuable upon the exercise of such warrants has not been declared effective prior the first anniversary of the issuance of such warrants.

Currently, the Company has not made all of its required payments under these Convertible notes.

Debentures due April 3, 2007
-----------------------------

An aggregate of $895,000 of such 9% Convertible Debentures were due and payable on April 3, 2007 and bear interest at 9% per annum on a simple non-compounded basis. Such 9% Convertible Debentures are in default but the holders thereof have taken no action with respect to the collection of such 9% Convertible Debentures. Such 9% Convertible Debentures are otherwise on the same terms as our 9% Convertible Debentures due on March 24, 2007 described above.

Currently, the Company has not made all of its required payments under these Convertible notes.

Debentures due May 2, 2007
---------------------------

An aggregate of $440,000 of such 9% Convertible Debentures are due and payable on May 2, 2007 and bear interest at 9% per annum on a simple non-compounded basis. Such 9% Convertible Debentures are otherwise on the same terms as our 9% Convertible debentures due on March 24, 2007 described above.

Bridge Loan Financing
---------------------

We have borrowed an aggregate of $1,960,000 from various investors. In connection with such financing, we issued Notes in the aggregate principal amount of $1,744,629 (such Notes were sold at a discount) and warrants to purchase 55,183,286 shares of our common stock.

Such Notes do not bear interest but, as noted above, the face value of such Notes at issuance was equal to a certain percentage above the purchase price thereof. All such Notes are due and payable prior to the end of 2006. From and after the date we amend our certificate of incorporation as described below, if an event of default under such Notes occurs then such Notes will be convertible, at the holder's option, into shares of our common stock at a conversion rate equal to 75% of the average of the 5 lowest closing bid prices of our common stock for the 30 trading days immediately preceding the applicable date of conversion. We may, at our option, prepay such Notes at any time. The holders of such Notes may accelerate the maturity date of such Notes following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy and certain judgment defaults.

26

<Page>

If the holders of our common stock approve an amendment to our certificate of incorporation to increase our authorized capital stock to an amount sufficient to permit the exercise of such warrants, then each such warrant will be exercisable from the date we file such amendment with the Secretary of State of the State of Delaware until the expiration date provided in each such warrant. Such warrants are exercisable at $0.07 per share, such exercise price subject to adjustment for subsequent lower price issuances by us and other customary events including stock splits, reverse stock splits, dividends of our common stock and spin-offs. The holders of such warrants are entitled to effect a cashless exercise of such warrants in certain circumstances.

As of December 31, 2006, the Company was in default under the terms of the Bridge loan agreements.

ITEM 7. FINANCIAL STATEMENTS

Our financial statements for the year ended December 31, 2006 are attached hereto as pages F-1 through F-43.

27

<Page>

ITEM 8. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
FINANCIAL DISCLOSURE

None.

ITEM 8A. CONTROLS AND PROCEDURES.

We maintain a set of disclosure controls and procedures designed to ensure that
information required to be disclosed by us in the reports filed under the
Securities Exchange Act of 1934, is recorded, processed, summarized and reported
within the time periods specified by the Securities and Exchange Commission's
rules and forms. Disclosure controls are also designed with the objective of
ensuring that this information is accumulated and communicated to our management
to allow timely decisions regarding required disclosure.

Based upon our management's evaluation as of the end of the period covered by
this report, our chief executive officer concluded that, our disclosure controls
and procedures are not effective to ensure that information required to be
included in our periodic Securities and Exchange Commission filings is recorded,
processed, summarized, and reported within the time periods specified in the
Securities and Exchange Commission's rules and forms.

In connection with the audit of our financial statements for the year ended
December 31, 2006, our auditors identified the following material weaknesses;

  o   the lack of segregation of duties in the process of cash receipts and
      disbursements;
  o   the lack of a timely closing of our books and records and preparation
      of our financial statements;
  o   the lack of controls with respect to the documentation and accounting
      for the issuance of our equity securities; and
  o   inadequate accounting resources to account for and analyze technical
      accounting issues, including, without limitation, accounting for
      derivative obligations.

The Company has retained the services of outside consultants to assist in the
financial statement closing process. Management believes this additional
assistance has enabled the Company to prepare accurate financial statements for
the year ended December 31, 2006.

There have not been any changes in our internal control over financial reporting during the quarter ended December 31, 2006 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.]

ITEM 9B. OTHER INFORMATION.

None.

28

<Page>

PART III

ITEM 9. DIRECTORS AND EXECUTIVE OFFICERS; COMPLIANCE WITH SECTION 16(A) OF THE EXCHANGE ACT

DIRECTORS AND OFFICERS

The following table sets forth certain information regarding our officers and directors as of the date of this annual report:

| Name | Age | Title |
| --- | --- | --- |
| Allan Klepfisz | 51 | President, Chief Executive Office and Director |
| Arie Baalbergen | 67 | Director |
| Chai Ong | 57 | Director |
| Kenneth Parks | 43 | Chief Operating Officer |

All directors hold office until the next annual meeting of stockholders and until their successors have been elected and qualified. The Board of Directors elects the officers annually.

Allan Klepfisz joined us as our President, Chief Executive Officer and a Director on December 15, 2004. Mr. Klepfisz was appointed to our Board of Directors in connection with the consummation of our acquisition of LTDN. Between August 1999 and March 2000, Mr. Klepfisz was involved in the formation of LTDN. Since March 2000, Mr. Klepfisz has served as the Chief Executive

Officer and a director of LTDN.

Arie Baalbergen joined us as a Director on December 15, 2004. Mr. Baalbergen was appointed to our Board of Directors in connection with the consummation of our acquisition of LTDN. Between August 1999 and March 2000, Mr. Baalbergen was involved in the formation of LTDN. Since March 2000, Mr. Baalbergen has served as the Chief Financial Officer and a director of LTDN.

Chai Ong joined us a Director on December 15, 2004. Mr. Ong was appointed to our Board of Directors in connection with the consummation of our acquisition of LTDN. Since 2001, Mr. Ong has served as a director of LTDN. During 2000 and 2001, Mr. Ong served as the Vice President, Corporate Finance of LTDN.

Kenneth Parks joined us as Chief Operating Officer on October 18, 2006. Mr. Parks has worked at EMI Music as Senior Vice President, Strategy and Business Development and as General Counsel of Getmusic LLC.

We do not have a separate audit committee. In addition, our Board of Directors has determined that none of our directors is an "audit committee financial expert" as defined under the rules of the Securities and Exchange Commission. Due to our small size and limited resources we are not able to recruit potential directors that would qualify as such an "audit committee financial expert".

COMPLIANCE WITH SECTION 16(a) OF THE EXCHANGE ACT

Section 16(a) of the Securities Exchange Act of 1934 requires our officers and directors, and persons who own more than ten percent (10%) of a registered class of our equity securities, to file certain reports regarding ownership of, and transactions in, our securities with the Securities and Exchange Commission. Such officers, directors and 10% stockholders are also required to furnish us with copies of all Section 16(a) forms that they file.

<div align="center">29</div>

<Page>

Based solely on our review of copies of Forms 3 and 4 and any amendments furnished to us with respect to the fiscal year ended December 31, 2006, and any written representations referred to in Item 405(b)(2)(i) of Regulation S-B stating that no Forms 5 were required, we believe that, during such fiscal year, each of Allan Klepfisz and Arie Baalbergen was delinquent in filing Form 4s with

respect to securities disposed of by such persons during such year.

CODE OF ETHICS

We have not adopted a Code of Ethics that applies to our executive officers. Due to our small size and limited resources we currently only have a single executive officer. We have communicated to such executive officer the high level of ethical conduct expected of him. We intend to adopt a written Code of Ethics as soon as practicable.

ITEM 10. EXECUTIVE COMPENSATION

The following table presents, for each of the last three fiscal years ending December 31, 2006 the annual compensation earned by our chief executive officer and our most highly compensated executive officers, who are referred to in this annual report as the "Named Executive Officers".

<TABLE>
<S>                <C>

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Nonqualified Deferred Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Allen Klepfisz, Chief Executive Officer and President | 2006 | $275,000 | $  -- | --  | -- | -- | -- | 90,000 | $365,000 |
|  | 2005 | $275,000 | $78,571(1) | $91,200(2) | -- | -- | -- | -- | $444,771 |
|  | 2004 | $11,455(3) | --  | --  | -- | -- | -- | -- | $11,455 |
| Ken Parks, Chief Operating Officer | 2006 | $83,250(4) | $ 90,000 | $ 166,500 (5) | -- | -- | -- | -- | $339,833 |

(1) During 2005, Mr. Klepfisz received 523,811 shares of our common stock registered on Form S-8.

(2) Mr. Klepfisz receives an expense allowance of $7,600 per month.

(3) Mr. Klepfisz joined us as our President and Chief Executive Officer on December 15, 2004 at a base annual salary of $275,000.

(4) Mr. Parks joined us as our Chief Operating Officer on October 18, 2006 at a base annual salary of $333,000. On April 17, 2007, the Company and Mr. Parks entered into a separation agreement.

(5) The stock award has been earned but not yet granted to Mr. Parks as of April 17, 2007.

30

<Page>

ITEM 11.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The following table sets forth information as of April [17], 2007 as to each person who is known to us to be the beneficial owner of more than 5% of our common stock (giving effect to all warrants and options exercisable within 60 days) and as to the security and percentage ownership of each of our Named Executive Officers and directors and all of our officers and directors as a group. Except where specifically noted, each person listed in the table has sole voting and investment power with respect to the shares listed.

| Name of Beneficial Owner | Common Stock Beneficially Owned | Percent of Common Stock |
|---|---|---|
| Allan Klepfisz<br>211 Madison Avenue<br>Apt #28B<br>New York, NY | 523,811 | * |
| Kenneth Parks (3)<br>630 Burgundy Place,<br>Yardley, PA | --- | * |
| Chai Ong (1)<br>c/o IJInetwork, Inc.<br>Level 11 Atrium Tower<br>459 Collins Street<br>Melbourne, Victoria<br>Australia | 4,820,452 | * |

Arie Baalbergen (2)                                      1.8%
c/o LTDnetwork, Inc.
Level 11 Atrium Tower
459 Collins Street
Melbourne, Victoria
Australia

All Officers and Directors as a          16,861,663     2.7%
group (4 persons)

* Less than 1%.

(1) Includes warrants to purchase 1,481,200 shares of our common stock. Also
includes 190,400 shares of our common stock and warrants to purchase 480,800
shares of our common stock held by Mr. Ong's wife.

(2) Includes warrants to purchase 7,813,200 shares of our common stock.

(3) On April 17, 2007, the Company and Mr. Parks entered into a separation
agreement.

                                  31

<Page>

Equity Compensation Plan Information
------------------------------------

The following table provides certain information as of December 31, 2006
concerning shares of our common stock that may be issued under existing equity
compensation plans.

| Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|

| | | |
|---|---|---|
| Equity compensation plans approved by security holders (1) | 470,000 | $0.34 | 4,530,000 |
| Equity compensation plans not approved by security holders (2) | -- | $0.00 | -- |
| Total | 470,000 | $0.34 | 4,530,000 |

</TABLE>

(1) Included in this category are the Brilliant Technologies Corporation 2000 Stock Option Plan and the Brilliant Technologies Corporation 2005 Equity Incentive Plan.

(2) Included in this category are the Brilliant Technologies Corporation 2001 Consultants Stock Plan and the Brilliant Technologies Corporation 2005 Stock Compensation Plan.

On November 30, 2001 our Board of Directors adopted a stock plan entitled the Brilliant Technologies Corporation 2001 Consultants Stock Plan (the "2001 Plan"). Our stockholders have not approved the 2001 Plan. Under the 2001 Plan, options and restricted stock awards may be issued to persons providing consulting services to us. Our Board of Directors administers the 2001 Plan but may delegate such administration to a committee, which shall consist of at least two members of our Board. Our Board or such committee has the authority to determine the number of options to be granted, when the options may be exercised and the exercise price of the options, provided that the exercise price may never be less than 85% of the fair market value of the shares of our common stock on the date the option is granted. Our Board or such committee may also grant the options according to a defined vesting schedule, provided that in no case shall any option provide for the vesting of option shares for a period of time which exceeds five years from date of grant of the option, or on a cumulative incremental percentage basis which is less than twenty percent (20%) per year. Options may be granted for terms not exceeding ten years from the date of the grant.

32

<Page>

On February 23, 2005 our Board of Directors adopted a stock plan entitled the Brilliant Technologies Corporation 2005 Stock Compensation Plan (the "2005 Plan"). Our stockholders have not approved the 2005 Plan. Under the 2005 Plan, options and restricted stock awards may be issued to persons providing consulting services to us. Our Board of Directors administers the 2005 Plan but may delegate such administration to a committee, which shall consist of at least two members of our Board. Our Board or such Committee has the authority to determine the number of options to be granted, when the options may be exercised and the exercise price of the options. Our Board or such Committee may also grant the options according to a defined vesting schedule. Options may be granted for terms not exceeding ten years from the date of the grant.

## ITEM 12. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

As of December 31, 2006 we owed Mr. Klepfisz $828,180 related to advances made by him. This obligation is payable on demand and does not provide for interest.

None of our directors are independent within the meaning established under the rules of the Securities and Exchange Commission.

33

<Page>

## ITEM 13. EXHIBITS

Exhibit 2.1    Amended and Restated Agreement and Plan of Merger, dated as of August 11, 2004, among the Registrant, LTDnetwork, Inc. and LTDN Acquisition Corp. (1)

Exhibit 2.2    First Amendment, dated as of December 15, 2004, among the Registrant, LTDnetwork, Inc. and LTDN Acquisition Corp. to that certain Amended and Restated Agreement and Plan of Merger, dated as of August 11, 2004, among the Registrant, LTDnetwork, Inc. and LTDN Acquisition Corp. (2)

Exhibit 2.3    Stock and Intellectual Property Purchase Agreement, dated as of December 13, 2004, among Alice Schlatti, Schlatti GBR, the Registrant, Claudia Schreiner, Susanne Schlatti and Ralph Schlatti. (2)

Exhibit 3.1    Certificate of Incorporation of the Registrant (13)

Exhibit 3.2    Certificate of Designations for the Series A Convertible
               Preferred Stock of the Registrant (2)

Exhibit 3.3    Amendment No. 1 to the Certificate of Designations for the
               Series A Convertible Preferred Stock of the Registrant (3)

Exhibit 3.4    Amended and Restated By-laws of the Registrant (10)

Exhibit 4.1    Warrant Agreement, dated as of December 15, 2004, between
               the Registrant and LJDnetwork, Inc. (2)

Exhibit 4.2    Registration Rights Agreement, dated as of December 15,
               2004, between the Registrant and LJDnetwork, Inc. (2)

Exhibit 4.3    Securities Purchase Agreement dated as of March 1, 2005
               between the Registrant and The Gross Foundation, Inc.(3)

Exhibit 4.4    Amendment No. 1 dated as of April 5, 2005 to the
               Securities Purchase Agreement and the Transaction Documents
               between the Registrant and The Gross Foundation, Inc.(3)

Exhibit 4.5    Form of 9% Convertible Debenture issued to The Gross
               Foundation, Inc.(3)

Exhibit 4.6    Form of Warrant issued to The Gross Foundation, Inc.(3)

Exhibit 4.7    Registration Rights Agreement dated as of March 1, 2005
               between the Registrant and The Gross Foundation, Inc.(3)

Exhibit 4.8    Securities Purchase Agreement dated as of April 14, 2005
               between the Registrant and Double U Master Fund, L.P.(3)

Exhibit 4.9    Form of 9% Convertible Debenture issued to Double U Master
               Fund, L.P.(3)

Exhibit 4.10   Form of Warrant issued to Double U Master Fund, L.P.(3)

Exhibit 4.11   Registration Rights Agreement dated as of April 14, 2005
               between the Registrant and Double U Master Fund, L.P.(3)

Exhibit 4.12   Securities Purchase Agreement dated as of April 14, 2005

Exhibit 4.13    Form of 9% Convertible Debenture issued to Platinum Partners Value Arbitrage Fund, L.P. (3)

Exhibit 4.14    Form of Warrant issued to Platinum Partners Value Arbitrage Fund, L.P. (3)

Exhibit 4.15    Registration Rights Agreement dated as of April 18, 2005 between the Registrant and Platinum Partners Value Arbitrage Fund, L.P. (3)

34

<Page>

Exhibit 4.16    Securities Purchase Agreement dated as of April 18, 2005 between the Registrant and JM Investors, Inc.(3)

Exhibit 4.17    Form of 9% Convertible Debenture issued to JM Investors, Inc.(3)

Exhibit 4.18    Form of Warrant issued to JM Investors, Inc.(3)

Exhibit 4.19    Registration Rights Agreement dated as of April 18, 2005 between the Registrant and JM Investors, Inc.(3)

Exhibit 4.20    Securities Purchase Agreement dated as of July 14, 2005 between the Registrant and the investors named therein (4)

Exhibit 4.21    Form of 9% Convertible Debenture issued to certain investors on July 19 (4)

Exhibit 4.22    Form of Warrant issued to certain investors on July 19 (4)

Exhibit 4.23    Registration Rights Agreement dated as of July 14, 2005 between the Registrant and the investors named therein (4)

Exhibit 4.24    Amendment No. 1 dated as of July 19, 2005 to the Registration Rights Agreements between the Registrant and the

|  |  |
|---|---|
|  | investors named therein and the related Debentures(4) |
| Exhibit 4.25 | Security Agreement dated as of July 19, 2005 between the Registrant and the investors named therein (4) |
| Exhibit 4.26 | Securities Purchase Agreement dated as of August 26, 2005 between the Registrant and Harborview Master Fund L.P.(5) |
| Exhibit 4.27 | Form of 9% Convertible Debenture issued to Harborview Master Fund L.P. (5) |
| Exhibit 4.28 | Form of Warrant issued to Harborview Master Fund L.P. (5) |
| Exhibit 4.29 | Registration Rights Agreement dated as of August 26, 2005 between the Registrant and Harborview Master Fund L.P. (5) |
| Exhibit 4.30 | Securities Purchase Agreement dated as of September 12, 2005 between the Registrant and Silverlake Holdings. Inc.(5) |
| Exhibit 4.31 | Form of 9% Convertible Debenture issued to Silverlake .Holdings. Inc. (5) |
| Exhibit 4.32 | Form of Warrant issued to Silverlake Holdings. Inc. (5) |
| Exhibit 4.33 | Registration Rights Agreement dated as of September 12, 2005 between the Registrant and Silverlake Holdings. Inc. (5) |
| Exhibit 4.34 | Securities Purchase Agreement dated as of October 11, 2005 between the Registrant and Chicago Venture Partners L.P.(5) |
| Exhibit 4.35 | Form of 9% Convertible Debenture issued to Chicago Venture Partners L.P. (5) |
| Exhibit 4.36 | Form of Warrant issued to Chicago Venture Partners L.P. (5) |
| Exhibit 4.37 | Registration Rights Agreement dated as of October 11, 2005 between the Registrant and Chicago Venture Partners L.P. (5) |
| Exhibit 4.38 | Securities Purchase Agreement dated as of October 17, 2005 between the Registrant and Monarch Capital Fund Ltd (5) |
| Exhibit 4.39 | Form of 9% Convertible Debenture issued to Monarch |

Capital Fund Ltd (5)

35

<Page>

| Exhibit 4.40 | Form of Warrant issued to Monarch Capital Fund Ltd (5) |
| Exhibit 4.41 | Registration Rights Agreement dated as of October 17, 2005 between the Registrant and Monarch Capital Fund Ltd (5) |
| Exhibit 4.42 | Securities Purchase Agreement dated as of November 28, 2005 between the Registrant and Harborview Master Fund L.P. (6) |
| Exhibit 4.43 | Form of 9% Convertible Debenture issued to Harborview Master Fund L.P. (6) |
| Exhibit 4.44 | Form of Warrant issued to Harborview Master Fund L.P. (6) |
| Exhibit 4.45 | Registration Rights Agreement dated as of November 28, 2005 between the Registrant and Harborview Master Fund L.P. (6) |
| Exhibit 4.46 | Securities Purchase Agreement dated as of November 28, 2005 between the Registrant and Monarch Capital Fund Ltd (6) |
| Exhibit 4.47 | Form of 9% Convertible Debenture issued to Monarch Capital Fund Ltd (6) |
| Exhibit 4.48 | Form of Warrant issued to Monarch Capital Fund Ltd (6) |
| Exhibit 4.49 | Registration Rights Agreement dated as of November 28, 2005 between the Registrant and Monarch Capital Fund Ltd (6) |
| Exhibit 4.50 | Securities Purchase Agreement dated as of February 21, 2006 between the Registrant and The Gross Foundation, Inc. (7) |
| Exhibit 4.51 | Form of 9% Convertible Debenture issued to The Gross Foundation, Inc. (7) |
| Exhibit 4.52 | Form of Warrant issued to The Gross Foundation, Inc. (7) |

Exhibit 4.53    Registration Rights Agreement dated as of February 21, 2006 between the Registrant and The Gross Foundation, Inc.(7)

Exhibit 4.54    Securities Purchase Agreement dated as of March 13, 2006 between the Registrant and Nite Capital LP (8)

Exhibit 4.55    Form of 9% Convertible Debenture issued to Nite Capital LP (8)

Exhibit 4.56    Form of Warrant issued to Nite Capital LP (8)

Exhibit 4.57    Registration Rights Agreement dated as of March 13, 2006 between the Registrant and Nite Capital LP (8)

Exhibit 4.58    Securities Purchase Agreement dated as of March 24, 2006 between the Registrant and Chicago Venture Partners, L.P. (8)

Exhibit 4.59    Form of 9% Convertible Debenture issued to Chicago Venture Partners, L.P. (8)

Exhibit 4.60    Form of Warrant issued to Chicago Venture Partners, L.P. (8)

Exhibit 4.61    Registration Rights Agreement dated as of March 24, 2006 between the Registrant and Chicago Venture Partners, L.P. (8)

Exhibit 4.62    Form of Securities Purchase Agreement dated as of March 30, 2006 between the Registrant and each of Double U Master Fund, L.P., CMS Capital, Brio Capital, L.P. and Treshnish Investment, Inc., respectively. (9)

Exhibit 4.63    Form of 9% Convertible Debenture issued to each of Double U Master Fund, L.P., CMS Capital, Brio Capital, L.P. and Treshnish Investment, Inc., respectively. (9)

36

<Page>

Exhibit 4.64    Form of Warrant issued to each of Double U Master Fund, L.P., CMS Capital, Brio Capital, L.P. and Treshnish

Investment, Inc., respectively. (9)

Exhibit 4.65    Registration Rights Agreement dated as of March 30, 2006 between the Registrant and each of Double U Master Fund, L.P., CMS Capital, Brio Capital, L.P. and Treshnish Investment, Inc., respectively. (9)

Exhibit 4.66    Securities Purchase Agreement dated as of May 2, 2006 between the Registrant and Monarch Capital Fund Ltd. (11)

Exhibit 4.67    Form of 9% Convertible Debenture issued to Monarch Capital Fund Ltd. (11)

Exhibit 4.68    Form of Warrant issued to Monarch Capital Fund Ltd. (11)

Exhibit 4.69    Registration Rights Agreement dated as of May 2, 2006 between the Registrant and Monarch Capital Fund Ltd. (11)

Exhibit 4.70    Securities Purchase Agreement dated as of May 2, 2006 between the Registrant and Harborview Master Fund L.P. (11)

Exhibit 4.71    Form of 9% Convertible Debenture issued to Harborview Master Fund L.P. (11)

Exhibit 4.72    Form of Warrant issued to Harborview Master Fund L.P. (11)

Exhibit 4.73    Registration Rights Agreement dated as of May 2, 2006 between the Registrant and Harborview Master Fund L.P. (11)

Exhibit 4.74    Securities Purchase Agreement dated as of May 12, 2006 between the Registrant and Cobalt Blue LLC. (12)

Exhibit 4.75    Form of 9% Convertible Debenture issued to Cobalt Blue LLC. (12)

Exhibit 4.76    Form of Warrant issued to Cobalt Blue LLC. (12)

Exhibit 4.77    Registration Rights Agreement dated as of May 12, 2006 between the Registrant and Cobalt Blue LLC. (12)

Exhibit 4.78    Form of Securities Purchase Agreement between the Registrant and each of Sidney Welz, Jose Zajac, Leon Goldenberg, Bella Jacobs, Ateres Mechoel and Shalom Torah Center, respectively. (14)

| Exhibit 4.79 | Form of 9% Convertible Debenture issued to each of Sidney Welz, Jose Zajac, Leon Goldenberg, Bella Jacobs, Ateres Mechoel and Shalom Torah Center, respectively. (14) |
|---|---|
| Exhibit 4.80 | Form of Warrant issued to each of Sidney Welz, Jose Zajac, Leon Goldenberg, Bella Jacobs, Ateres Mechoel and Shalom Torah Center, respectively. (14) |
| Exhibit 4.81 | Form of Registration Rights Agreement between the Registrant and each of Sidney Welz, Jose Zajac, Leon Goldenberg, Bella Jacobs, Ateres Mechoel and Shalom Torah Center, respectively. (14) |
| Exhibit 4.82 | Form of Bridge Loan Agreement between the Registrant and Double U Master Fund, L.P., Platinum Partners Long Term Growth IV, LLC and J & N Investments LLC, respectively. (15) |
| Exhibit 4.83 | Form of Note issued to Double U Master Fund, L.P., Platinum Partners Long Term Growth IV, LLC and J & N Investments LLC, respectively. (15) |
| Exhibit 4.84 | Form of Warrant issued to Double U Master Fund, L.P., Platinum Partners Long Term Growth IV, LLC and J & N Investments LLC, respectively. (15) |
| Exhibit 10.1 | Release and Stock Purchase Agreement, dated as of July 15, 2003, between James Samuelson and the Registrant (16) |

37

<Page>

| Exhibit 10.2 | Option Agreement, dated as of March 12, 2004, between James Samuelson and the Registrant. (17) |
|---|---|
| Exhibit 10.3 | Settlement Agreement and General Release, dated as of May 17, 2004, among Richardson & Patel, a Law Corporation, Richardson & Patel LLP, ITDnetwork, Inc. and the Registrant. (17) |

Exhibit 10.4    Consulting Services Agreement dated as of July 8, 2004 between Allan Klepfisz and the Registrant. (17)

Exhibit 10.5    Consulting Services Agreement dated as of July 8, 2004 between Chai Ong and the Registrant. (17)

Exhibit 10.6    2000 Stock Option Plan (20)

Exhibit 10.7    2001 Consultant's Stock Plan (18)

Exhibit 10.8    2005 Stock Compensation Plan (19)

Exhibit 10.9    2005 Equity Incentive Plan (21)

Exhibit 21.1    List of Subsidiaries (13)

Exhibit 23.1    Consent of Independent Registered Public Accounting Firm*

Exhibit 31      Certification of the Principal Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002*

Exhibit 32      Certification of the Principal Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002*

*  Filed herewith

(1)    Incorporated herein by reference to the Registrant's Current Report on Form 8-K as filed with the Securities and Exchange Commission on August 13, 2004

(2)    Incorporated herein by reference to the Registrant's Current Report on Form 8-K as filed with the Securities and Exchange Commission on December 17, 2004

(3)    Incorporated by reference to the Registrant's Annual Report on Form 10-KSB for the year ended December 31, 2004 as filed with the Securities and Exchange Commission on June 10, 2005.

(4)    Incorporated herein by reference to the Registrant's Current Report on Form 8-K as filed with the Securities and Exchange Commission on July 20, 2005

(5)    Incorporated herein by reference to the Registrant's Current Report on Form 8-K as filed with the Securities and Exchange Commission on November 2, 2005

(6)    Incorporated herein by reference to the Registrant's Current Report on Form 8-K as filed with the Securities and Exchange Commission on January 3, 2006

(7)     Incorporated herein by reference to the Registrant's Current Report on
        Form 8-K as filed with the Securities and Exchange Commission on March
        10, 2006

(8)     Incorporated herein by reference to the Registrant's Current Report on
        Form 8-K as filed with the Securities and Exchange Commission on March
        31, 2006

(9)     Incorporated herein by reference to the Registrant's Current Report on
        Form 8-K as filed with the Securities and Exchange Commission on April
        11, 2006

(10)    Incorporated herein by reference to the Registrant's Current Report on
        Form 8-K as filed with the Securities and Exchange Commission on May
        1, 2006

(11)    Incorporated herein by reference to the Registrant's Current Report on
        Form 8-K as filed with the Securities and Exchange Commission on May
        9, 2006

(12)    Incorporated herein by reference to the Registrant's Current Report on
        Form 8-K as filed with the Securities and Exchange Commission on May
        25, 2006

(13)    Incorporated by reference to the Registrant's Annual Report on Form
        10-KSB for the year ended December 31, 2005 as filed with the
        Securities and Exchange Commission on May 26, 2006

(14)    Incorporated herein by reference to the Registrant's Current Report on
        Form 8-K as filed with the Securities and Exchange Commission on June
        19, 2006

38

<Page>

(15)    Incorporated herein by reference to the Registrant's Current Report on
        Form 8-K as filed with the Securities and Exchange Commission on July
        11, 2006

(16)    Incorporated by reference to the Registrant's Quarterly Report on Form
        10-QSB for the quarter ended June 30, 2003 as filed with the
        Securities and Exchange Commission on September 24, 2003

(17)    Incorporated by reference to the Registrant's Registration Statement
        on Form S-8 as filed with the Securities and Exchange Commission on
        July 15, 2004

(18)    Incorporated by reference to the Registrant's Registration Statement
        on Form S-8 as filed with the Securities and Exchange Commission on

(19)    December 3, 2001
        Incorporated by reference to the Registrant's Registration Statement
        on Form S-8 as filed with the Securities and Exchange Commission on
        February 28, 2005

(20)    Incorporated herein by reference to the Registrant's Current Report on
        Form 8-K as filed with the Securities and Exchange Commission on
        November 8, 2000

(21)    Incorporated by reference to the Registrant's Registration Statement
        on Form 8-K as filed with the Securities and Exchange Commission on
        November 1, 2005

ITEM 14.    PRINCIPAL ACCOUNTANT FEES AND SERVICES

Marcum & Kliegman LLP, certified public accountants, provided us accounting
services during the year ended December 31, 2006.

The following table presents fees for professional audit services rendered by
Marcum & Kliegman, LLP for the audit of our annual financial statements for the
years ended December 31, 2006 and 2005, and fees billed for other services
rendered by Marcum & Kliegman, LLP during such years.

|                        | 2006      | 2005      |
|------------------------|-----------|-----------|
| Audit Fees (1)         | $323,090  | $361,618  |
| Audit Related Fees (2) | --        | --        |
| Tax Fees (3)           | --        | --        |
| All Other Fees (4)     | --        | --        |
|                        | $323,090  | $361,618  |

Notes:

(1)    Audit fees consist of fees for audit of our annual financial
       statements, review of financial statements included in our quarterly
       reports on Form 10-Q and services normally provided by the independent
       auditor in connection with statutory and regulatory filings or
       engagements.

(2)    Audit related fees consist of fees for assurance and related services
       by the independent auditor.

(3)    Tax fees consist of fees for tax consultation and tax compliance

services provided to us.

(4)    All other fees consist of fees primarily related to a registration
statement filed by us.

We do not have an audit committee, therefore there is no pre-approval of audit
and permissible non-audit services that are provided by the independent
auditors. The non-audit services include audit-related services, tax services
and other services. Our policy is to pre-approve all services and fees for up to
one year, which approval includes the appropriate detail with regard to each
particular service and its related fees.

We have considered whether the services provided by Marcum & Kliegman, LLP,
apart from the audit services described under the heading "Audit Fees" above,
are compatible with maintaining the independence of Marcum & Kliegman, LLP.

39

<Page>

SIGNATURES
----------

In accordance with Section 13 or 15(d) of the Exchange Act,
the registrant caused this report to be signed on its behalf by the undersigned,
thereunto duly authorized.

BRILLIANT TECHNOLOGIES CORPORATION

Dated: April 25, 2007        By /s/ Allan Klepfisz
                                -----------------------
                                Allan Klepfisz
                                Chief Executive Officer, President
                                and Director

In accordance with the Exchange Act, this report has been
signed below by the following persons on behalf of the registrant and in the
capacities and on the dates indicated.

Dated: April 25, 2007        /s/ Allan Klepfisz
                             -----------------------

Dated: April 25, 2007        Allan Klepfisz
                             Chief Executive Officer, President
                             and Director

                             /s/ Chai Ong
                             ---------------------------------
                             Chai Ong
                             Director

Dated: April 25, 2007        /s/ Arie Baalbergen
                             ---------------------------------
                             Arie Baalbergen
                             Director

                             40

<Page>

                BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
                           (A Development Stage Company)

                   INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

                                                              Page Nos.
                                                              ---------

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM           F-1

CONSOLIDATED BALANCE SHEET                                        F-2
  At December 31, 2006

CONSOLIDATED STATEMENTS OF OPERATIONS                            F-3
  For the Years Ended December 31, 2006 and 2005
  For the Period from Inception (October 1, 1999) to
  December 31, 2006

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY
From Inception (October 1, 1999) to December 31, 2006                    F-4 to F-11

CONSOLIDATED STATEMENTS OF CASH FLOWS
For the Years Ended December 31, 2006 and 2005
For the Period from Inception (October 1, 1999) to
December 31, 2006                                                        F-12 to F-13

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS                               F-14 to F-43

&lt;Page&gt;

        REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
        -------------------------------------------------------

To the Audit Committee of the
Board of Directors and Stockholders
of Brilliant Technologies Corporation

We have audited the accompanying consolidated balance sheet of Brilliant
Technologies Corporation and Subsidiaries (a development stage company) (the
"Company") as of December 31, 2006, and the related consolidated statements of
operations, stockholders' deficiency and cash flows for the years ended December
31, 2006 and 2005 and for the period from October 1, 1999 (inception) to
December 31, 2006. These consolidated financial statements are the
responsibility of the Company's management. Our responsibility is to express an
opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company
Accounting Oversight Board (United States). Those standards require that we plan
and perform the audit to obtain reasonable assurance about whether the financial
statements are free of material misstatement. The Company is not required to
have, nor were we engaged to perform, an audit of its internal control over
financial reporting. Our audit included consideration of internal control over
financial reporting as a basis for designing audit procedures that are
appropriate in the circumstances, but not for expressing an opinion on the
effectiveness of the Company's internal control over financial reporting.
Accordingly, we express no such opinion. An audit also includes examining, on a
test basis, evidence supporting the amounts and disclosures in the financial
statements, assessing the accounting principles used and significant estimates

made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Brilliant Technologies Corporation and Subsidiaries (a development stage company), as of December 31, 2006, and the results of their operations and their cash flows for the years ended December 31, 2006 and 2005 and for the period from October 1, 1999 (inception) to December 31, 2006 in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the consolidated financial statements, the Company continues to generate operating losses and has a significant working capital deficiency as of December 31, 2006. The Company has yet to generate revenues. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans regarding these matters are also described in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ Marcum & Kliegman LLP

New York, New York
April 20, 2007

F-1

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED BALANCE SHEET

December 31, 2006

ASSETS

<Page>
<TABLE>

```
<S>                                                         <C>
Current Assets:
  Cash                                                  $      86,927
  Prepaid expenses and other current assets                  116,645
                                                        --------------

        Total Current Assets                                 203,572

Property and equipment, net                                   59,420

Deferred licenses and other fees, net                      1,326,500

Deferred financing costs, net                                 47,608

Capitalized software                                         851,728

Other assets                                                  13,207
                                                        --------------

        TOTAL ASSETS                                   $   2,502,035
                                                        ==============

        LIABILITIES AND STOCKHOLDERS' DEFICIENCY
        ----------------------------------------

CURRENT LIABILITIES:
  Notes payable, including related parties of $27,063   $   2,693,318
  Convertible debentures, net of debt discount of $215,480  1,619,520
  Accrued liabilities                                       6,582,002
  Accrued minimum royalties                                 1,444,000
  Due to related parties                                    1,190,960
  Derivative liabilities for conversion options and warrants 8,058,812
                                                        --------------

        TOTAL LIABILITIES                                  21,588,612
                                                        --------------

COMMITMENTS AND CONTINGENCIES

STOCKHOLDERS' DEFICIENCY:
  Preferred stock - $.001 par value; 1,000,000 shares authorized;
   - 0 - shares issued and outstanding                           --
```

Common stock - $.0001 par value; 800,000,000 shares authorized;
625,849,751 issued and outstanding

| | |
|---|---:|
| Common stock | 62,584 |
| Additional paid-in capital | 32,146,193 |
| Accumulated other comprehensive income | 40,649 |
| Deferred compensation | (154,333) |
| Deficit accumulated during the development stage | (51,181,670) |
| TOTAL STOCKHOLDERS' DEFICIENCY | (19,086,577) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIENCY | $ 2,502,035 |

The accompanying notes are an integral part of these consolidated financial statements.

F-2

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF OPERATIONS

| | For the Years Ended December 31, | | For the Period from Inception (October 1, 1999) to December 31, |
|---|---|---|---|
| | 2006 | 2005 | 2006 |
| REVENUE | $ -- | $ -- | $ 9,862 |
| OPERATING COSTS: | | | |
| Research and development | 1,005,221 | 812,175 | 3,176,598 |
| In-process research and development | -- | -- | 23,224,695 |
| Consulting fees | 1,717,543 | 377,488 | 9,808,936 |
| General and administrative, including | | | |

|  |  |  |  |
|---|---:|---:|---:|
| compensatory element of stock issuances of $3,728,890 and $664,044 for 2006 and 2005, respectively | 6,391,065 | 3,570,478 | 15,893,453 |
| Depreciation and amortization | 31,733 | 84,440 | 356,475 |
| Settlement provision | -- | 2,200,000 | 2,200,000 |
| TOTAL OPERATING COSTS | 9,145,562 | 7,044,581 | 54,660,157 |
| LOSS FROM OPERATIONS | (9,145,562) | (7,044,581) | (54,650,295) |
| Derivative gains, net | (4,438,874) | (10,840,340) | (15,279,214) |
| Interest and amortization of debt costs and stock issuances for interest $2,697,334 and $519,989 for 2006 and 2005, respectively | 9,564,275 | 2,057,274 | 11,738,674 |
| Other (income) expense | (32,014) | (12,508) | 71,915 |
| NET (LOSS) INCOME | $ (14,238,949) | $ 1,750,994 | $ (51,181,670) |
| Basic net (loss) income per common share | $ (0.03) | $ 0.01 |  |
| Diluted net (loss) income per common share | $ (0.03) | $ 0.01 |  |
| Weighted average number of shares outstanding – Basic | 438,898,223 | 197,714,949 |  |
| Weighted average number of shares outstanding – Diluted | 438,898,223 | 326,855,149 |  |

The accompanying notes are an integral part of these consolidated financial statements.

F-3

&lt;Page&gt;

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

|  | Per Share Amount | Common Stock Shares | Common Stock Amount | Preferred Stock Shares | Preferred Stock Amount | Additional Paid-in Capital | Receivable on Sale of Stock |
|---|---|---|---|---|---|---|---|
| Period from Inception (October 1, 1999) through December 31, 1999 | $ -- | -- | $ -- | -- | $ -- | $ -- | $ -- |
| Issuance of founders shares | 0.01 | -- | -- | 52,014 | -- | 487 | -- |
| Net loss | -- | -- | -- | -- | -- | -- | -- |
| Balance at December 31, 1999 | -- | -- | -- | 52,014 | -- | 487 | -- |
| Issuance of stock for cash | 174.47 | -- | -- | 8,310 | 8 | 1,449,788 | -- |
| Issuance of stock for services | 35.27 | -- | -- | 3,640 | 4 | 128,390 | -- |
| Subscription receivable | -- | -- | -- | -- | -- | -- | (65,000) |
| Net loss | -- | -- | -- | -- | -- | -- | -- |
| Foreign currency translation adjustment | -- | -- | -- | -- | -- | -- | -- |
| Comprehensive loss | -- | -- | -- | -- | -- | -- | -- |
| Balance at December 31, 2000 | -- | -- | -- | 63,964 | 12 | 1,578,665 | (65,000) |
| Issuance of stock for cash | 252.29 | -- | -- | 8,140 | 8 | 2,053,695 | -- |
| Issuance of stock for services | 503.35 | -- | -- | 2,080 | 1 | 1,046,999 | -- |
| Subscription receivable | -- | -- | -- | -- | -- | -- | 65,000 |
| Net loss | -- | -- | -- | -- | -- | -- | -- |
| Foreign currency translation adjustment | -- | -- | -- | -- | -- | -- | -- |
| Comprehensive loss | -- | -- | -- | -- | -- | -- | -- |

Balance at December 31, 2001    --    $    --    --    74,184    $    21    $ 4,679,359    $    --

The accompanying notes are an integral part of these consolidated financial statements.

F-4a

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

| | Unearned Compensation | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit During the Development Stage | Total Stockholders' (Deficiency) | Comprehensive Income (Loss) |
|---|---|---|---|---|---|
| Period from Inception (October 1, 1999) through December 31, 1999 | $ -- | $ -- | $ -- | $ -- | $ -- |
| Issuance of founders shares | -- | -- | -- | 487 | -- |
| Net loss | -- | -- | (483) | (483) | (483) |
| Balance at December 31, 1999 | -- | -- | (483) | 4 | -- |
| Issuance of stock for cash | -- | -- | -- | 1,449,796 | -- |
| Issuance of stock for services | -- | -- | -- | 128,394 | -- |
| Subscription receivable | -- | -- | -- | (65,000) | -- |
| Net loss | -- | -- | (1,877,614) | (1,877,614) | (1,877,614) |
| Foreign currency translation adjustment | -- | 2,391 | -- | 2,391 | 2,391 |
| Comprehensive loss | -- | -- | -- | -- | (1,875,223) |

|  |  |  |  |  |
| --- | --- | --- | --- | --- |
| Balance at December 31, 2000 | -- | (1,878,097) | (362,029) | 2,391 | -- |
| Issuance of stock for cash | -- | 2,053,703 | -- | -- | -- |
| Issuance of stock for services | -- | 1,047,000 | -- | -- | -- |
| Subscription receivable | -- | 65,000 | -- | -- | -- |
| Net loss | -- | (2,983,450) | (2,983,450) | -- | -- |
| Foreign currency translation adjustment | -- | 51,020 | 51,020 | 51,020 | -- |
| Comprehensive loss | -- | -- | (2,932,430) | -- | -- |
| Balance at December 31, 2001 | $ -- | $ (4,861,547) | $ (128,756) | $ 53,411 | $ -- |

The accompanying notes are an integral part of these consolidated financial statements.

F-4b

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

| | Per Share Amount | Common Stock | | Preferred Stock | | Additional Paid-in Capital | Receivable on Sale of Stock |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Shares | Amount | Shares | Amount | | |
| Balance at December 31, 2001 | $ -- | -- | $ -- | 74,184 | $ 21 | $ 4,679,359 | $ -- |
| Issuance of stock for cash | 197.75 | -- | -- | 13,624 | 8 | 2,694,254 | -- |
| Issuance of stock for services | 32.32 | -- | -- | 8,446 | -- | 441,833 | -- |
| Net loss | -- | -- | -- | -- | -- | -- | -- |
| Foreign currency translation adjustment | -- | -- | -- | -- | -- | -- | -- |

| | | | | | | |
|---|---|---|---|---|---|---|
| Comprehensive loss | -- | -- | -- | -- | -- | $ -- |
| | | | | | | |
| Balance at December 31, 2002 | -- | $ -- | 96,254 | $ 29 | $ 7,815,446 | $ -- |
| | | | | | | |
| Balance at December 31, 2002 | -- | $ -- | 96,254 | $ 29 | $ 7,815,446 | -- |
| Issuance of stock for cash | 168.09 | -- | 2,203 | 16 | 370,351 | -- |
| Issuance of stock for services | 60.99 | -- | 7,595 | 8 | 523,965 | -- |
| Net loss | -- | -- | -- | -- | -- | -- |
| Amortization of unearned compensation | -- | -- | -- | -- | -- | -- |
| Foreign currency translation adjustment | -- | -- | -- | -- | -- | -- |
| Comprehensive loss | -- | -- | -- | -- | -- | -- |
| Balance at December 31, 2003 | -- | $ -- | 106,052 | $ 53 | $ 8,709,762 | $ -- |

The accompanying notes are an integral part of these consolidated financial statements.

F-5a

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

| | Unearned Compensation | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit During the Development Stage | Total Stockholders' (Deficiency) | Comprehensive Income (Loss) |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| Balance at December 31, 2001 | $ -- | $ 53,411 | $ (4,861,547) | $ (128,756) | |
| Issuance of stock for cash | -- | -- | -- | 2,694,254 | -- |
| Issuance of stock for services | (344,157) | -- | -- | 97,684 | -- |
| Net loss | -- | -- | (2,824,849) | (2,824,849) | (2,824,849) |
| Foreign currency translation adjustment | -- | (162,210) | -- | (162,210) | (162,210) |
| Comprehensive loss | | | | | (2,987,059) |
| Balance at December 31, 2002 | $ (344,157) | $ (108,799) | $ (7,686,396) | $ (323,877) | $ -- |
| | | | | | |
| Balance at December 31, 2002 | $ (344,157) | $ (108,799) | $ (7,686,396) | $ (323,877) | $ -- |
| Issuance of stock for cash | -- | -- | -- | 370,367 | -- |
| Issuance of stock for services | (523,973) | -- | -- | -- | -- |
| Net loss | -- | -- | (2,459,819) | (2,459,819) | (2,459,819) |
| Amortization of unearned compensation | 458,948 | -- | -- | 458,948 | 458,948 |
| Foreign currency translation adjustment | -- | (160,901) | -- | (160,901) | (160,901) |
| Comprehensive loss | | | | | (2,620,720) |
| Balance at December 31, 2003 | $ (409,182) | $ (269,700) | $(10,146,215) | $ (2,115,282) | $ -- |

The accompanying notes are an integral part of these consolidated financial statements.

F-5b

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

<Page>

| | Per Share Amount | Common Stock | | Preferred Stock | | Additional Paid-in Capital |
|---|---|---|---|---|---|---|
| | | Shares | Amount | Shares | Amount | |
| Balance at December 31, 2003 | $ -- | -- | $ -- | 106,052 | $ 53 | $ 8,709,762 |
| Issuance of stock for cash | 51.67 | -- | -- | 63,659 | 64 | 3,288,885 |
| Offering costs | -- | -- | -- | -- | -- | (125,000) |
| Issuance of stock for services | 90.23 | -- | -- | 36,125 | 36 | 3,259,533 |
| Conversion of debt | -- | -- | -- | 2,053 | 2 | 224,817 |
| Issuance of stock to shareholders of ATI | 109.57 | 83,931,775 | 8,393 | 50,000 | 50 | 15,933,212 |
| Net loss | -- | -- | -- | -- | -- | -- |
| Amortization of unearned compensation | -- | -- | -- | -- | -- | -- |
| Foreign currency translation adjustment | -- | -- | -- | -- | -- | -- |
| Comprehensive loss | -- | -- | -- | -- | -- | -- |
| Adjustment pursuant to merger agreement | -- | -- | -- | (14,553) | (10) | 10 |
| Balance at December 31, 2004 | $ -- | 83,931,775 | $ 8,393 | 243,336 | $ 195 | $ 31,291,219 |
| Balance at December 31, 2004 | $ -- | 83,931,775 | $ 8,393 | 243,336 | $ 195 | $ 31,291,219 |
| First Quarter | | | | | | |
| Issuance of stock on a conversion of an accrued expense ($.17) | -- | 1,692,388 | 169 | -- | -- | 287,537 |
| Issuance of stock on a conversion of an accrued expense ($68.75) | -- | -- | -- | 10,538 | 11 | 727,459 |
| Issuance of stock for compensation ($.15) | -- | 523,811 | 52 | -- | -- | 78,519 |
| Issuance of stock for compensation ($.15) | -- | 380,952 | 38 | -- | -- | 57,104 |
| Issuance of stock for consulting fees ($69.23) | -- | -- | -- | 375 | 1 | 22,499 |
| Issuance of stock for | | | | | | |

| | | | | |
|---|---|---|---|---|
| consulting fees ($.19) | 187,500 | 19 | -- | -- | 35,981 |
| Issuance of common stock for cash ($.10) | 500,000 | 50 | -- | -- | 49,950 |

The accompanying notes are an integral part of these consolidated financial statements.

F-6a

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

| | Receivable on Sale of Stock | Unearned Compensation | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit During the Development Stage | Total Stockholders' (Deficiency) | Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|
| Balance at December 31, 2003 | $ -- | $ (409,182) | $ (269,700) | $ (110,146,215) | $ (2,115,282) | $ -- |
| Issuance of stock for cash | -- | -- | -- | -- | 3,288,949 | -- |
| Offering costs | -- | -- | -- | -- | (125,000) | -- |
| Issuance of stock for services | -- | (3,259,569) | -- | 234 | 234 | -- |
| Conversion of debt | -- | -- | -- | -- | 224,819 | -- |
| Issuance of stock to shareholders of ATI | -- | -- | -- | -- | 15,941,655 | -- |
| Net loss | -- | -- | -- | (28,547,734) | (28,547,734) | (28,547,734) |
| Amortization of unearned compensation | -- | 3,668,751 | -- | -- | 3,668,751 | -- |
| Foreign currency translation adjustment | -- | -- | (164,023) | -- | (164,023) | (164,023) |
| Comprehensive loss | -- | -- | -- | -- | -- | (28,711,757) |
| Adjustment pursuant to merger agreement | -- | -- | -- | -- | -- | -- |

| | | | | | |
|---|---|---|---|---|---|
| Balance at December 31, 2004 | $ -- | $ -- | $ (433,723) | $(38,693,715) | $ (7,827,631) $ -- |
| Balance at December 31, 2004 | $ -- | $ -- | $ (433,723) | $(38,693,715) | $ (7,827,631) |
| First Quarter | | | | | |
| Issuance of stock on a conversion of an accrued expense ($.17) | -- | -- | -- | 287,706 | -- |
| Issuance of stock on a conversion of an accrued expense ($68.75) | -- | -- | -- | 727,470 | -- |
| Issuance of stock for compensation ($.15) | -- | -- | -- | 78,571 | -- |
| Issuance of stock for compensation ($.15) | -- | -- | -- | 57,142 | -- |
| Issuance of stock for consulting fees ($69.23) | -- | -- | -- | 22,500 | -- |
| Issuance of stock for consulting fees ($.19) | -- | -- | -- | 36,000 | -- |
| Issuance of common stock for cash ($.10) | -- | -- | -- | 50,000 | -- |

The accompanying notes are an integral part of these consolidated financial statements.

F-6b

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

| Per Share | Common Stock | Preferred Stock | Additional Paid-in |
|---|---|---|---|

<Page>

| | Amount | Shares | Amount | Shares | Amount | Capital |
|---|---|---|---|---|---|---|
| **First Quarter** | | | | | | |
| Issuance of common stock for cash | $ 0.10 | 250,000 | $ 25 | -- | -- | $ 24,975 |
| Issuance of common stock for cash | 0.10 | 300,000 | 30 | -- | -- | 29,535 |
| Issuance of stock on conversion of a note payable ($.17) | 0.17 | 1,971,428 | 197 | -- | -- | 137,803 |
| **Second Quarter** | | | | | | |
| Issuance of common stock for cash | 0.10 | 250,000 | 25 | -- | -- | 24,975 |
| Issuance of common stock for services | 0.13 | 276,394 | 28 | -- | -- | 35,903 |
| Issuance of common stock for services | 0.12 | 312,500 | 31 | -- | -- | 37,469 |
| Issuance of stock to an officer of the company | 0.12 | 1,000,000 | 100 | -- | -- | 119,900 |
| Issuance of stock to an officer of the company | 0.14 | 1,000,000 | 100 | -- | -- | 139,900 |
| Issuance of stock to an officer of the company | 0.10 | 333,000 | 33 | -- | -- | 33,300 |
| Issuance of stock to an officer of the company | 0.11 | 333,000 | 33 | -- | -- | 36,634 |
| **Third Quarter** | | | | | | |
| Issuance of stock for consulting fees | 0.11 | 300,000 | 30 | -- | -- | 32,970 |
| Issuance of stock on a conversion of an accrued expense | 0.13 | 70,000 | 7 | -- | -- | 9,093 |
| Issuance of stock with investor in connection with certain amendments related to the 9% Convertible Debenture financing consulting fees | -- | -- | -- | 1,875 | 10 | 59,990 |

The accompanying notes are an integral part of these consolidated financial statements.

F-7a

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

| | Receivable on Sale of Stock | Unearned Compensation | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit During the Development Stage | Total Stockholders' Equity (Deficiency) | Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|
| **First Quarter** | | | | | | |
| Issuance of common stock for cash | $ -- | $ -- | $ -- | $ -- | $ 25,000 | $ -- |
| Issuance of common stock for cash | -- | -- | -- | -- | 29,565 | -- |
| Issuance of stock on conversion of a note payable ($.17) | -- | -- | -- | -- | 138,000 | -- |
| **Second Quarter** | | | | | | |
| Issuance of common stock for cash | -- | -- | -- | -- | 25,000 | -- |
| Issuance of common stock for services | -- | -- | -- | -- | 35,931 | -- |
| Issuance of common stock for services | -- | -- | -- | -- | 37,500 | -- |
| Issuance of stock to an officer of the company | -- | -- | -- | -- | 120,000 | -- |
| Issuance of stock to an officer of the company | -- | -- | -- | -- | 140,000 | -- |
| Issuance of stock to an officer of the company | -- | -- | -- | -- | 33,333 | -- |
| Issuance of stock to an officer of the company | -- | -- | -- | -- | 36,667 | -- |
| **Third Quarter** | | | | | | |
| Issuance of stock for consulting fees | -- | -- | -- | -- | 33,000 | -- |

| | Per Share Amount | Common Stock Shares | Common Stock Amount | Preferred Stock Shares | Preferred Stock Amount | Additional Paid-in Capital | Receivable on Sale of Stock |
|---|---|---|---|---|---|---|---|
| Issuance of stock on a conversion of an accrued expense | | -- | -- | -- | -- | 9,100 | -- |
| Issuance of stock with investor in connection with certain amendments related to the 9% Convertible Debenture financing consulting fees | | -- | -- | -- | -- | 60,000 | -- |

The accompanying notes are an integral part of these consolidated financial statements.

F-7b

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

| | Per Share Amount | Common Stock Shares | Common Stock Amount | Preferred Stock Shares | Preferred Stock Amount | Additional Paid-in Capital | Receivable on Sale of Stock |
|---|---|---|---|---|---|---|---|
| Balance at December 31, 2004, continued | | | | | | | |
| Third Quarter | | | | | | | |
| Issuance of stock for finders fees | $ -- | -- | -- | 10,000 | 10 | 319,990 | -- |
| Exercise of warrants to purchase Series A Convertible Stock | -- | -- | -- | 28,205 | 28 | 460,625 | -- |
| Conversion of Preferred Stock to Common Stock | -- | 117,731,600 | 11,773 | (294,329) | (255) | (11,518) | -- |
| Fourth Quarter | | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Issuance of stock for services | 0.10 | 2,500,000 | 250 | -- | -- | 249,750 | -- |
| Reclassification of derivative liabilities' | -- | -- | -- | -- | -- | (20,565,700) | -- |
| Conversion of derivative liabilities' | -- | -- | -- | -- | -- | -- | -- |
| Exercise of warrants | 0.04 | 17,098,043 | 1,710 | -- | -- | 1,589,513 | -- |
| Incentive bonus | 0.10 | 334,000 | 33 | -- | -- | 696,269 | -- |
| Issuance of shares for services | 0.10 | 208,033 | 21 | -- | -- | 33,367 | -- |
| Comprehensive income: | | | | | | 20,812 | -- |
| Net Income | | -- | -- | -- | -- | -- | -- |
| Foreign currency translation adjustment | | -- | -- | -- | -- | -- | -- |
| Balance at December 31, 2005 | | $ 231,484,424 | $ 23,147 | $ -- | $ -- | $ 16,065,823 | $ -- |
| Balance at December 31, 2005 | | $ 231,484,424 | $ 23,147 | $ -- | $ -- | $ 16,065,823 | $ -- |

**First Quarter**

| | | | | | | |
|---|---|---|---|---|---|---|
| Issuance of stock for consulting fees | 0.11 | 1,894,737 | 189 | -- | -- | 208,232 | -- |
| Issuance of stock for consulting fees | 0.11 | 3,315,789 | 332 | -- | -- | 364,405 | -- |
| Issuance of stock for consulting fees | 0.11 | 3,789,474 | 379 | -- | -- | 416,463 | -- |
| Issuance of stock for consulting fees | 0.11 | 571,800 | 57 | -- | -- | 62,841 | -- |
| Issuance of stock for financing services | 0.11 | 750,000 | 75 | -- | -- | 82,425 | -- |
| Issuance of stock for consulting fees | 0.11 | 50,000 | 5 | -- | -- | 5,495 | -- |
| Issuance of stock for consulting fees | 0.11 | 50,000 | 5 | -- | -- | 5,495 | -- |

The accompanying notes are an integral part of these consolidated financial statements.

F-8a

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

| | Unearned Compensation | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit During the Development Stage | Total Stockholders' Equity (Deficiency) | Comprehensive Income (Loss) |
|---|---|---|---|---|---|
| Balance at December 31, 2004, continued | | | | | |
| Third Quarter | | | | | |
| Issuance of stock for finders fees | -- | -- | -- | 320,000 | -- |
| Exercise of warrants to purchase Series A Convertible Stock | -- | -- | -- | 460,653 | -- |
| Conversion of Preferred Stock to Common Stock | -- | -- | -- | -- | -- |
| Fourth Quarter | | | | | |
| Issuance of stock for services | -- | -- | -- | 250,000 | -- |
| Reclassification of derivative liabilities | -- | -- | -- | (20,565,700) | -- |
| Conversion of derivative liabilities' | -- | -- | -- | 1,589,513 | -- |
| Exercise of warrants | -- | -- | -- | 697,979 | -- |
| Incentive bonus | -- | -- | -- | 33,400 | -- |
| Issuance of shares for services | -- | -- | -- | 20,833 | -- |

http://www.sec.gov/Archives/edgar/data/1054825/000101968707001189/0001019687-07-001189.txt

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

|  |  |  |  |  |  |
|---|---:|---:|---:|---:|---:|
| Comprehensive Income: |  |  |  |  |  |
| Net Income | -- | 1,750,994 | 1,750,994 |  | 1,750,994 |
| Foreign currency translation adjustment | -- | -- | 706,949 | 706,949 | 706,949 |
| Balance at December 31, 2005 | $ -- | $ 273,226 | $ (36,942,721) | $ (20,580,525) | $ 2,457,943 |
| Balance at December 31, 2005 | $ -- | $ 273,226 | $ (36,942,721) | $ (20,580,525) |  |
| First Quarter |  |  |  |  |  |
| Issuance of stock for consulting fees | (208,421) | -- | -- | -- | -- |
| Issuance of stock for consulting fees | (364,737) | -- | -- | -- | -- |
| Issuance of stock for consulting fees | (416,842) | -- | -- | -- | -- |
| Issuance of stock for consulting fees | -- | -- | -- | 62,898 | -- |
| Issuance of stock for financing services | -- | -- | -- | 82,500 | -- |
| Issuance of stock for consulting fees | -- | -- | -- | 5,500 | -- |
| Issuance of stock for consulting fees | -- | -- | -- | 5,500 | -- |

The accompanying notes are an integral part of these consolidated financial statements.

F-8b

&lt;Page&gt;

Page 82 of 332

| | Per Share Amount | Common Stock Shares | Common Stock Amount | Preferred Stock Shares | Preferred Stock Amount | Additional Paid-in Capital |
|---|---|---|---|---|---|---|
| **First Quarter** | | | | | | |
| Issuance of stock for consulting fees | $ 0.11 | 50,000 | $ 5 | -- | $ -- | $ 5,495 |
| Issuance of stock for financing services | 0.07 | 750,000 | 75 | -- | -- | 49,925 |
| Issuance of stock for financing services | 0.11 | 500,000 | 50 | -- | -- | 54,950 |
| Issuance of stock for consulting fees | 0.11 | 3,000,000 | 300 | -- | -- | 329,700 |
| Issuance of stock for consulting fees | 0.11 | 1,500,000 | 150 | -- | -- | 164,850 |
| Issuance of stock for financing services | 0.11 | 4,500,000 | 450 | -- | -- | 494,550 |
| Issuance of stock for consulting fees | 0.11 | 3,000,000 | 300 | -- | -- | 329,700 |
| Issuance of stock for financing services | 0.11 | 1,736,000 | 174 | -- | -- | 190,786 |
| Issuance of stock for consulting fees | 0.04 | 7,183,333 | 718 | -- | -- | 286,607 |
| Issuance of stock in settlement of claims | 0.10 | 21,795,061 | 2,180 | -- | -- | 2,197,820 |
| Issuance of shares for conversion of debentures and accrued interest | 0.05 | 28,268,178 | 2,827 | -- | -- | 1,300,358 |
| Issuance of common stock upon exercise of warrants | 0.04 | 9,161,802 | 916 | -- | -- | 367,594 |
| Issuance of share for financing transaction | 0.11 | 5,630,075 | 563 | -- | -- | 618,745 |
| Reclassifications of derivative liability upon exercise of warrants and conversion option liability | -- | -- | -- | -- | -- | 872,782 |
| **Second Quarter** | | | | | | |
| Issuance of shares for conversion of debentures and accrued interest | 0.02 | 72,894,981 | 7,289 | -- | -- | 1,092,191 |
| Issuance of stock for consulting fees | 0.02 | 3,700,000 | 370 | -- | -- | 73,307 |
| **Third Quarter** | | | | | | |
| Issuance of shares for conversion of debentures and accrued interest | 0.01 | 29,984,095 | 2,998 | -- | -- | 417,002 |
| Issuance of common stock upon exercise of warrants | 0.04 | 49,734,675 | 4,973 | -- | -- | 1,984,414 |

The accompanying notes are an integral part of these consolidated financial statements.

F-9a

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

| | Receivable on Sale of Stock | Unearned Compensation | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit During the Development Stage | Total Stockholders' (Deficiency) | Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|
| **First Quarter** | | | | | | |
| Issuance of stock for consulting fees | $ -- | $ -- | $ -- | $ -- | $ 5,500 | $ -- |
| Issuance of stock for financing services | -- | -- | -- | -- | 50,000 | -- |
| Issuance of stock for financing services | -- | -- | -- | -- | 55,000 | -- |
| Issuance of stock for consulting fees | -- | -- | -- | -- | 330,000 | -- |
| Issuance of stock for consulting fees | -- | -- | -- | -- | 165,000 | -- |
| Issuance of stock for financing services | -- | -- | -- | -- | 495,000 | -- |
| Issuance of stock for consulting fees | -- | -- | -- | -- | 330,000 | -- |
| Issuance of stock for financing services | -- | -- | -- | -- | 190,960 | -- |
| Issuance of stock for consulting fees | -- | (287,325) | -- | -- | -- | -- |
| Issuance of stock in settlement of claims | -- | -- | -- | -- | 2,200,000 | -- |
| Issuance of shares for conversion of debentures and accrued interest | -- | -- | -- | -- | 1,303,185 | -- |
| Issuance of common stock upon exercise of warrants | -- | -- | -- | -- | 368,510 | -- |
| Issuance of share for financing transaction | -- | -- | -- | -- | 619,308 | -- |
| Reclassifications of derivative liability upon exercise of warrants and conversion | | | | | | |

| | |
|---|---:|
| option liability | 872,782 |
| **Second Quarter** | |
| Issuance of shares for conversion of debentures and accrued interest | 1,099,480 |
| Issuance of stock for consulting fees | 73,677 |
| **Third Quarter** | |
| Issuance of shares for conversion of debentures and accrued interest | 420,000 |
| Issuance of common stock upon exercise of warrants | 1,989,387 |

The accompanying notes are an integral part of these consolidated financial statements.

F-9b

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

| | Per Share Amount | Common Stock Shares | Common Stock Amount | Preferred Stock Shares | Preferred Stock Amount | Additional Paid-in Capital |
|---|---|---|---|---|---|---|
| **Third Quarter** | | | | | | |
| Issuance of stock for financing services | $ 0.03 | 24,000,000 | 2,400 | -- | -- | 717,600 |
| Issuance of stock for consulting fees | 0.03 | 19,000,000 | 1,900 | -- | -- | 568,100 |

http://www.sec.gov/Archives/edgar/data/1054825/000101968707001189/000101968707-07-001189.txt

7/18/2007

| | | | | | |
|---|---|---|---|---|---|
| Issuance of stock for consulting fees | 0.02 | 300,000 | 30 | -- | -- | 5,970 |
| Issuance of stock for consulting fees | 0.02 | 1,300,000 | 130 | -- | -- | 25,870 |
| Issuance of stock for consulting fees | 0.02 | 18,600,000 | 1,860 | -- | -- | 370,140 |
| Issuance of stock for consulting fees | 0.02 | 1,800,000 | 180 | -- | -- | 35,820 |
| Issuance of stock for consulting fees | 0.03 | 2,000,000 | 200 | -- | -- | 59,800 |
| Issuance of stock for consulting fees | 0.03 | 2,500,000 | 250 | -- | -- | 74,750 |
| Issuance of stock for financing services | 0.03 | 600,000 | 60 | -- | -- | 17,940 |
| Issuance of stock for financing services | 0.03 | 4,000,000 | 400 | -- | -- | 119,600 |
| Issuance of stock for financing services | 0.03 | 10,000,000 | 1,000 | -- | -- | 299,000 |
| Issuance of stock for cash | 0.03 | 10,000,000 | 1,000 | -- | -- | 309,000 |
| Issuance of stock for financing services | 0.03 | 202,195 | 20 | -- | -- | 6,046 |
| Reclassifications of derivative liability upon exercise of warrants and conversion option liability | -- | -- | -- | -- | -- | 116,667 |
| Fourth Quarter | | | | | | |
| Issuance of stock for compensation | 0.03 | 5,500,000 | 550 | -- | -- | 173,450 |
| Issuance of stock for conversion fees | 0.04 | 7,000,000 | 700 | -- | -- | 308,004 |
| Issuance of shares for conversion of debentures and accrued interest | 0.03 | 19,210,243 | 1,921 | -- | -- | 496,010 |
| Issuance of shares for financing transaction | 0.05 | 750,000 | 75 | -- | -- | 40,425 |
| Issuance of shares for conversion of accrued interest | 0.04 | 2,792,889 | 281 | -- | -- | 105,713 |

The accompanying notes are an integral part of these consolidated financial statements.

F-10a

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

Accumulated

<Page>

| | Receivable on Sale of Stock | Unearned Compensation | Accumulated Other Comprehensive Income (Loss) | Deficit During the Development Stage | Total Stockholders' Equity (Deficiency) | Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|
| **Third Quarter** | | | | | | |
| Issuance of stock for financing services | -- | -- | -- | -- | 720,000 | -- |
| Issuance of stock for consulting fees | -- | -- | -- | -- | 570,000 | -- |
| Issuance of stock for consulting fees | -- | -- | -- | -- | 6,000 | -- |
| Issuance of stock for consulting fees | -- | -- | -- | -- | 26,000 | -- |
| Issuance of stock for consulting fees | -- | -- | -- | -- | 372,000 | -- |
| Issuance of stock for consulting fees | -- | -- | -- | -- | 36,000 | -- |
| Issuance of stock for consulting fees | -- | -- | -- | -- | 60,000 | -- |
| Issuance of stock for consulting fees | -- | -- | -- | -- | 75,000 | -- |
| Issuance of stock for financing services | -- | -- | -- | -- | 18,000 | -- |
| Issuance of stock for financing services | -- | -- | -- | -- | 120,000 | -- |
| Issuance of stock for financing services | -- | -- | -- | -- | 300,000 | -- |
| Issuance of stock for cash | -- | -- | -- | -- | 310,000 | -- |
| Issuance of stock for financing services | -- | -- | -- | -- | 6,066 | -- |
| Reclassifications of derivative liability upon exercise of warrants and conversion option liability | -- | -- | -- | -- | 116,667 | -- |
| **Fourth Quarter** | | | | | | |
| Issuance of stock for compensation | -- | -- | -- | -- | 174,000 | -- |
| Issuance of stock for consulting fees | -- | -- | -- | -- | 308,704 | -- |
| Issuance of shares for conversion of debentures and accrued interest | -- | -- | -- | -- | 497,931 | -- |
| Issuance of shares for financing transaction | -- | -- | -- | -- | 40,500 | -- |
| Issuance of shares for conversion of accrued interest | -- | -- | -- | -- | 105,995 | -- |

The accompanying notes are an integral part of these consolidated financial statements.

F-10b

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

| | Per Share Amount | Common Stock Shares | Common Stock Amount | Preferred Stock Shares | Preferred Stock Amount | Additional Paid-in Capital | Receivable on Sale of Stock |
|---|---|---|---|---|---|---|---|
| **Fourth Quarter** | | | | | | | |
| Issuance of shares for cash | $ 0.03 | 11,000,000 | $ 1,100 | -- | $ -- | $ 210,000 | $ -- |
| Reclassification of debentures options and exercise of warrants from derivative liabilities | -- | -- | -- | -- | -- | 44,333 | -- |
| Amortization of unearned compensation | -- | -- | -- | -- | -- | -- | -- |
| Net Loss | -- | -- | -- | -- | -- | -- | -- |
| Foreign currency translation adjustment | -- | -- | -- | -- | -- | -- | -- |
| Balance at December 31, 2006 | | 625,849,751 | $ 62,584 | -- | $ -- | $ 32,146,193 | $ -- |

The accompanying notes are an integral part of these consolidated financial statements.

F-11a

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' DEFICIENCY

For the Period from Inception (October 1, 1999) to December 31, 2006

| | Unearned Compensation | Accumulated Other Comprehensive Income (Loss) | Accumulated Deficit During the Development Stage | Total Stockholders' Equity (Deficiency) | Comprehensive Income (Loss) |
|---|---|---|---|---|---|
| **Fourth Quarter** | | | | | |
| Issuance of shares for cash | $ -- | $ -- | $ -- | $ 211,100 | $ -- |
| Reclassification of debentures options and exercise of warrants from derivative liabilities | -- | -- | -- | 44,333 | -- |
| Amortization of unearned compensation | 1,122,992 | -- | -- | 1,122,992 | -- |
| Net Loss | -- | -- | (14,238,949) | (14,238,949) | (14,238,949) |
| Foreign currency translation adjustment | -- | (232,577) | -- | (232,577) | (232,577) |
| Balance at December 31, 2006 | $ (154,333) | $ 40,649 | $(51,181,670) | $(19,086,577) | $(14,471,526) |

The accompanying notes are an integral part of these consolidated financial statements.

F-11b

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF CASH FLOWS

<Page>

| | For the Years Ended December 31, | | For the Period from Inception (October 1, 1999) to December 31, |
|---|---|---|---|
| | 2006 | 2005 | 2006 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Net (loss) income | $(14,238,949) | $ 1,750,994 | $(51,181,670) |
| Adjustments to reconcile net (loss) income to net cash used in operating activities: | | | |
| Acquired in process technology | -- | -- | 23,224,695 |
| Gain on derivative liabilities | (4,438,874) | (10,840,340) | (15,279,214) |
| Stock-based costs | 6,426,224 | 1,184,033 | 13,011,521 |
| Accrued settlement provision | -- | 2,200,000 | 2,200,000 |
| Amortization of license | 340,000 | -- | 340,000 |
| Depreciation and amortization | 31,733 | 84,440 | 356,475 |
| Loss on sale of investment | -- | 88,927 | 88,927 |
| Non-cash charges for finance and consulting | 367,000 | -- | 837,000 |
| Amortization of deferred financing costs | 224,019 | 126,292 | 350,311 |
| Write-off of fixed assets | -- | -- | 11,068 |
| Debt discount amortization | 4,066,214 | 1,114,038 | 5,180,252 |
| Changes in Operating Assets and Liabilities: | | | |
| Prepaid expenses and other current assets | (334,304) | 114,669 | (380,735) |
| Other assets | (2) | -- | (13,207) |
| Accrued liabilities | 1,466,560 | 1,898,650 | 4,067,029 |
| Net Cash Used in Operating Activities | (6,090,379) | (2,278,297) | (17,187,548) |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| Proceeds from sale of ATI stock prior to merger | -- | -- | 460,000 |
| Capitalized software costs | -- | (325,499) | (804,875) |
| Advances to ATI prior to merger | -- | -- | (2,443,619) |
| Proceeds of sale of investments | -- | 21,019 | 21,019 |
| Capital expenditures | (29,779) | -- | (347,246) |
| Net Cash Used in Investing Activities | (29,779) | (304,480) | (3,114,721) |

CASH FLOWS FROM FINANCING ACTIVITIES:

|  | | | For the Years Ended December 31, | | For the Period from Inception (October 1, 1999) to December 31, 2006 |
|  | 2006 | | | | |
| Proceeds from issuance of common stock | 521,100 | | | | 10,507,733 |
| Capitalized financing costs | (132,460) | | | | (423,382) |
| Exercise of warrants | 2,357,897 | | | | 2,357,897 |
| Proceeds from loans | 3,801,381 | | | | 7,388,284 |
| Repayment of loans | (533,940) | | | | (612,894) |
| Due from (to) related parties, net | 148,826 | | | | 1,171,558 |
| Net Cash Provided by Financing Activities | 6,162,804 | | | | 20,389,196 |
| Increase (Decrease) in Cash | 42,646 | | | | 86,927 |
| Cash – Beginning of Year | 44,281 | | | | -- |
| Cash – End of Year | $ 86,927 | | | | $ 86,927 |

The accompanying notes are an integral part of these consolidated financial statements.

F-12

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

CONSOLIDATED STATEMENTS OF CASH FLOWS

|  | For the Years Ended December 31, | | For the Period from Inception (October 1, 1999) to December 31, 2006 |
|  | 2006 | 2005 | |
| Interest paid | $ 86,927 | $ -- | $ 449,746 |

| Income taxes paid | $ | -- | $ | -- | $ | 1,055,000 |
| | | | | | | |
| Non-Cash Investing and Financing Transactions: | | | | | | |
| | | | | | | |
| Conversion of debt and related interest | $ | 3,426,591 | $ | 138,000 | $ | 3,789,410 |
| Exercise of warrants satisfied by | | | | | | |
| reduction in related party | $ | -- | $ | 460,653 | $ | 460,653 |
| Conversion of advances to affiliate | $ | -- | $ | -- | $ | 1,655,000 |
| Conversion of accrued liabilities | $ | 2,200,000 | $ | 1,015,176 | $ | 3,215,176 |
| Reclassification of derivative liability | $ | 1,033,782 | $ | 20,565,700 | $ | 21,599,482 |
| Offering costs satisfied by transfer of ATI stock | $ | -- | $ | -- | $ | (125,000) |
| Deferred license fee and related liability | $ | 1,444,000 | $ | -- | $ | 1,444,000 |

The accompanying notes are an integral part of these consolidated financial statements.

F-13

</TABLE>

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 1 - BUSINESS, REVERSE MERGER AND BASIS OF PRESENTATION

REVERSE MERGER

On December 15, 2004 (the "Closing Date"), Brilliant Technologies Corporation
("BLTN") (formerly Advanced Technology Industries, Inc. ("ATI")) consummated the
acquisition of all of the issued and outstanding shares of capital stock of
LTDnetwork, Inc., a Delaware corporation ("LTDN"), LTDN and BLTN collectively
are referred to herein as "the Company".

LTDN and its wholly-owned Australian subsidiary, LTD Network PTY LTD ("LTD
PTY"), are development stage companies and their efforts have been primarily
devoted to technology identification and acquisition, research and development
and raising capital. LTDN and LTD PTY specialize in the development of

innovative technologies, software and services for online e-tailers, advertising, media and marketing companies.

The acquisition was consummated pursuant to the Amended and Restated Agreement and Plan of Merger, dated as of August 11, 2004, among BLLN, LTDN and LTDN Acquisition Corp., a Delaware corporation and a wholly owned subsidiary of BLLN ("Acquisition Sub"), as amended by the First Amendment thereto, dated as of December 15, 2004, among BLLN, LTDN and Acquisition Sub. Such acquisition was effected pursuant to a merger (the "Merger") of LTDN with and into Acquisition Sub. Pursuant to the terms of the Merger and taking into account the purchase price adjustment in connection therewith, BLLN issued to the stockholders of LTDN consideration (the "Merger Consideration") consisting of (i) 193,336 shares of Series A Convertible Preferred Stock of BLLN ("Series A Preferred Stock") and (ii) warrants (the "Warrants") to purchase 487,903 shares of Series A Preferred Stock at an exercise price of $16.33 per share. The exercise period with respect to the Warrants expired on June 18, 2006. The board of directors determined to extend the exercise period of the Warrants subject to the Company having a sufficient number of authorized shares of common stock of the Company ("Common Stock") available to be issued upon the exercise of the Warrants. As a result, the definition of "Exercise Period" in the Warrant Agreement relating to the Warrants has been amended as follows:

"Exercise Period" means the period commencing on the date the Merger is consummated and terminating on June 18, 2006 and the period commencing on the date (the "Second Commencement Date") LTDN files with the Delaware Secretary of State an amendment to BLLN's Certificate of Incorporation to increase the authorized capital stock of BLLN in an amount equal to the greater of (x) 1,300,000,000 shares of Common Stock and (y) 120% of the sum of (A) the outstanding number of shares of Common Stock on the Second Commencement Date, (B) with respect to securities of LTDN that are convertible or exercisable into shares of Common Stock (including the Warrants), the number of shares of Common Stock that are issuable upon the conversion or exercise of such securities on the Second Commencement Date and (C) without duplication of securities referenced in clause (B) above, the number of shares of Common Stock that LTDN is obligated to issue pursuant to any binding obligation of LTDN in effect as of the Second Commencement Date and terminating (i) with respect to 25% of the aggregate Warrants under this Agreement, at 5:00 p.m. on the 60th day following the Second Commencement Date, (ii) with respect to 25% of the aggregate Warrants under this Agreement, at 5:00 p.m. on the 90th day following the Second Commencement Date, (iii) with respect to 25% of the aggregate Warrants under this Agreement, at 5:00 p.m. on the 120th day following the Second Commencement Date and (iv) with respect to 25% of the aggregate Warrants under this Agreement, at 5:00 p.m. on the 150th day following the Second Commencement Date; provided that if the Second Commencement Date does not occur prior to December 31, 2006, the

Exercise Period shall terminate on December 31, 2006, as amended. As of April 15, 2007, BLLN has not filed such an amendment to its Certificate of Incorporation.

F-14

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 1 - BUSINESS, REVERSE MERGER AND BASIS OF PRESENTATION (CONTINUED)

REVERSE MERGER (CONTINUED)

The terms of the Series A Preferred Stock provided that each share of Series A Preferred Stock would automatically convert into 400 shares of Common Stock when the holders of the Common Stock approved an amendment to the certificate of incorporation of the Company to increase the authorized capital stock from 100,000,000 shares to at least 500,000,000 shares. The holders of the Common Stock approved such amendment at the Company's annual meeting of stockholders held on September 26, 2005 to increase the number of authorized shares of Common Stock to 800,000,000 and the Company filed such amendment with the Secretary of State of the State of Delaware on September 27, 2005. As a result, all shares of the Series A Preferred Stock were converted into shares of Common Stock and the corresponding Warrants became Warrants to purchase shares of Common Stock at approximately $0.04 per share.

BLLN agreed to file a registration statement with the Securities and Exchange Commission ("SEC") relating to the resale of the shares of Common Stock issuable upon conversion of the Series A Preferred Stock issued in the Merger. The Company has filed such registration statement and it became effective on January 26, 2006. The Company has agreed to keep such registration statement effective until the earliest of (a) the sale of all securities eligible to be sold thereunder, (b) the expiration of the period referred to in Rule 144(k) under the Securities Act of 1933 and (c) two years from the effective date of such registration statement. The use of such registration statement has been suspended by the Company until it files a post-effective amendment thereto

updating certain information contained therein.

Since immediately following the Merger the former stockholders of LTDN owned a majority of the Common Stock (assuming the conversion of all the shares of the Series A Preferred Stock and the exercise of all the Warrants, in each case issued to such stockholders) and the management of LTDN controlled the Board of Directors of the Company, the Merger has been accounted for as a reverse merger with LTDN as the acquirer of BLLN. The accompanying consolidated financial statements of the Company reflect the historical results of LTDN, and the consolidated results of operations of BLLN subsequent to the Closing Date.

The common stock of LTDN has been retroactively restated to reflect the recapitalization and merger transactions discussed above.

GOING CONCERN AND MANAGEMENT'S PLAN

The accompanying consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America, which contemplate the continuation of the Company as a going concern. However, as shown in the accompanying consolidated financial statements, the Company has incurred losses from operations since inception. Management anticipates incurring substantial additional losses in 2007. Further, the Company may incur additional losses thereafter depending on its ability to generate revenues from the licensing or sale of its technologies and products, or to enter into any or a sufficient number of joint ventures. The Company has no significant revenue to date. There is no assurance that the Company can successfully commercialize any of its technologies and products and realize any revenues there from. The Company's technologies and products have never been utilized on a large-scale commercial basis and there is no assurance that any of its technologies or products will receive market acceptance. There is no assurance that the Company can continue to identify and acquire new technologies. As of December 31, 2006, the Company had an accumulated deficit since inception of $51,181,670 and a working capital deficiency and stockholder's deficiency of $21,385,040 and $19,086,577 respectively.

F-15

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

<Page>

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 1 - BUSINESS, REVERSE MERGER AND BASIS OF PRESENTATION (CONTINUED)

GOING CONCERN AND MANAGEMENT'S PLAN (CONTINUED)

While no assurance can be given, management believes the Company can raise adequate capital to keep the Company functioning during 2007. During the quarter ended March 31, 2007 the Company received proceeds from Bridge notes of $895,000. No assurance can be given that the Company can obtain additional working capital, or if obtained, that such funding will not cause substantial dilution to stockholders of the Company. If the Company is unable to raise additional funds, it may be forced to change or delay its contemplated marketing and business plans. During the year ended December 31, 2006, the Company has raised from various financing sources approximately $6,680,000 through the issuance of common stock, convertible debt, Bridge notes and exercise of warrants (Notes 6 and 7). The Company has been late filing three of its periodic filings with the Securities and Exchange Commission and accordingly the Company is not eligible for quotation on the Over the Counter Bulletin Board. (See Note 10)

The Company's principal business activity consists of the development of a technology referred to as Qtrax. Qtrax is a music file sharing technology-based internet service, which when available will provide consumers the ability at no charge to download music files. This free service will allow a consumer to play the ad-supported music files only on the computer such consumer uses to download such music files as well as a portable device with DRM rules attached to the service. It is the intention that Qtrax will also operate as an online music store where a consumer can purchase music files as a permanent download so that the consumer can play such music files on any device that plays MP3 files. In addition, LTDN and Brilliant Technologies will be able to offer online e-tailers, advertising, media and marketing companies the ability to provide highly targeted advertising, promotional and other marketing information to consumers who may have a strong interest in such advertisers' products.

To date, the Company has entered into license agreements with Major Labels and Publishers for use of their catalogues and publishing rights. These include EMI Music & EMI Publishing, TVT Records, SonyATV Publishing, SonyBMG, Warner Music Group, Universal Music Publishing. The Company has also entered into license agreements with several independent record labels for use of their catalogues.

To date, Qtrax has not been launched and additional development activities and

various collaborative agreements need to be completed. There is no assurance that the development activities and agreements can be successfully completed and, if so, there is no assurance that Qtrax will be commercially successful.

Being a development stage company, the Company is subject to all the risks inherent in the establishment of a new enterprise and the marketing and manufacturing of a new product, many of which risks are beyond the control of the Company. All of the factors discussed above raise substantial doubt about the Company's ability to continue as a going concern.

These consolidated financial statements do not include any adjustments relating to the recoverability of recorded asset amounts that might be necessary as a result of the above uncertainty.

F-16

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

PRINCIPLES OF CONSOLIDATION

The consolidated financial statements include the accounts of LTDN and its subsidiaries and Brilliant and all of its wholly-owned and its majority-owned subsidiaries commencing with the Closing Date. All significant intercompany accounts and transactions have been eliminated in consolidation. Investments in unconsolidated affiliates are accounted for using the equity method when the Company owns at least 20%, but no more than 50% of such affiliates and under the cost method when the Company owns less than 20%. Under the equity method, the Company records its proportionate shares of profits and losses based on its percentage interest in earnings.

USE OF ESTIMATES

The preparation of financial statements, in conformity with accounting principles generally accepted in the United States of America, requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

EQUITY METHOD OF ACCOUNTING FOR UNCONSOLIDATED AFFILIATES

At December 31, 2006 and 2005, investments in companies accounted for under the equity method consist of the following inactive foreign development-stage technology companies:

|  | % Owned | Country of Operations |
|---|---|---|
| Flexitech,Ltd | 20.00% | Israel |
| Piccoat,Ltd. | 20.00% | Israel |
| Sibconvers | 50.00% | Russia |
| Container Engineering, Ltd | 50.00% | Russia |

The Company does not have sufficient control over management, the board of directors or financial matters and accordingly the Company does not consolidate such entities. The above companies do not have any revenue nor any significant assets, liabilities, commitments and contingencies. The Company's carrying values in these equity-method investments is zero as of December 31, 2006 and 2005.

FAIR VALUE OF FINANCIAL INSTRUMENTS

The Company has estimated the fair value of financial instruments using available market information and other valuation methodologies in accordance with SFAS No. 107, "Disclosures about Fair Value of Financial Instruments." Management of the Company believes that the fair value of financial instruments, consisting of cash, prepaid expenses and other current assets , accounts payable and accrued liabilities, approximates carrying value due to the immediate or short-term maturity associated with these instruments and that the notes payable approximate fair value in that they carry market-based interest rates.

CASH AND CASH EQUIVALENTS

For purposes of the statement of cash flows, the Company considers all

short-term investments with original maturities of three months or less when purchased to be cash equivalents. The Company had no cash equivalents as of December 31, 2006.

F-17

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

CONCENTRATION OF CREDIT RISK

The Company places its cash in what it believes to be creditworthy financial institutions. However, cash balances may exceed FDIC insured levels at various times during the year.

PROPERTY AND EQUIPMENT

Property and equipment are stated at cost, less accumulated depreciation and amortization. Depreciation is provided on a straight-line basis over the estimated useful lives of the related assets, generally two to ten years.

Amortization of leasehold improvements is provided on a straight-line basis over the lesser of the estimated useful lives of the improvements or the initial term of the lease. Gain or loss is recognized upon sale or other disposition of property and equipment.

Major repairs or replacements of property, plant and equipment are capitalized. Maintenance, repairs and minor replacements are charged to operations as incurred.

IMPAIRMENT OF LONG-LIVED ASSETS

In accordance with Statement of Financial Accounting Standards ("SFAS") No. 144, "Accounting for the Impairment or Disposal On Long-Lived Assets," the Company

reviews the carrying amount of long-lived assets on a regular basis for the existence of facts or circumstances, both internally and externally, that suggest impairment. The Company determines if the carrying amount of a long-lived asset is impaired based on anticipated undiscounted cash flows before interest from the use of the asset. In the event of impairment, a loss is recognized based on the amount by which the carrying amount exceeds the fair value of the asset. Fair value is determined based on appraised value of the assets or the anticipated cash flows from the use of the asset, discounted at a rate commensurate with the risk involved.

INCOME TAXES

Income taxes are calculated using an asset and liability approach as prescribed by SFAS No. 109, Accounting for Income Taxes. The provision for income taxes includes federal and state taxes currently payable and deferred taxes, due to temporary differences between financial statement and tax bases of assets and liabilities. In addition, future tax benefits are recognized to the extent that realization of such benefits is more likely than not. Valuation allowances are established when management determines that it is more likely than not that some portion or all of the deferred asset will not be realized. The effect of a change in tax rates is recognized as income or expense in the period of change.

REVENUE RECOGNITION

The Company expects that it will derive substantially all of its revenues for the sale of advertising on its Qtrax product. The Company anticipates to have four major advertising revenues streams; Click Ad, revenues will be recognized when an ad that is placed in Qtrax is successfully 'Clicked' and linked to another website or area; Video revenues will be recognized when ads are played within the Qtrax product; Banner revenues will be recognized when an ad is displayed on the Qtrax site; and Imprint revenues will be recognized one the established number of time an ad is to be shown is shown. Any prepaid advertising payments received will be treated as deferred revenues.

F-18

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

RESEARCH AND DEVELOPMENT

In accordance with SFAS No. 2, "Accounting for Research and Development Costs," all research and development ("R&D") costs are expensed when they are incurred, unless they are reimbursed under specific contracts. Assets used in R&D activity, such as machinery, equipment, facilities and patents that have alternative future use either in R&D activities or otherwise are capitalized. In connection with the merger of Brilliant and LFON, $23,224,695 was allocated to in-process research and development costs and was charged to R&D costs during the period ended December 31, 2004.

CAPITALIZED SOFTWARE

Capitalization of computer software development costs begins upon the establishment of technological feasibility. Technological feasibility for the Company's computer software is generally based upon achievement of a detailed program design free of high risk development issues and the completion of research and development on the product hardware in which it is to be used. The establishment of technological feasibility and the ongoing assessment of recoverability of capitalized computer software development costs require considerable judgment by management with respect to certain external factors, including, but not limited to, technological feasibility, anticipated future gross revenue, estimated economic life and changes in software and hardware technology.

Amortization of capitalized computer software development costs commences when the related products become available for general release to customers. Amortization is provided on a product by product basis. The annual amortization is the greater of the amount computed using (a) the ratio that current gross revenue for a product bears to the total of current and anticipated future gross revenue for that product, or (b) the straight-line method over the remaining estimated economic life of the product.

The Company periodically performs reviews of the recoverability of such capitalized software development costs. At the time a determination is made that capitalized amounts are not recoverable based on the estimated cash flows to be generated from the applicable software, the capitalized costs of each software product is then valued at the lower of its remaining unamortized costs or net realizable value. Amounts capitalized during the years ended December 31, 2006

and 2005 totaled $-0- and $325,499 respectively. There was no amortization expense for the years ended December 31, 2006 and 2005 as the software product was not placed into use as of December 31, 2006.

COMPREHENSIVE INCOME (LOSS)

SFAS No. 130, "Accounting for Comprehensive Income," establishes standards for reporting and disclosure of comprehensive income and its components (including revenues, expenses, gains and losses) in a full set of general-purpose financial statements. The items of other comprehensive income that are typically required to be disclosed are foreign currency items, minimum pension liability adjustments, and unrealized gains and losses on certain investments in debt and equity securities.

Accumulated other comprehensive income, at December 31, 2006, consists of foreign currency translation adjustments in the amount of $40,649.

F-19

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

<Page>

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

TRANSLATION OF FOREIGN CURRENCIES

The U.S. dollar is the functional currency for all of the Company's businesses, except its operations in Australia and Europe. Foreign currency denominated assets and liabilities for these units are translated into U.S. dollars based on exchange rates prevailing at the end of each period presented, and revenues and expenses are translated at average exchange rates during the period presented. The effects of foreign exchange gains and losses arising from these translations of assets and liabilities are included as a component of equity.

NET INCOME (LOSS) PER SHARE OF COMMON STOCK

Basic net income (loss) per share of common stock are computed by dividing net
income (loss) available to common stockholders by the weighted average number of
shares of common stock outstanding during the periods presented.

Diluted net income (loss) per share reflects per share amounts that result if
dilutive common stock equivalents are converted to common stock.

Common stock equivalents, consisting of convertible debt, options and warrants,
discussed in Note 9, were not included in the calculation of diluted loss per
share for 2006 and 2005 because their inclusion would have had been
anti-dilutive.

Basic and diluted loss per share have been calculated assuming the Series A
Preferred Stock has been converted under the "if converted method" since each
share of Series A Preferred Stock automatically converts into 400 shares of
common stock upon the increase in authorized common shares to 500 million. The
Series A Preferred Stock was converted into common shares on September 27, 2005.

F-20

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

NET INCOME (LOSS) PER SHARE OF COMMON STOCK (CONTINUED)

The following table sets forth the components used in the computation of basic
and diluted income (loss) per common share:

Net Income (Loss) Per Share of Common Stock:

<TABLE>
<CAPTION>

| | 2006 | 2005 |
|---|---|---|

```
<S>                                              <C>                 <C>
Numerator:
 Net (loss) income - numerator for
  basic income (loss) per share            $ (14,238,949)       $  1,750,993

Effect of dilutive securities:
 Interest related to Convertible Debentures          N/A          1,139,140
                                            -------------       ------------
Numerator for diluted (loss) income per share -
 income after assumed conversions          $ (14,238,949)       $  2,890,133
                                            =============       ============

Denominator:
 Denominator for basic (loss) income per share -
  weighted average shares                     438,898,223        197,714,949

Effect of dilutive securities:
 Convertible debentures and accrued interest          N/A         45,750,000
 Warrants                                             N/A         83,390,500
                                            -------------       ------------
Total potentially dilutive securities                 N/A        129,140,500
                                            -------------       ------------

Denominator for diluted (loss) income per share -
 adjusted weighted average shares and assumed
 conversions                                  438,898,223        326,855,449
                                            =============       ============

Basic net (loss) income per share          $      (0.03)       $       0.01
                                            =============       ============
Diluted net (loss) income per share        $      (0.03)       $       0.01
                                            =============       ============

</TABLE>

For the year ended December 31, 2005, 125,317,000 shares attributable to
outstanding stock options and warrants were excluded from the calculation of
diluted earnings per share because the exercise prices of the stock options and
warrants were greater than, or equal to, the average price of the common shares
and, therefore, their inclusion would have been anti-dilutive.

BUSINESS SEGMENT

SFAS No. 131, "Disclosures About Segments of an Enterprise and Related
```

Information," establishes standards for the way public enterprises report information about operating segments in annual consolidated financial statements and requires reporting of selected information about operating segments in interim financial statements regarding products and services, geographical areas and major customers. The Company has determined that under SFAS No. 131, it operates in three geographic segments (see Note 11).

F-21

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

CONVERTIBLE NOTES AND WARRANTS

The Company accounts for conversion options embedded in convertible notes in accordance with SFAS No. 133 "Accounting for Derivative Instruments and Hedging Activities" ("SFAS 133") and ("EITF") 00-19, "Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock" ("EITF 00-19"). SFAS 133 generally requires companies to bifurcate conversion options embedded in convertible notes from their host instruments and to account for them as free standing derivative financial instruments in accordance with EITF 00-19. SFAS 133 provides for an exception to this rule when convertible notes, as host instruments, are deemed to be conventional as that term is described in the implementation guidance under Appendix A to SFAS 133 and further clarified in EITF 05-2 "The Meaning of "Conventional Convertible Debt Instrument" in Issue No. 00-19.

The Company accounts for convertible notes deemed conventional and conversion options embedded in non-convertible notes which qualify as equity under EITF 00-19, in accordance with the provisions of Emerging Issues Task Force Issue ("EITF") 98-5 "Accounting for Convertible Securities with Beneficial Conversion Features," and EITF 00-27 "Application of EITF 98-5 to Certain Convertible Instruments." Accordingly, the Company records, as a discount to convertible notes, the intrinsic value of such conversion options based upon the differences

between the fair value of the underlying common stock at the commitment date of the note transaction and the effective conversion price embedded in the note. Debt discounts under these arrangements are amortized over the term of the note related debt to their earliest date of redemption.

The Company accounts for embedded conversion options in non-conventional convertible notes which do not qualify as equity under EITF 00-19, as derivative liabilities. Accordingly, the Company determines the fair value (as determined under the Black-Scholes Valuation Method) of all embedded derivatives (usually conversion option and warrants). Such fair value is recorded as a debt discount up to the proceeds of the debt and any amount in excess of the proceeds of the debt is charged to operations at the security issuance date.

The Company's 2005 and 2006 Convertible Notes host embedded conversion options that are deemed to be free standing derivatives financial instruments which have been accounted for as derivative liabilities (Note 6).

The Company accounts for the issuance of common stock purchase warrants issued and other free standing derivative financial instruments in accordance with the provisions of EITF 00-19. Based on the provisions of EITF 00-19, the Company classifies as equity any contracts that (i) require physical settlement or net-share settlement or (ii) gives the Company a choice of net-cash settlement or settlement in its own shares (physical settlement or net-share settlement). The Company classifies as assets or liabilities any contracts that (i) require net-cash settlement (including a requirement to net cash settle the contract if an event occurs and if that event is outside the control of the Company and (ii) give the counterparty a choice of net-cash settlement or settlement in shares (physical settlement or net-share settlement). All of the outstanding warrants have been classified as free standing derivative liabilities (Note 6).

F-22

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

## STOCK BASED COMPENSATION

Effective January 1, 2006, the Company adopted SFAS No. 123R, "Share Based Payment," using the modified-prospective-transition method. There was no effect to the accompanying financial statements pursuant to the adoption of SFAS No. 123R since at the date of the adoption, all employee stock options were fully vested. SFAS No. 123R is a revision of SFAS No. 123, and supersedes APB Opinion No. 25, and its related implementation guidance. SFAS No. 123R addresses all forms of share-based payment awards including shares issued under employee stock purchase plans, stock options, restricted stock and stock appreciation rights. Under SFAS No. 123R, stock-based awards result in a cost that will be measured at fair value on the award's grant date, based on the estimated number of awards that are expected to vest that will result in a charge to operations.

Prior to January 1, 2006, the Company accounted for employee stock transactions in accordance with Accounting Principle Board ("APB") Opinion No. 25. "Accounting for Stock Issued to Employees." The Company had adopted the pro forma disclosure requirements of SFAS No. 123, "Accounting for Stock-Based Compensation."

Prior to the Company's adoption of SFAS No. 123R, SFAS No. 123 required that the Company provide pro-forma information regarding net earnings and net earnings per share as if the Company's stock-based awards had been determined in accordance with the fair value method prescribed therein. The Company had previously adopted the disclosure portion of SFAS No. 148 "Accounting for Stock-based Compensation - Transition and Disclosure," requiring quarterly SFAS No. 123 pro-forma disclosures. The pro-forma charge for compensation cost related to stock-based awards granted was recognized over the service period. For stock options, the service period represents the period of time between the date of grant and the date each option becomes exercisable without consideration of acceleration provisions (e.g., retirement, change of control, etc.).

There were no stock options granted to employees or unvested stock options during the years ended December 31, 2006 and 2005 and, accordingly, there was no difference between the reported net income (loss) and proforma net income(loss). As of December 31, 2006, the Company had no unvested options.

The cost of stock-based compensation awards issued to non-employees for services are recorded at either the fair value of the services rendered or of the instruments issued in exchange for such services, whichever is more readily determinable, using the measurement date guidelines enumerated in Emerging Issues Task Force ("EITF") Issue No. 96-18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with

Selling, Goods or Services."

F-23

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

<Page>

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS

In February 2006, the FASB issued SFAS No. 155 "Accounting for Certain Hybrid
Financial Instruments-an amendment of FASB Statements No.133 and 140" ("FAS
155"). FAS 155 addresses the following: a) permits fair value re-measurement for
any hybrid financial instrument that contains an embedded derivative that
otherwise would require bifurcation; b) clarifies which interest-only strips and
principal-only strips are not subject to the requirements of Statement 133; c)
establishes a requirement to evaluate interests in securitized financial assets
to identify interests that are freestanding derivatives or that are hybrid
financial instruments that contain an embedded derivative requiring bifurcation;
d) clarifies that concentrations of credit risk in the form of subordination are
not embedded derivatives; and e) amends Statement 140 to eliminate the
prohibition on a qualifying special-purpose entity from holding a derivative
financial instrument that pertains to a beneficial interest other than another
derivative financial instrument. FAS 155 is effective for all financial
instruments acquired or issued after the beginning of an entity's first fiscal
year that begins after September 15, 2006. The Company has not yet completed its
evaluation of the impact of adopting SFAS 155 on its results of operations or
financial position, but does not expect that the adoption of SFAS 155 will have
a material impact

In March 2006, the FASB issued SFAS 156 - "Accounting for Servicing of Financial
Assets - an amendment of FASB Statement No.140" ("SFAS 156"). SFAS 156 is
effective for the first fiscal year beginning after September 15, 2006. SFAS 156
changes the way entities account for servicing assets and obligations associated
with financial assets acquired or disposed of. The Company has not yet completed

its evaluation of the impact of adopting SFAS 156 on its results of operations or financial position, but does not expect that the adoption of SFAS 156 will have a material impact.

In July 2006, the Financial Accounting Standards Board issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes - an Interpretation of FASB Statement No. 109" (the "Interpretation"). The Interpretation establishes for all entities a minimum threshold for financial statement recognition of the benefit of tax positions, and requires certain expanded disclosures. The Interpretation is effective for fiscal years beginning after December 31, 2006, and is to be applied to all open tax years as of the date of effectiveness. The Company is in the process of evaluating the impact of the application of the Interpretation to its consolidated financial statements.

In September 2006, the FASB issued Statement of Financial Accounting Standard ("SFAS") No. 157, "Fair Value Measurements." This statement defines fair value, establishes a fair value hierarchy to be used in generally accepted accounting principles and expands disclosures about fair value measurements. Although this statement does not require any new fair value measurements, the application could change current practice. The statement is effective for fiscal years beginning after November 15, 2007. The Company is currently evaluating the impact this statement to its consolidated financial position and results of operations.

In February 2007, the FASB issued SFAS No. 159, "The Fair Value Option for Financial Assets and Liabilities" ("SFAS No. 159"). SFAS No. 159 provides companies with an option to report selected financial assets and liabilities at fair value, and establishes presentation and disclosure requirements designed to facilitate comparisons between companies that choose different measurement attributes for similar types of assets and liabilities. The new guidance is effective for fiscal years beginning after November 15, 2007. The Company is currently evaluating the potential impact of the adoption of SFAS No. 159 on its financial position and results of operations.

F-24

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

<Page>

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS (CONTINUED)

In September 2006, the staff of the Securities and Exchange Commission issued SAB No. 108 which provides interpretive guidance on how the effects of the carryover or reversal of prior year misstatements should be considered in quantifying a current year misstatement. SAB 108 becomes effective in fiscal 2007. The adoption of this pronouncement is not expected to have an impact on the Company's financial position, results of operation or cash flows.

In December 2006, the FASB approved FASB Staff Position (FSP) No. EITF 00-19-2, "Accounting for Registration Payment Arrangements" ("FSP EITF 00-19-2"), which specifies that the contingent obligation to make future payments or otherwise transfer consideration under a registration payment arrangement, whether issued as a separate agreement or included as a provision of a financial instrument or other agreement, should be separately recognized and measured in accordance with SFAS No. 5, "Accounting for Contingencies". FSP EITF 00-19-2 also requires additional disclosure regarding the nature of any registration payment arrangements, alternative settlement methods, the maximum potential amount of consideration and the current carrying amount of the liability, if any. The guidance in FSP EITF 00-19-2 amends FASB Statements No. 133, "Accounting for Derivative Instruments and Hedging Activities", and No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity", and FASB Interpretation No. 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others", to include scope exceptions for registration payment arrangements.

FSP EITF 00-19-2 is effective immediately for registration payment arrangements and the financial instruments subject to those arrangements that are entered into or modified subsequent to the issuance date of this FSP, or for financial statements issued for fiscal years beginning after December 15, 2006, and interim periods within those fiscal years, for registration payment arrangements entered into prior to the issuance date of this FSP. The adoption of this pronouncement is not expected to have an impact on the Company's financial position, results of operations or cash flows.

In June 2006, the EITF reached a consensus on Issue No. 06-3 ("EITF 06-03"), "Disclosure Requirements for Taxes Assessed by a Governmental Authority on Revenue-Producing Transactions." The consensus allows companies to choose between two acceptable alternatives based on their accounting policies for

transactions in which the company collects taxes on behalf of a governmental
authority, such as sales taxes. Under the gross method, taxes collected are
accounted for as a component of sales revenue with an offsetting expense.
Conversely, the net method allows a reduction to sales revenue, if such taxes
are accounted gross and are significant, companies should disclose the amount of
those taxes. The guidance should be applied to financial reports through
retrospective application for all periods presented, if amounts are significant,
for interim and annual reporting beginning after December 15, 2006 with early
adoption is permitted. We do not expect the adoption of EITF 06-03 to have a
material effect on our consolidated financial statements.

F-25

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 3 - ROYALTY/LICENSE AGREEMENTS

The Company entered into nine Royalty and License Agreements. The Company has
made various payments and is obligated to make additional non-refundable
recoupable prepayments. At December 31, 2006 such fees aggregated as follows:

|  |  |
|---|---|
| Deferred license and other fees | $1,666,500 |
| Less: accumulated amortization | (340,000) |
|  | $1,326,500 |

Royalty/license payments are accounted for in accordance with statement of
Financial Accounting Standard ("SFAS") No. 50 "Financial Reporting for the
Record and Music Industry". The Company reports such minimum guaranteed license
payments as an asset and charged to expense in accordance with the terms of the
license agreements. In May 2006 and August 2006, the Company signed agreements
with EMI Music Publishing And EMI Records ("EMI") whereby EMI has licensed its
music publishing properties for listening and download on the Company's Qtrax

<Page>

legal P2P music network. Under the terms of the agreement, the Company is required to make non-refundable, recoupable prepayments to EMI in the amount of $385,000. These payments are recoupable against payments due under various subscription agreements. Under the terms of the agreement, the payments are due as follows: (a) upon execution of the agreement, the Company shall pay $225,000 with remaining payment of $62,500 to be paid to EMI at least 14 days prior to the commercial launch of the service. As of December 31, 2006, the Company has paid EMI $222,500 under these agreements.

In November 2006, the Company signed an agreement with Sony/ATV Music Publishing LLC ("ATV") whereby ATV has licensed its music publishing properties for listening and download on the Company's Qtrax legal P2P music network. Under the terms of the agreement, the Company is required to make two non-refundable, recoupable prepayments to ATV in the amount of $15,000 and $15,000 for a total of $30,000. These payments shall be recoupable against payments due under various subscription agreements. Under the terms of the agreement, the payments are due as follows: (a) upon execution of the agreement, the Company shall pay $15,000 with remaining payment of $15,000 to be paid to ATV no later than March 31, 2007. As of December 31, 2006, the Company has not paid ATV such amounts due under the agreement. As of February 2007, the Company has made such payments totaling $30,000.

In April 2006, the Company signed an agreement with TVT Music Inc. and TVT Records ("TVT"), which was amended in December 2006, whereby TVT has licensed its music publishing properties for listening and download on the Company's Qtrax legal P2P music network. Under the terms of the agreement, the Company is required to make a non-refundable, recoupable prepayments to TVT in the amount of $30,000. This payment shall be recoupable against payments due under various subscription agreements. Under the terms of the agreement, the payments are due by December 2006. As of December 31, 2006, the Company has not paid TVT such amounts due under the agreement. As of February 2007, the Company has made such payments totaling $30,000.

In August 2006, the Company signed an agreement with Warner Music Inc ("Warner") whereby ATV has licensed its music publishing properties for listening and download on the Company's Qtrax legal P2P music network. Under the terms of the agreement, the Company is required to make a non-refundable payment of $100,000 and two sets of non-refundable payments, recoupable prepayments to Warner in the amount of $50,000 and $75,000 for a total of $225,000. These payments shall be recoupable against payments due under various subscription agreements. Under the terms of the agreement, the payments are due as follows: (a) upon execution of the agreement, the Company shall pay $100,000, with $50,000 due in 3 months of the signing date with remaining payments of $25,000 each to be paid in November and December 2006 and January 2007. As of December 31, 2006, the Company has

paid Warner $33,333 under the agreement, and was in default under the terms of
the agreement. In February 2007, the Company paid $33,333.

On April 17, 2007, the above payment terms were amended as follows: $85,000
payable upon signing of the agreement; $23,333 on May 15, 2007; $25,000 on
June 15, 2007; and the final payment on June 17, 2007.

F-26

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 3 - ROYALTY/LICENSE AGREEMENTS (CONTINUED)

In October 2006, the Company signed an agreement with Sony BMG ("BMG"), whereby
BMG has licensed its music publishing properties for listening and download on
the Company's Qtrax legal P2P music network. Under the terms of the agreement,
the Company is required to make a non-refundable, recoupable prepayments to BMG
in the amount of $1,000,000. This payment shall be recoupable against payments
due under various subscription agreements. Under the terms of the agreement, the
payments are due as follows: (a) upon execution of the agreement, the Company
shall pay $200,000 with the remaining payment of $800,000 to be paid in equal
monthly installments commencing in November. As of December 31, 2006, the
Company has not paid BMG amounts due under the agreement, and was under default
the terms of the agreement.

The terms of the licenses vary from twelve to eighteen months and provide for
various conditions to be met. As of April 17, 2007 the Company was renegotiating
the terms of some of the agreements that had certain milestones which as of
April 17, 2007 had not been met and included the launching of the Qtrax site.
The Company is in the process of renegotiating the terms of payment and
milestones and is anticipating that these terms will be extended and milestones
reset, however there is no guarantee that the record companies will alter the
terms of the agreements. The inability to have terms and milestones adjusted
will significantly impact the viability of the Qtrax product. As of March 2007,
the Company has paid $200,000 under this agreement.

In September 2006, the Company signed an agreement with Universal Music Publishing Group ("UMP"), whereby UMP has licensed its music publishing properties for listening and download on the Company's Qtrax legal P2P music network. Under the terms of the agreement, the Company is required to make a non-refundable, recoupable prepayments to UMP in the amount of $30,000. This payment shall be recoupable against payments due under various subscription agreements with the amount due upon execution of the agreement As of December 31, 2006, the Company has not paid UMP amounts due under the agreement, and was under default under the terms of the agreement. Subsequent to year end the Company paid $30,000.

NOTE 4 - PROPERTY AND EQUIPMENT

The components of property and equipment, at cost, as of December 31, 2006 are as follows:

|  |  |  |
|---|---|---|
| Computer Software | $ | 174,105 |
| Computer Hardware |  | 206,094 |
| Furniture and fixtures |  | 50,276 |
| Total property and equipment |  | 430,475 |
| Less: Accumulated Depreciation |  | (371,055) |
| Property, plant, and equipment, net | $ | 59,420 |

Depreciation expense for the year ended December 31, 2006 and 2005, amounted to $31,733 and $84,440, respectively.

NOTE 5 - DEFERRED FINANCING COSTS

At December 31, 2006, deferred financing costs incurred in connection with the Convertible Debentures of the Company (see Note 6) were:

|  |  |  |
|---|---|---|
| Deferred financing costs | $ | 430,453 |
| Accumulated amortization |  | (382,845) |
| Deferred Financing Costs, Net | $ | 47,608 |

Amortization of deferred financing cost for the years ended December 31, 2006 and December 31, 2005 was $224,019 and $126,292, respectively.

<Page>

F-27

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 6 - CONVERTIBLE DEBENTURES

Convertible Debentures consist of the following at December 31, 2006:

2005 CONVERTIBLE DEBENTURES

The total dollar value of the Debentures and number of Debenture Warrants sold
to investors during 2005 totaled $2,745,000 and 39,214,285, respectively. The
Debentures bear interest at 9% per annum on a simple non-compounded basis and
are due and payable on August 20, 2006. The Debentures are convertible at the
holder's option, into shares of Common Stock at a conversion rate equal to the
lesser of $0.07 (subject to adjustment for subsequent lower price issuances by
the Company and other customary events including stock splits, reverse stock
splits, dividends of Common Stock and spin-offs) or 75% of the average of the 10
lowest closing bid prices of the Common Stock for the 30 trading days
immediately preceding the applicable date of conversion. If a holder elects to
convert all or a portion of the Debentures and the conversion price is less than
$0.07 (subject to adjustment for subsequent lower price issuances by the Company
and other customary events including stock splits, reverse stock splits,
dividends of Common Stock and spin-offs), in lieu of effecting such conversion,
the Company may elect to redeem the amount of the Debentures requested to be so
converted at a purchase price equal to 150% of the principal amount of the
Debentures plus accrued and unpaid interest to the date of redemption. The
holder may accelerate the maturity date of the Debentures following the
occurrence of customary events of default, including, without limitation,
payment defaults, breaches of certain covenants and representations, certain
events of bankruptcy, certain judgment defaults and the suspension of the Common
Stock from trading on the Over the Counter Bulletin Board.

The Debenture Warrants are exercisable at a per share exercise price of $0.10,

such exercise price subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs. Each Debenture Warrant is exercisable until the second anniversary of the effective date of the registration statement described below. If the average of the closing bid prices of the Common Stock during any period of 20 consecutive trading days is equal to or greater than $0.50 and the closing bid price of the Common Stock is equal to or greater than $0.50 for at least 10 trading days during such period then with respect to each Debenture Warrant that the holder does not exercise during the 15 trading day period following the receipt by the holder of a notice from the Company that such average price and closing bid prices have occurred, the exercise price for such Debenture Warrants will each be adjusted to $0.25 per share (subject to adjustment for customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs). Holders of Debenture Warrants are entitled to effect a cashless exercise of the Debenture Warrants if the registration statement (as described below) has not been declared effective prior the first anniversary of the issuance of the Debenture Warrants.

In 2006, $2,956,438 of Debentures (including related accrued interest) were converted into 132,976,205 shares of Common Stock. None of the Debenture warrants were exercised as of December 31, 2006. As of December 31, 2006, there was no principal amount outstanding.

The Company has filed a registration statement to register the shares of Common Stock issuable upon the conversion of the Debentures and the exercise of the Debenture Warrants. The Company was obligated to pay the holder of the Debentures certain liquidated damages since such registration statement was not filed by October 5, 2005 and was not declared effective by November 30, 2005. The Company has filed such registration statement and it became effective on January 26, 2006. In connection with the late effectiveness of the registration statement, the Company incurred liquidating damages of approximately $82,500.

F-28

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

<Page>

NOTE 6 - CONVERTIBLE DEBENTURES (CONTINUED)

2005 CONVERTIBLE DEBENTURES (CONTINUED)

As a result of a floorless conversion option held by the holders of the
Debentures, the derivatives embedded in the Debentures (the Conversion Option
and Debenture Warrants) have been classified as derivative liabilities. The
combined liabilities recorded during 2005 totaled $5,912,806. Of such amount,
$2,745,000 was recorded as a debt discount and is being amortized over the term
of the Debentures and $3,167,806 was immediately charged to loss on derivative
obligations during 2005.

As a result of the conversion feature contained in the 2005 Convertible
Debentures, the Company's outstanding LTDN Warrants at such time no longer
qualified as equity. Accordingly, during 2005, these Warrants were reclassified
to derivative obligations resulting in an increase to liabilities of $20,565,700
and a reduction to stockholders' equity of an equal amount.

2006 CONVERTIBLE DEBENTURES

In February 2006, the Company issued to an investor $100,000 aggregate principal
amount of its 9% Convertible Debentures and warrants to purchase 1,428,571
shares of Common Stock at a per share exercise price of $.10 per share. The
terms of these securities are substantially the same as the securities issued in
2005.

In March 2006, the Company issued to an investor $300,000 aggregate principal
amount of its 9% Convertible Debentures and warrants to purchase 4,285,714
shares of Common Stock at a per share exercise price of $.10 per share. The
terms of these securities are substantially the same as the securities issued in
2005.

In March 2006, the Company issued to an investor $350,000 aggregate principal
amount of its 9% Convertible Debentures (the "New Debentures") and warrants (the
"New Debenture Warrants") to purchase 5,000,000 shares of Common Stock at a per
share exercise price of $.07 per share. In addition, subject to certain
conditions such investor has agreed to purchase (i) at least three days prior to
the filing of the registration statement registering the shares of Common Stock
issuable upon the conversion of such New Debentures and the exercise of such New
Debenture Warrants, an aggregate of $250,000 principal amount of New Debentures
and New Debenture Warrants to purchase 3,571,428 shares of Common Stock for an
aggregate purchase price of $250,000 and (ii) at least three days prior to the

effective date of such registration statement, an aggregate of $600,000 principal amount of such New Debentures and New Debenture Warrants to purchase 8,571,428 shares of Common Stock for an aggregate purchase price of $600,000. The New Debentures bear interest at 9% per annum on a simple non-compounded basis and are due and payable on March 24, 2007. The New Debentures are convertible, at the holder's option, into shares of Common Stock at a conversion rate equal to the lesser of $0.07 (subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs) and 75% of the average of the 5 lowest closing bid prices of the Common Stock for the 30 trading days immediately preceding the applicable date of conversion. If a holder elects to convert all or a portion of the New Debentures and the conversion price is less than $0.07 (subject to adjustment for subsequent lower price issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs), in lieu of effecting such conversion, the Company may elect to redeem the amount of the New Debentures requested to be so converted at a purchase price equal to 150% of the principal amount of the New Debentures plus accrued and unpaid interest to the date of redemption. The holder may accelerate the maturity date of the New Debentures following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy, certain judgment defaults and the suspension of the Common Stock from trading on the Over the Counter Bulletin Board.

F-29

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 6 - CONVERTIBLE DEBENTURES (CONTINUED)

2006 CONVERTIBLE DEBENTURES (CONTINUED)

The New Debenture Warrants are exercisable at a per share exercise price of $0.07, such exercise price subject to adjustment for subsequent lower price

issuances by the Company and other customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs. Each New Debenture Warrant is exercisable until the second anniversary of the effective date of the registration statement registering the shares of Common Stock issuable upon the conversion of such New Debentures and the exercise of such New Debenture Warrants. If the average of the closing bid prices of the Common Stock during any period of 20 consecutive trading days is equal to or greater than $0.50 and the closing bid price of the Common Stock is equal to or greater than $0.50 for at least 10 trading days during such period then with respect to each New Debenture Warrant that the holder does not exercise during the 15 trading day period following the receipt by the holder of a notice from the Company that such average price and closing bid prices have occurred, the exercise price for such New Debenture Warrants will each be adjusted to $0.25 per share (subject to adjustment for customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs). Holders of Debenture Warrants are entitled to effect a cashless exercise of the New Debenture Warrants if such registration statement has not been declared effective prior the first anniversary of the issuance of the New Debenture Warrants. The Company has agreed to file a registration statement to register the shares of Common Stock issuable upon the conversion of the New Debentures and the exercise of the New Debenture Warrants.

In April 2006, the Company issued to a group of investors $575,000 aggregate principal amount of its 9% Convertible Debentures and warrants to purchase 8,214,285 shares of Common Stock at a per share exercise price of $.07 per share. The terms of these securities are substantially the same as debentures and debenture warrants issued in March 2006.

In May 2006, the Company issued to a group of investors $200,000 aggregate principal amount of its 9% Convertible Debentures due on May 2, 2007 and warrants to purchase 4,285,714 shares of Common Stock at a per share exercise price of $.07 per share. In addition, the Company issued to such investors $40,000 aggregate principal amount of such 9% convertible debentures as a diligence fee and $200,000 aggregate principal amount of such 9% Convertible Debentures as a penalty for not filing its Annual Report on Form 10-KSB with the Securities and Exchange Commission ("SEC") on or prior to May 17, 2006. The terms of these securities are substantially the same as the New Debenture and New Debenture Warrants.

In May 2006 the Company issued to a group of investors $170,000 aggregate principal amount of its 9% Convertible Debentures due April 3, 2007 and warrants to purchase 1,857,140 shares of Common Stock at a per share exercise price of $.07 per share. The terms of these securities are substantially the same as the New Debentures and New Debenture Warrants. In June 2006, the Company issued to a

group of investors $150,000 aggregate principal amount of its 9% Convertible
Debentures due April 3, 2007 and Warrants to purchase 2,142,857 shares of Common
Stock at a per share exercise price of $.07 per share. The terms of these
securities are substantially the same as the New Debentures and the New
Debenture Warrants.

During 2006, $250,000 of debentures issued in 2006 and related accrued interest
were converted into 17,381,312 shares of Common Stock. None of the New Warrants
issued in 2006 were exercised as of December 31, 2006.

The Company is obligated to file a registration statement to register the shares
of Common Stock issuable upon the conversion of the Debentures and the exercise
of the Debenture Warrants. The Company is obligated to pay the holder of the
Debentures certain liquidated damages in the event that such registration
statement was not timely filed and was not declared effective by a stated date.
As of April 17, 2007, the Company has not filed such registration statement and,
accordingly, liable for liquidating damages. The Company accrued liquidating
damages of approximately $231,900.

F-30

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 6 – CONVERTIBLE DEBENTURES (CONTINUED)

2006 CONVERTIBLE DEBENTURES (CONTINUED)

The holders of Debentures have a lien on all of the Company's assets (including
the Intellectual Property) and could foreclose in the event that the Company
defaults under the Debentures. As of December 31, 2006, the Company was not in
full compliance with the Debenture agreements, including the required repayment
terms.

As a result of a floorless conversion option held by the holders of the
Convertible Debentures, the derivatives embedded in the Convertible Debenture

(the Conversion Option and Debenture Warrant) have been classified as derivative liabilities. The combined liabilities recorded in 2006 totaled $1,007,816. This amount was recorded as a debt discount and is being amortized over the term of the debentures.

The fair value of all of the derivative obligations including the embedded conversion options and Warrants related to the Bridge Notes (Note 7) at December 31, 2006 totaled $8,058,812. The change in the fair value of the derivative liabilities during 2006 and 2005 was recorded as a gain on derivative obligations during the year ended December 31, 2006 and 2005.

The net derivative gains for the years ended December 31, 2006 and 2005 are composed of the following:

**2006**
----

| | | |
|---|---|---|
| Gain recorded on change in fair value during 2006 | $ | 4,438,874 |
| Net Gain on Derivatives | $ | 4,438,874 |

**2005**
----

| | | |
|---|---|---|
| Loss recorded at date of issuance | $ | (3,167,806) |
| Gain recorded on change in fair value during 2005 | | 14,008,146 |
| Net Gain on Derivatives | $ | 10,840,340 |

Amortization of debt discount for the year ended December 31, 2006 and 2005 was $2,423,298 and $1,114,038, respectively.

NOTE 7 – CONVERTIBLE LOANS AND NOTES PAYABLE

Pursuant to 2006 Bridge Loan Agreements between the Company and six investors, the Company borrowed an aggregate of $1,960,000. The Company issued to the investors' Notes (the "Notes") in the aggregate principal amount of $2,087,000 (an amount equal to approximately 107% of the purchase price of the Notes) and warrants ("Note Warrants") to purchase 55,183,286 shares of Common Stock. The

Company received net proceeds in such sale of $1,942,910, after the payment of offering related fees and expenses.

The Notes do not bear interest but, as noted above, the face value of the Notes at issuance was equal to approximately 107% of the purchase price thereof. The Notes are due and payable between October 25, 2006 and January 15, 2007. From and after the date, the Company amends the certificate of incorporation as described below, if an event of default under the Note occurs then the Note will be convertible, at the holder's option, into shares of Common Stock at a conversion rate equal to 75% of the average of the 5 lowest closing bid prices of the Common Stock for the 30 trading days immediately preceding the applicable date of conversion. The Company may, at its option, prepay the Notes at any time. The holder may accelerate the maturity date of the Note following the occurrence of customary events of default, including, without limitation, payment defaults, breaches of certain covenants and representations, certain events of bankruptcy and certain judgment defaults. If an event of default occurs, the Notes provide for interest at 14% per annum commencing with the date of the default.

As of December 31, 2006, the Company was in default under the terms of the Bridge Loan agreements.

F-31

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

<Page>

NOTE 7 - CONVERTIBLE LOANS AND NOTES PAYABLE (CONTINUED)

If the holders of Common Stock approve an amendment to the Company's certificate of incorporation to increase its authorized capital stock to an amount sufficient to permit the exercise of the Note Warrants, then each Note Warrant will be exercisable from the date the Company files such amendment with the Secretary of State of the State of Delaware until June 27, 2011. The Note Warrants are exercisable at $0.07 per share, such exercise price subject to adjustment for subsequent lower price issuances by the Company and other

http://www.sec.gov/Archives/edgar/data/1054825/000101968707001189/0001019687-07-001189.txt

customary events including stock splits, reverse stock splits, dividends of Common Stock and spin-offs. The holders of Note Warrants are entitled to effect a cashless exercise of the Note Warrants in certain circumstances. The holders of Note Warrants have been granted registration rights for the shares they receive upon exercise of the Note Warrants.

As a result of a floorless conversion option held by the holders of the Convertible Debentures, the derivatives embedded in the Convertible Debenture (the Conversion Option and Debenture Warrant) have been classified as derivative liabilities.

A debt discount of $1,642,916 was recorded in 2006 representing the value of the conversion options and warrants issued to the Bridge note holders. This amount was amortized to interest expense during 2006.

During the year ended December 31, 2006, the Company repaid $322,500 of the Bridge loans.

During June 2001, Brilliant borrowed $260,000 from an individual and issued a promissory note, which is in default and provides for interest at the rate of 1% per month. This loan is still outstanding at December 31, 2006. Also on July 13, 2001, an officer of Brilliant advanced $10,000 pursuant to a promissory note, which is in default and provides for interest at the rate of 1% per month.

On November 27, 2001, Brilliant borrowed $10,000 from an individual and issued a promissory note which is in default and provides for interest at the rate of 1% per month.

During October 2002, Brilliant received an advance of $120,000 from an individual, payable on demand. The loan accrues interest at 10% per annum.

LFDN has loans outstanding payable to four unrelated parties which aggregate $463,117 at December 31, 2006. These loans are all payable on demand and do not provide for interest.

As of December 31, 2005, LFDN had a loan payable to a related party of $211,440. This loan is payable on demand and provides for interest of 12% per annum. This loan was repaid during 2006.

As of December 31, 2006, Brilliant owed its Chief Executive Officer and another director/shareholder $1,190,960 related to advances and accrued salaries. These advances are payable on demand and do not provide for interest. This balance is included in due to related parties on the accompanying consolidated balance sheet.

<Page>

F-32

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 8 - INCOME TAXES

There is no provision for income taxes for the years ended December 31, 2006 and
2005, as a result of net operating losses incurred during those years.

The net operating losses from October 1, 1999 to December 31, 2006 approximated
$30.2 million. Substantially all of these net losses are related to the
Company's operations in Australia and Germany and these net operating losses may
not be used to offset future taxable income in the United States. Utilization of
this carryover is dependent upon future income. The tax benefit of net operating
losses and temporary difference of $7.9 million (principally stock based
compensation) has been fully reserved by a valuation allowance of approximately
$13 million.

As of December 31, 2006, the Company had available approximately $9.9 million of
net operating losses for income tax purposes that may be carried forward to
offset future U.S. taxable income, if any. The net operating losses expire
during the period 2019 through 2025. Pursuant to Section 382 of the Internal
Revenue Code ("IRS"), substantial restrictions are imposed on the utilization of
net operating losses carryforwards in the event of an ownership change. Prior to
the merger with LTDN, Brilliant had a net operating loss carryforward of
approximately $12 million. Utilization of this carryover is limited based on IRS
Section 382 and is dependent upon future income earned by the former businesses
of Brilliant.

The increase in the valuation allowance for 2006 and 2005 was approximately
$4.6 million and $1.4 million, respectively.

A reconciliation between the statutory federal income tax rate (34%) and the
effective rate is as follows:

Case 1:07-cv-06571-SAS    Document 7-6    Filed 08/14/2007    Page 126 of 143

Page 124 of 332

|  | For the Years Ended December 31, | |
|  | 2006 | 2005 |
| Federal statutory rate | (34)% | 34% |
| Unutilized foreign losses | 2 | 74 |
| Permanent differences substantially consisting of gain on derivative obligations and non-deductible interest expense | (1) | (189) |
| Increase in valuation allowance | 33 | 81 |
| Effective rate | -0-% | -0-% |

The Company is delinquent in its filings of its 2004 and 2005 tax returns.

NOTE 9 - STOCKHOLDERS' EQUITY

PREFERRED STOCK

The Company has authorized 1,000,000 shares of preferred stock, par value $.001 per share. The Board of Directors of the Company has broad discretion to create one or more series of preferred stock and to determine the rights, preferences and privileges of any such series.

As described in Note 1, the Company has designated 950,000 shares of Series A Convertible Preferred Stock. In connection with the Merger and Recapitalization between BRILLIANT and LTDN (Note 1), 193,336 shares of Series A Convertible Preferred Stock were issued to the stockholders of LTDN and 50,000 shares were issued to the stockholders of BRILLIANT.

During February of 2005, the Company issued a former consultant 10,538 shares of its Series A Convertible Preferred Stock as part of the consideration in the settlement of accrued consulting fees (Note 10).

F-33

http://www.sec.gov/Archives/edgar/data/1054825/000101968707001189/000101969687-07-001189.txt

7/18/2007

&lt;Page&gt;

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 9 - STOCKHOLDERS' EQUITY (CONTINUED)

PREFERRED STOCK (CONTINUED)

During March 2005, the Company issued 375 shares of Series A Convertible
Preferred Stock, valued at $22,500, to a party as a finders fee relating to
financings the Company entered into during the first quarter of 2005.

In August 2005, the Company issued 1,875 shares of its Series A Convertible
Preferred Stock to an investor in connection with certain amendments to the 9%
Convertible debentures previously issued to such investors. The Company recorded
a charge of $60,000 which was charged to financing expense.

In September 2005, the Company issued 10,000 shares of its Series A Convertible
Preferred Stock as a finder's fee to a finder in connection with the Company's
acquisition of LITDN. The Company recorded a charge of $320,000 which was charged
to financing expense during the year ended December 31, 2005.

In September 2005 the Company issued to certain affiliates of its chief
executive officer 28,205 shares of the Company's Series A Convertible Preferred
Stock upon the exercise of Preferred Stock warrants at an aggregate exercise
price of $460,653 The exercise price of $460,653 was satisfied by a reduction of
the debt due to the executive officer.

At the Annual Meeting of Stockholders held on September 26, 2005, the
stockholders approved an amendment to the articles of incorporation of BRILLIANT
whereby the number of shares of common stock authorized for issuance by the
Company was increased from 100,000,000 shares to 800,000,000 shares.
Accordingly, as a result of this stockholder approval, 293,406 shares of the
Company's Series A Preferred Stock automatically converted into 117,731,600
shares of the Company's Common Stock pursuant to terms of the merger agreement.

COMMON STOCK ISSUANCES FOR THE YEAR ENDED DECEMBER 31, 2005

During February 2005, the Company issued to the President and Chief Executive
Officer of the Company 523,811 shares of Common Stock as a bonus valued at
$78,571.

During February 2005, the Company issued to a Director of the Company 380,952 shares of Common Stock as a bonus valued at $57,142.

During February 2005, the Company issued to a former consultant 1,692,388 shares of Common Stock registered on Form S-8 and 10,538 shares of the Company's Series A Preferred Stock in settlement of $1,016,000 of accrued consulting fees.

During February 2005, the Company issued 187,500 shares of common stock to a consultant for services provided valued at $36,000. During March 2005, the Company sold to several investors 1,050,000 shares of Common Stock for $104,565.

During May 2005, the Company issued 276,394 shares of Common Stock to a consultant for services provided valued at $35,931.

During June 2005, the Company entered into a conversion agreement with a debt holder whereby the Company issued 1,971,428 shares of restricted Common Stock as full and final payment of $138,000 of accrued liabilities.

F-34

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 9 - STOCKHOLDERS' EQUITY (CONTINUED)

COMMON STOCK ISSUANCES FOR THE YEAR ENDED DECEMBER 31, 2005 (CONTINUED)

During June 2005, the Company issued 312,500 shares of Common Stock to a consultant for services provided valued at $37,500.

During April 2005, the Company sold to an investor 250,000 shares of Common Stock for $25,000.

During June 2005, the Company issued to an officer 2,000,000 shares of its Common Stock pursuant to a June 30, 2005 Bonus Inceptive arrangement. The officer is also entitled to be issued up to 1,000,000 shares of Common Stock

upon additional milestones being reached. The total value of the 2,000,000 shares issued was $260,000, which was charged to operations during the year ended December 31, 2005.

During July 2005, the Company issued to an officer 333,000 shares as an incentive bonus. The total value of the 333,000 shares was $33,333, which was charged to operations during the year ended December 31, 2005.

During July 2005, the Company issued 300,000 shares of Common Stock to a consultant for services provided valued at $33,000.

During August 2005, the Company issued to an officer 333,000 shares as an incentive bonus. The total value of the 333,000 shares was $36,667, which was charged to operations during the year ended December 31, 2005.

During September, 2005, the Company issued 70,000 shares of its Common Stock for legal services to one of the Company's law firms valued at $9,100, in connection with a legal settlement discussed in Note 10.

In November 2005, the Company issued to an officer 334,000 shares as an incentive bonus valued at $33,400.

During November 2005, the Company issued 2,500,000 shares of its common stock for services provided by a third party valued at $250,000.

In December 2005, various shareholders exercised warrants to purchase 17,098,043 shares of Common Stock resulting in proceeds to the Company aggregating $697,979.

In December 2005, the Company issued 208,333 shares of its Common Stock, valued at $20,833, in connection with a 2005 financing transaction.

COMMON STOCK ISSUANCES FOR 2006

During the period from January 1, 2006 through March 31, 2006, various holders of Warrants exercised warrants and purchased 9,161,802 shares of Common Stock resulting in proceeds of $368,510.

On January 26, 2006, the Company issued 21,795,061 shares of Common Stock in connection with the settlement of claims made by certain former stockholders of LTDN. These stockholders claimed that they were entitled to receive more shares of Common Stock in connection with the merger with Brilliant. At December 31, 2005, the Company recorded a liability of $2,200,000 related to the settlement of these claims.

F-35

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 9 - STOCKHOLDERS' EQUITY (CONTINUED)

COMMON STOCK ISSUANCES FOR 2006 (CONTINUED)

During the quarter ended March 31, 2006, $1,196,500 principal amount of
Convertible Debentures, including related interest of $106,685, were converted
and 28,268,178 shares of Common Stock were issued pursuant to these conversions.

In connection with a Support Agreement entered into on November 17, 2005 between
the Company and one of its stockholders, Aperchance Ltd. ("Aperchance"), in
consideration of inducing Aperchance to exercise their Warrants to purchase
4,841,200 shares of Common Stock, the Company provided Aperchance with certain
price protection on shares of Common Stock held by Aperchance. The price
protection guarantee took effect during February of 2006. As a result of a stock
price decline in 2006, the Company was required to issue an additional 5,630,075
shares of Common Stock to Aperchance.

During the quarter ended March 31, 2006, the Company issued to five of its
existing stockholders 8,221,800 shares of Common Stock for services valued at
$904,398.

During the quarter ended March 31, 2006, the Company issued 8,236,000 of shares
for services related to financing activities valued at $873,460.

During the quarter ended March 31, 2006, the Company issued 16,183,333 shares of
its Common Stock valued at $1,277,325 pursuant to various one-year consulting
agreements with four of its stockholders.

During the quarter ended June 30, 2006, the Company issued 3,700,000 of shares
of Common Stock for services valued at $73,677.

During the quarter ended June 30, 2006, $1,095,500 principal amount of Convertible Debentures and related accrued interest of $3,980 were converted and 72,894,981 shares of Common Stock were issued pursuant to these conversions.

During the quarter ended September 30, 2006, the Company sold 10,000,000 shares of Common Stock for $310,000.

During the quarter ended September 30, 2006, various holders of warrants exercised Warrants and purchased 49,734,679 shares of Common Stock resulting in proceeds of $1,989,387 of which $510,455 was received in the third quarter with the remaining $1,478,932 to be received in the fourth quarter.

During the quarter ended September 30, 2006, the Company issued 38,802,195 shares for services related to financing activities valued at $1,164,066.

During the quarter ended September 30, 2006 the Company issued 45,500,000 of shares of Common Stock for services valued at $1,145,000.

During the quarter ended September 30, 2006, $420,000 principal amount of Convertible Debentures and $-0- of related accrued interest were converted and 29,984,095 shares of Common Stock were issued pursuant to this conversion.

During the quarter ended December 31, 2006, the Company issued 750,000 shares for services related to the issuances of Bridge Loans value at $40,500.

During the period October 1, 2006 through December 31, 2006, the Company issued 12,500,000 for services valued at $482,704.

F-36

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 9 - STOCKHOLDERS' EQUITY(CONTINUED)

COMMON STOCK ISSUANCES FOR 2006 (CONTINUED)

During the period from October 1, 2006 through December 31, 2006, $283,000 principal amount of Convertible Debentures including related interest and penalty of $214,922 were converted and 19,210,243 number of shares of Common Stock were issued pursuant to these conversions.

During the period from October 1, 2006 through December 31, 2006, $100,000 of accrued interest was converted and 2,792,889 number of shares of Common Stock were issued pursuant to these conversions.

During the quarter ended December 31, 2006, the Company issued 11,000,000 shares of common stock for $211,000.

2005 EQUITY INCENTIVE PLAN

At the Annual Meeting of Stockholders held on September 26, 2005, the stockholders approved the Brilliant Technologies Corporation 2005 Equity Incentive Plan (the "Incentive Plan").

A maximum of 15,000,000 shares of common stock may be delivered in satisfaction of awards made under the Incentive Plan. In the event of a stock dividend, stock split or other change in the capital structure of the Company, the person (the Company's Board or committee of such Board, and their delegates) charged with administering the Incentive Plan (the "Administrator") will make appropriate adjustments to the maximum number of shares available under the Incentive Plan and will also make appropriate adjustments to the number and kind of shares of stock or securities subject to awards, any exercise prices relating to awards and any other provisions of awards affected by the change. The Administrator may also make similar adjustments to take into account other distributions to stockholders or any other event, if the Administrator determines that adjustments are appropriate to avoid distortion in the operation of the Incentive Plan and to preserve the value of awards.

No shares of Common Stock were issued under this Plan during 2005 or 2006.

F-37

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES

&lt;Page&gt;

(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 9 - STOCKHOLDERS' EQUITY (CONTINUED)

STOCK OPTION PLANS

On October 26, 2000, the Board of Directors adopted the Brilliant Technologies
Corporation 2000 Stock Option Plan ("Plan"). During 2002, the Board of Directors
and the majority stockholders amended the Plan to increase the number of shares
that are subject to Incentive stock Options, from 3,000,000 to 5,000,000.

The following is a summary of options issued under the above plans and outside
the plans:

<TABLE>
<CAPTION>

| | INCENTIVE STOCK OPTIONS | WEIGHTED AVERAGE EXERCISE PRICE | NON-QUALIFIED STOCK OPTIONS | WEIGHTED AVERAGE EXERCISE PRICE |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Options outstanding at date of merger (December 15, 2004) | 470,000 | $0.34 | 1,242,777 | $0.28 |
| Outstanding 12/31/05 and 12/31/06 | 470,000 | $0.34 | 1,242,777 | $0.28 |
| Composition at 12/31/06: | | | | |
| 2000 stock option plan | 470,000 | 0.34 | 305,000 | $0.34 |
| Options granted outside the plan | -- | -- | 937,777 | 0.22 |
| Outstanding 12/31/06 | 470,000 | $0.34 | 1,242,777 | $0.28 |
| Total Number and Potential Proceeds Assuming All Exercised | 470,000 | $159,800 | 1,242,777 | $310,011 |

</TABLE>

The incentive stock options expire in 2010 and the non-qualified stock options

expire in 2009.

As of December 31, 2006, there was no unrecognized compensation cost related to non vested stock option awards, which is to be recognized over the remaining weighted average vesting period of eight months.

WARRANTS

At December 31, 2006, there were outstanding warrants to purchase 1,000,000 shares of Common Stock at $0.165 per share (the "Old Warrants"), outstanding Warrants issued to the LYDN shareholders (the "LYDN Warrants") to purchase 107,884,680 shares of Common Stock at an exercise price of $0.04 per share and there were outstanding Debenture Warrants to purchase 44,928,570 shares of Common Stock at an exercise price of $0.10 per share and outstanding Debenture and Note warrants to purchase 76,683,280 shares of Common Stock at an exercise price of $0.07 per share. Each Old Warrant is exercisable until December 19, 2008. Each Debenture Warrant is exercisable until the second anniversary of the effective date of the registration statement registering the shares of Common Stock issuable upon exercise of the Debenture Warrants. The Note warrants are exercisable over a five-year period.

During the year ended December 31, 2006, various holders of LYDN warrants exercised warrants and purchased 58,896,477 shares of Company's Common Stock resulting in proceeds of $2,357,897, all of which was received in 2006.

F-38

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 9 - STOCKHOLDERS' EQUITY (CONTINUED)

WARRANTS (CONTINUED)

The following is a summary of the Company's warrant activity:

<Page>

http://www.sec.gov/Archives/edgar/data/1054825/000101968707001189/0001019687-07-001189.txt

```
<TABLE>
<CAPTION>
```

| | COMPENSATORY WARRANTS | DEBENTURE AND NOTE WARRANTS | LTDN WARRANTS | WEIGHTED AVERAGE EXERCISE PRICE |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Outstanding January 1, 2005 | 1,000,000 | -- | 195,161,200 | $ .04 |
| Issued | -- | 39,214,285 | -- | .10 |
| Cancelled | | | | |
| Exercised | -- | -- | (28,380,043) | .04 |
| Balance December 31, 2005 | 1,000,000 | 39,214,285 | 166,781,157 | $ .05 |
| Issued | -- | 82,397,565 | -- | .07 |
| Cancelled | -- | -- | -- | -- |
| Exercised | -- | -- | (58,896,477) | .04 |
| Balance December 31, 2006 (all excercisable) | 1,000,000 | 121,611,850 | 107,884,680 | $.06 |
| Potential proceeds assuming all exercised | $ 165,000 | $ 9,860,687 | $ 4,315,387 | $ 14,341,074 |

```
</TABLE>
```

EARNINGS PER SHARE

Securities that could potentially dilute basic earnings per share ("EPS") in the future that were not included in the computation of diluted EPS because to do so would have been anti-dilutive for the periods presented consist of the following:

|  | |
|---|---|
| Bridge loans | (a) 38,274,854 |
| Convertible Debentures | (b) 42,923,976 |
| Options to purchase Common Stock | 1,712,777 |

Warrants to purchase Common Stock                    230,496,530
                                                    ------------

Total as December 31, 2006                          313,409,137
                                                    ============

(a)  $1,636,000 / $.0428 (75% of market price at December 31, 2006
     for note in default).
(b)  $1,835,000 / $.0428 (75% of market price at December 31,
     2006).

Substantial issuances after December 31, 2006:

Note warrants                                        58,000,000
Common Stock issued and issuable to consultants      7,750,000

The Company will not have sufficient Common shares available to issue should all
of the above conversions and exercises occur. Accordingly, the Company may have
to settle these contracts in cash if they are not successful in increasing the
authorized number of shares (Note 12).

                              F-39


<Page>

              BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
                        (A Development Stage Company)

                 NOTES TO CONSOLIDATED FINANCIAL STATEMENTS


NOTE 10 - COMMITMENTS AND OTHER MATTERS

CONSULTING AND EMPLOYMENT AGREEMENT

During October 2005, the Company entered into a one-year consulting agreement
with a stockholder which provides for monthly payments of approximately $12,000.
The agreement is automatically renewable for an additional year, unless both
parties mutually agree not to renew. As of December 31, 2006, amounts owed to
such individual approximated $186,000.

During October 2006, the Company entered into an employment contract with an individual to act as Chief Operating Officer with an annual base salary of $333,000. As of December 31, 2006, amount owed under this agreement is $83,250. In April of 2007, the COO resigned and the Company accepted his resignation "with Regret" (see Note 12).

COMPENSATION AGREEMENT

Pursuant to a 2005 compensation arrangement, the Company's Chief Executive officer is being paid a salary of $275,000 per annum plus an expense allowance of approximately $7,600 per month. Accrued amounts under this agreement total $365,000 as of December 31, 2006.

RUSSIAN CONTRACTS FOR RESEARCH AND DEVELOPMENT

The Company is a party to a research and development agreement with a Moscow-based State Scientific Research Institute Scientific Production Company named Lutch pursuant to which such entity has agreed to perform various contract research and development services related to technology obtained by the Company for a total price of $985,000. The Company paid $100,000 in a previous year under this agreement and was recorded as research and development expense. As a continued result of limited funding, no services have been performed under this agreement to date. It is uncertain when or if any services will eventually be completed under this contract.

The Company is a party to a research and development agreement with a branch of the Ministry of the Atomic Energy of the Russian Federation pursuant to which such entity has agreed to perform various contract research and development services to develop an industrial fireproof swelling cable coating for a total price of $462,000. As a result of limited funding of this contract, the performance of services were rescheduled to occur commencing with the quarter ended December 31, 2003 and to be completed within one year. The work under the contracts has not been completed as of December 31, 2006 and at this time the completion date can not be determined as a continued result of limited funding.

ACQUISITION OF IN-PROCESS TECHNOLOGIES

In connection with an oral agreement, the Company has agreed to acquire the rights to certain in-process technologies now held by a German bank, for an estimated purchase price of $500,000 payable in cash and/or common stock. Management of the Company has indicated that this transaction is expected to close during 2007 although there is no assurance it will be consummated. As of December 31, 2006, LFDN has paid $352,089 to the German bank as part of this oral agreement.

<Page>

F-40

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 10 - COMMITMENTS AND OTHER MATTERS (CONTINUED)

LEGAL DISPUTES

During the quarter ended June 30, 2003, the Company was notified that Dr. Jurgen
Lempert intended to commence legal proceedings against Brilliant relating to his
termination as Chief Executive Officer of Brilliant Nuklear. A German court
ruled that Dr. Lempert is entitled to collect $69,629. As of December 31, 2006,
the Company has accrued such amounts.

Donenfeld, a note holder, has initiated legal proceedings agains the Company in
the Supreme Court of New York claiming non-payment. The Company has issued a
counter-claim. Management believes that the eventual outcome of these matters
will not have a material adverse effect in our consolidated financial position,
results of operations, or cash flows.

TPG Capital have filed for arbitration against the Company regarding a purported
reset provision in an agreement entered into during 1999. TPG believes it is
entitled to receive an additional 1,465,671 shares of Common Stock under an
agreement previously executed between the parties. Should litigation arise,
the Company believes that it has sufficient defenses and intends to vigorously
defend itself against such claims.

Dr. Alexander Kaul, former Chairman of the Supervisory Board of Brilliant
Nuklear, initiated legal proceedings against Brilliant for monies he believes
are due him under his terminated employment contract. A German court ruled that
Dr. Kaul is entitled to collect approximately $67,808. As of December 31, 2006,
the Company has accrued such amounts.

Peter Goerke, a former Vice President of Brilliant, initiated legal proceedings

against Brilliant for the value of his remaining employment agreement, accrued wages and expenses. A German court ruled that Mr. Goerke is not entitled to the remaining value of his employment contract and is only entitled to collect approximately $197,486. At December 31, 2006, Brilliant has accrued such amount. Mr. Goerke has filed for a lien against certain assets of Cetoni Umwelttechnologie Entwicklungs GmbH ("Cetoni"), one of Brilliant's wholly owned subsidiaries.

Cnet Networks, Inc. initiated proceedings against LTDN for amounts due it by a former third party affiliate of LTDN. During June 2005, Cnet Networks, Inc. received a judgment in the amount of $100,000 against LTDN. LTDN believes that it is not liable for this amount and intends to appeal the verdict. Additionally, LTDN believes that it has a cause of action against Cnet Networks, Inc. relating to a breach of contract and other claims relating to a contract between it and Cnet Networks, Inc. As of December 31, 2006, LTDN accrued $100,000 related to this judgment.

A German court has suspended the corporate registration of Cetoni. The Company does not intend to appeal this decision as it is consistent with the restructuring of all German operations. The Company does not believe this ruling will have a material impact on the Company's operations as Cetoni no longer has any significant tangible or intangible assets.

The Company may be subject to additional litigation during its normal course of operations. Management believes that the eventual outcome of these matters will not have a material adverse effect on the Company's consolidated financial position, results of operations, or cash flows.

OFFICE LEASES

The Company rents office space under month-to-month rental agreements. Rent expense for the facility for the years ended December 31, 2006 and 2005 amounted to $217,855 and $195,818, respectively.

F-41

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

<Page>

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 10 - COMMITMENTS AND OTHER MATTERS (CONTINUED)

LIEN ON STAR CAN PATENTS

During June 2003, the Company became aware that a lien had been placed against the patents relating to the Reseal Technology by Paxsys Ltd., a Bermuda corporation, in connection with a failed financing. The Company continues to dispute the validity of the claim.

SETTLEMENT WITH FORMER LTD SHAREHOLDERS

On January 26, 2006, the Company issued 21,795,061 shares of Common Stock in connection with the settlement of claims made by certain former stockholders of LTDN. These stockholders claimed that they were entitled to receive more shares of Common Stock in connection with the merger with BRILLIANT. At December 31, 2005, the Company recorded a liability of approximately $2,200,000 related to the settlement of these claims.

SUPPORT AGREEMENT

In connection with a Support Agreement entered into on November 17, 2005 between the Company and one of its stockholders, Aperchance Ltd. ("Aperchance"), in consideration of inducing Aperchance to exercise their Warrants to purchase 4,841,200 shares of Common Stock, the Company provided Aperchance with certain price protection on shares of Common Stock held by Aperchance. The price protection terminated in February of 2006. As a result of stock price decline in 2006, the Company has issued an additional 5,630,075 shares of Common Stock to Aperchance.

PERIODIC FILINGS

Under a 2005 rule change, OTC Bulletin Board ("OTCBB") issuers that are cited for filing delinquency three times in a 24-month period and those removed for failure to file two times in a 24-month period will be ineligible for quotation by an NASD member. Following removal under this new rule, an issuer's securities would again become eligible for quotation on the OTCBB when the issuer has filed periodic reports for one year in a timely manner.

The Company has been late in three of its periodic filings with the Securities and Exchange Commission ("SEC") during 2006, of which the December 31, 2006 10-KSB was the last late filing. Accordingly, currently the Company is

ineligible for quotation by an NASD member. The Company has requested a hearing with NASD to see if the Company can continue to be listed as an NASD member. If the Company is not successful at the hearing, the Company will remain listed on the "Pink Sheets."

NOTE 11 - SEGMENT REPORTING

The Company's business is organized on a geographic basis, and the Company's Chief Operating Decision Maker assesses performance and allocates resources on this basis. The information provided in the following section is representative of the information used by the Chief Operating Decision Maker in deciding how to allocate resources and in assessing performance.

The Company has three geographic reportable segments: United States of America (U.S.A.), Australia and Germany. The accounting policies of the segments are the same as described in the summary of significant accounting policies. The Company evaluates segment performance based on net income (loss).

F-42

<Page>

BRILLIANT TECHNOLOGIES CORPORATION AND SUBSIDIARIES
(A Development Stage Company)

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 11 - SEGMENT REPORTING (CONTINUED)

Segment results for the years ended December 31, 2006 and 2005 are as follows:

<TABLE>

| 2006: | U.S.A. | Australia | Germany | Eliminations | Consolidated |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Net income (loss) | $ (13,257,090) | $ (981,859) | $ -- | $ -- | $ (14,238,949) |
| Depreciation and amortization | $ -- | $ 31,733 | $ -- | $ -- | $ 31,733 |
| Identifiable assets | $ 1,823,739 | $ 678,186 | $ 109 | $ -- | $ 2,502,034 |

2005

| | | | |
|---|---|---|---|
| Net income (loss) | $ 5,554,533 | $ (3,684,736) | $ (118,804) | $ --- | $ 1,750,993 |
| Depreciation and amortization | $ --- | $ 32,276 | $ 52,164 | $ --- | $ 84,440 |
| Identifiable assets | $ 44,281 | $ 1,019,507 | $ 1,098 | $ --- | $ 1,064,886 |

</TABLE>

NOTE 12 - SUBSEQUENT EVENTS

On March 7, 2007, Leslie Dick Worldwide, Ltd filed a complaint in the Supreme
Court of the State of New York against us. Such complaint relates to claims for
breach of contract. The Company has counterclaimed against the petitioner.
Management believes that the eventual outcome of these matters will not have a
material adverse effect on our consolidated financial position, results of
operations, or cash flows.

Subsequent to year end the Company issued 750,000 of common shares in settlement
for liabilities in the amount of $37,000 related to consulting expenses incurred
in 2004. The Company also issued shares in the total amount of 2,546,901 related
to the conversion of convertible debt and note payable including accrued
interest totaling $75,000. Shares totaling 819,672 were also issued upon the
conversion of convertible debt and incurred interest totaling $25,000.

Subsequent to year end, the Company entered into a consulting agreement for
management and financial consulting services for a period of seven months in
exchange for 3,000,000 restricted shares of the Company's stock.

During the quarter end March 31, 2007 the Company received proceeds from Bridge
Notes of approximately $895,000, in consideration for 10 million restricted
shares of the Company's stock and approximately 60 million warrants exercisable
at prices ranging from $.07 to $.36. The terms of these notes are substantially
the same as the Bridge Notes described in Note 7.

On March 14, 2007, the Company filed a definitive proxy pursuant to which the
shareholders will vote on an increase in the number of authorized common shares
from 800 million to 1.5 billion.

On April 17, 2007, the Company entered into a separation agreement with its current COO. The agreement requires the Company to pay approximately $250,000 due May 30, 2007 and 4,000,000 shares of the Company's Common Stock.

F-43

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-4.85
<SEQUENCE>2
<FILENAME>brilliant_10kex-0485.txt
<DESCRIPTION>FORM OF WARRANT DATED DECEMBER 15, 2006
<TEXT>
<PAGE>
```

EXHIBIT 4.85

BRIDGE LOAN AGREEMENT

THIS BRIDGE LOAN AGREEMENT, dated as of December 15, 2006, is entered into by and between BRILLIANT TECHNOLOGIES CORPORATION, a Delaware corporation with headquarters located at 211 Madison Avenue, New York, New York (the "Company"), and the entity named on an executed counterpart of the signature page hereto (the "Buyer").

WITNESSETH:

WHEREAS, the Company and the Buyer are executing and delivering this Agreement in accordance with and in reliance upon the exemption from securities registration for offers and sales to accredited investors afforded, INTER ALIA, by Rule 506 under Regulation D ("Regulation D") as promulgated by the United States Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended (the "1933 Act"), and/or Section 4(2) of the 1933 Act; and

WHEREAS, the Buyer wishes to lend funds in the amount of the Purchase Price (as defined below) to the Company, subject to and upon the terms and conditions of this Agreement and acceptance of this Agreement by the Company, the repayment of which will be represented by a Promissory Note of the Company (the "Note"), on the terms and conditions referred to herein; and